PRESENTATION BY MR. MICHAEL COOK, VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT, FLORIDA POWER AND LIGHT

MR. COOK: Thank you. Before I get into my testimony, there are prepared copies available to you, and I will elaborate and amend to some extent that. And I would like to thank you also for having given us, Florida Power and Light, the opportunity to meet previously with the staff to negotiate on the specific terms of the Florida Power and Light contract as well.

For the record, I am Michael Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power and Light.

Among my duties is contracting for the elements of the nuclear fuel cycle in support of our four nuclear plants. And certainly the safe disposal of the spent nuclear fuel and high level waste is a major concern to our company and the 2.4 million customers we serve.

There are six areas I would like to discuss, specifically, and before I go into that though I would like to comment that, in general, Florida Power and Light Company endorses the extensive efforts made by the Edison Electric Institute and the Utility Nuclear Waste Management Group in the preparation of written comments on this contract.

The utility industry recognizes the great importance of this rule making and has mounted an extensive

effort to provide significant input into this document, using the expertise of the entire industry. These comments that you will be receiving represent a broad consensus of opinion on what is required to most effectively implement the activities mandated by the Act. And I think the Department should recognize these as a very serious and honest effort and give them extremely heavy weight in determining the final contract language.

Florida Power and Light will also provide detailed comments on the draft contract, and I expect, in general, to adopt the EEI/UNWMG comments in addition to those I previously submitted to the Department. And, in fact, if any inconsistencies exist between the previous comments I made and those that you will be receiving from EEI/UNWMG, I would actually give preference to the EEI version since they do represent the industry concensus.

But let me now take this opportunity to comment on six areas which I think are very significant. And I would invite you, in fact, if you want to ask questions on any of these areas, if it's more convenient for you, to go ahead and interrupt as I cover the issues.

One of these important areas is performance standards. In general, it's a feature of all contracts to include a description of what's to be done by the party, when the specific activities are to be performed, and the

remedy in the event of nonperformance of the party.

The proposed contract is actually silent or, in some cases, vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste and do this through the Department of Energy. It, in fact, requires the Department of Energy to prepare a Mission Plan detailing its schedule for the construction of repositories and their capacities.

And what I'm proposing is that once this Mission Plan has been approved by the Congress it become the standard by which the contract performance by the Department of Energy is judged.

And what I'm suggesting is that Article V B (3) of the contract be modified to include a statement such as: "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal costs incurred by the Purchaser."

This approved Mission Plan and the annual acceptance ranking for the spent nuclear fuel will be the basis on which the utilities will plan their commitments of

resources for interim storage, if necessary, in order to meet their own projected discharge requirements. Without a provision of the type I've suggested requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities could be forced into the unenviable position of having to make emergency expenditures for interim storage many years after the fuel is actually consumed, while continuing to pay millions in mandated fees to the Waste Disposal Fund.

Yet, since the utility regulatory commissions generally will have provided for a recovery of spent fuel disposal costs in prior periods, the utilities might be faced with being unable to recover these additional unanticipated costs from their customers.

So I think it's less more equitable for the Department to cover all the costs incurred because of any DOE schedule slippage, regardless of the cause of the slippage, using money in the Nuclear Waste Dispoal Funds, and then to replenish the Fund if necessary through fee adjustments on future generation in the manner provided in the Act.

The second issue I'd like to discuss is the fee for spent nuclear fuel discharged before April 7th, 1983, and there are several aspects there. One of these is that it's very important the fee be fixed as of April 7th, 1983 so that

83-1-1

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY

| | | |
|---|---|---|
| In the Matter of<br>10 CFR Part 961 —<br>Standard Contract for Disposal of Spent Fuel and/or High Level Radioactive Waste | ) | 48 Fed. Reg. 5458 |

STATEMENT OF
M.C. COOK
VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT
ON BEHALF OF
FLORIDA POWER & LIGHT COMPANY

MARCH 1, 1983

I am Michael C. Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power & Light Company. Among my duties is contracting for all elements of the nuclear fuel cycle in support of our four nuclear power plants. The safe disposal of spent nuclear fuel and high level waste is a major concern of our Company and the 2.4 million Floridians we serve.

I want to briefly discuss six areas of concern with respect to the draft disposal contract:

1. Need for a performance standard;
2. Fee basis for spent nuclear fuel discharged prior to April 7, 1983;
3. Requirement for flexibility in the disposal contract;
4. Relationships with existing contracts for disposal obligations;
5. Indemnification; and
6. Credits for activities performed to reduce DOE's responsibilities and costs.

this opportunity to speak about the following major areas which need additional refinement:

## 1.0 PERFORMANCE STANDARDS

A common feature of all contracts is a description of what is to be done by each party, when the specific activities will be performed, and remedies in the event of nonperformance by a party. The proposed disposal contract is silent or at best vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste in an expeditious manner on a timetable which would relieve the uncertainty associated with the present situation. The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

The approved Mission Plan and the annual acceptance ranking for receipt of

SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements. Without the proposed provision requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities may be forced into the unenviable position of having to make emergency expenditures for interim storage many years after fuel is consumed, while continuing to pay millions in mandated fees to the Nuclear Waste Disposal Fund. Since utility regulatory commissions generally will have provided for spent fuel disposal costs in prior periods, the utilities may not be able to recover such additional unanticipated costs from their customers. It thus would be more equitable for the DOE to cover all costs incurred because of any DOE schedule slippage, using money in the Nuclear Waste Disposal Funds, and to then replenish the fund if necessary through fee adjustments on future generation as provided in the Act.

## 2.0 FEE FOR SPENT NUCLEAR FUEL DISCHARGED PRIOR TO APRIL 7, 1983

This issue has three aspects.

First, the fee must be fixed as of April 7, 1983, so that utilities in conjunction with regulatory bodies may provide for the orderly collection and payment of this fee for fuel previously utilitized.

Secondly, the fee must bear some relationship to the relative cost of disposal while at the same time satisfying the Nuclear Waste Policy Act requirement that "such fee shall be in an amount equivalent to an average charge of one mil per kilowatt hour for electricity generated by such spent nuclear fuel." We are in favor of the three tier approach based on exposure which has been presented in the DOE draft contract (Article XIII). This approach is the most

83-1-9

NSP

Northern States Power Company

414 Nicollet Mall
Minneapolis, Minnesota 55401
Telephone (612) 330-5500

March 3, 1983

Mr Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Dear Mr Morgan:

Northern States Power Company has reviewed the Draft Waste Disposal Contract and respectfully submits the following comments:

(1) DOE commitment -

"The context of the contract is inverted. Rather than a context of spent fuel "delivery commitments" as a binding obligation placed upon the utility, the contracts should be restated as in terms of "acceptance commitments" as a binding obligation placed upon DOE.

In this case, the utilities are making payments in advance for a "prospective service", rather than arranging in advance for a service for which "prospective payments" are to be made upon receipt of the service. Therefore, the context of the contract should be stated in terms of DOE "acceptance commitments", as the operative contract obligation in return for payments received.

Further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel and high level waste at the earliest practicable time upon the request of the owner or generator of such fuel and waste."

(2) Determination of fee for spent nuclear fuel discharge prior to April 7, 1983 -

Northern States Power Company feels the preferred calculation of the above fee is by determining the average burnup of all discharged fuel prior to April 7, 1983, calculating the dollar per kilogram for that average burnup equivalent to one mil per kilowatt hour, and applying that dollar per kilogram charge to all discharged fuel. We feel this method most closely follows the intent of the enacted legislation.

(6) Effective date for fees charged on electricity generated after April 6, 1983 -

The Purchaser should be allowed to prorate charges accumulated during the month of April on electricity generated over the Purchaser's normal accounting monthly time period to eliminate the possibility of requiring the Purchaser to maintain two sets of books. Such total prorated charge for the month of April shall be equivalent to the charges that would have been accrued if the effective date of the charges commenced on April 7, 1983.

(7) Audit rights covering the program and administration of the Waste Fund -

The Purchaser or its representative should have the right to perform any reasonable audits or inspections necessary to monitor DOE's conduct of the waste disposal program and the operation of the Nuclear Waste Fund.

(8) Costs of Military and Civilian Waste Programs -

Northern States Power Company feels accounting and control procedures should be established to separate all costs associated with the development and operation of the Military Waste Program from the Civilian Program. The Purchaser, should be assured, under the contract, that he will not bear any of the costs of the Military Waste Program in his fees.

(9) Exchanges of approved delivery commitment schedules among and within utilities -

The Purchaser should have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of Spent Nuclear Fuel and/or High Level Waste.

(10) Acceptance Priority Ranking System -

This system does not readily provide explicit priority to keep reactors operating, provide priority based upon the size of the Purchaser's total Spent Nuclear Fuel inventory, allow for "swapping" of delivery dates, and limits the Purchaser's flexibility as to which Spent Nuclear Fuel or High Level Waste it may ship by allowing the DOE only to accept the oldest Spent Nuclear Fuel and/or High Level Waste first. The contract should take these concerns into consideration.

(11) Annual acceptance allocation reports -

Northern States Power Company feels the Department of Energy should issue annual acceptance allocation reports starting not later than April 1, 1984 These reports are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage.

(19) Interest on late Fee -

Interest should be levied according to the following formula:

$$\text{Interest} = \begin{array}{l}\text{Amount due to DOE}\\ \text{for Assigned Three}\\ \text{Month Period}\end{array} \times \begin{array}{l}\text{Quarterly}\\ \text{Treasury}\\ \text{Rate}\end{array} \times \frac{\text{Day(s) Late}}{\text{365 Days}}$$

(20) Non-Standard Fuel -

There should be only two categories of Spent Nuclear Fuel: (1) F that has to be canned (i.e., Spent Nuclear Fuel that must be encap prior to shipment) and (2) Fuel that does not.

With the above comments [noteable exceptions being comments (2) and (3)] States Power Company generally endorses the positions taken by the joint mittal of the Edison Electric Institute and the Utility Nuclear Waste Ma Group. If I may be of any help or if you wish further clarification of please feel free to contact me.

Sincerely,

D H Peterson
Manager
Fuel Supply Department

vf

83-1-10

Enclosure 1

Omaha Public Power District's (OPPD) Comments Concerning Draft Standard Contract For The Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste

1) The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. OPPD believes that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog.

2) The words "of domestic origin" should be deleted from the first whereas. Domestic origin may be taken to mean only spent nuclear fuel assemblies containing domestic origin uranium. OPPD has purchased and used foreign origin uranium.

3) The "Assigned Three-Month Period" (Article I.1) should be at Purchaser's option.

4) The definitions of both "Commission" (Article I.4) and "DOE" (Article I.10) should be modified to include successor agencies.

5) Since there may be a large positive cash flow to the waste fund for many years, the definition of the term "Full Cost Recovery" in Article I.12 should be expanded to clarify that earnings on revenues invested will be accounted for as part of the income to the fund.

6) "Shipping Lot", defined in Article I.17, should recognize that transportation of a quantity of SNF/HLW will not take place on a specified date, but will begin on a specified date. It shall also be structured in terms of delivery by Purchaser, rather than transportation.

7) "Spent Nuclear Fuel" (Article I.18) is defined in the same language as appears in the Act (Section 2(23). This definition does not explicitly deal with fuel which has been irradiated in the reactor, withdrawn, and stored in the spent fuel pool pending further irradiation in a later cycle. The definition would also characterize fuel which is temporarily off-loaded during an outage as SNF. Including this temporarily withdrawn fuel in the definition of SNF would have significant implications for OPPD's one-time fee since as of April 7, 1983, four partially burned fuel assemblies will be in the spent fuel pool with the intention of reinsertion into the next cycle. The definition should only include spent fuel which is discharged with no intent to later reinsert it in the reactor.

14) Article V.B.2 should require DOE to provide Purchaser with the necessary information, procedures, specifications needed for Purchaser to meet its responsibilities under Article V.A.2(c) to maintain, protect and preserve shipping casks while they are at Purchaser's site. The information should be provided sufficiently far in advance so that Purchaser will be adequately prepared. The provision should also recognize DOE's responsibility for normal cask maintenance and repair. Finally, Article V.B.2 should acknowledge that more than one cask may be involved.

15) Article V.B.5 should be expanded to allow Purchaser or an oversight group of Purchasers to periodically discuss with DOE plans and budgets for the use of Nuclear Waste Fund monies as well as technical briefings on activities supported by the Fund.

16) DOE's obligation to provide Purchaser with program cost projection information (Art. V.B.5) should specifically include a requirement that DOE inform Purchaser at the earliest possible date of a proposed increase in the fee.

17) In Article V.B, to allow Purchasers to plan for spent fuel storage, an annual report should be required which would provide DOE's projected annual receiving capacity and the annual acceptance allocation for all purchasers. The report should present data extending 10 years into the future. The ten year period would be consistent with the annual reports filed by purchasers pursuant to Article V.A.1.

18) If Purchaser has failed fuel which requires encapsulation prior to loading in the shipping cask, DOE should provide the cannisters, to assure that they are compatible with the casks. A new paragraph V.B.7 should be added.

19) The title of Article V.1, "Criteria for Disposal", is a misnomer. The Article sets forth procedures for DOE acceptance of SNF/HLW. A better title would be "Acceptance Procedures". There are essentially no acceptance criteria since DOE is obligated to accept all SNF/HLW. Thus, Article VI.B, now entitled "Acceptance Criteria", is also misnamed. A solution would be to delete the "Vl.B - Acceptance Criteria" as a heading, and change subheadings Vl.Bl, Vl.B.2, and Vl.B3 to Vl.B, Vl.C and Vl.D, respectively.

83-1-11

THE CINCINNATI GAS & ELECTRIC COMPANY

CINCINNATI OHIO 45201

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue SW
Room 7B-084
Washington, D.C. 20585

Re: Notice of Proposed Rulemaking on Standard Contract for Disposal of Spent Nuclear and/or High-Level Radioactive Waste
<u>48 Fed. Reg. 5458 (February 4, 1983)</u>

Dear Mr. Morgan:

On February 4, 1983, the Department of Energy ("DOE") published in the Federal Register (48 Fed. Reg. 5458) a proposed new Part 961 to Title 10 of the Code of Federal Regulations. The Federal Register notice published for comment a proposed standard contract to be used by DOE in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste and DOE's proposed procedures designed to implement §302 of the Nuclear Waste Policy Act of 1982. The proposed regulations would, among other things, establish the rights and duties of DOE and the owners and generators of spent nuclear fuel and/or high-level radioactive waste. The Department of Energy invited interested persons to comment on the proposed rulemaking by March 7, 1983.

The Cincinnati Gas & Electric Company hereby submits the following comments on the draft Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. These comments are divided into two parts. The first part consists of general overview contract comments. The second part consists of detailed contract comments and are provided on an Article by Article basis for the text and appendices.

The proposed contract is comprised of three major areas:

1. Collection of fees from "Purchasers" to fund the Waste Disposal System.

ARTICLE III

7. The phrase "DOE has accepted SNF and/or HLW from" should be changed to "DOE has accepted and received all SNF and/or HLW generated at". This more clearly delineates ownership, generation, and location.

ARTICLE IV

8. In paragraph A., the phrase "for disposal thereof" may be better stated as "for ultimate disposal thereof. This would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrieval Storage prior to permanent disposal.

9. In paragraph B, after DOE's disapproval of the schedule and a Purchasers timely resubmition, a condition might occur in which the new schedule was not acceptable to the DOE. In order to accommodate such a condition, the following sentence should be included, "if this revised schedule is also found unacceptable by the DOE, the two parties shall promptly seek to negotiate a mutually acceptable schedule."

10. In paragraph B, the phrase in the second paragraph "the Purchaser may choose the specific assemblies to be delivered" is not sufficiently restrictive. It would be better in the form, "the Purchaser may substitute SNF/HLW of the same class, quantity and age to be delivered.

ARTICLE V

11. In paragraph A.1, the term "projected" should be replaced with "its best estimate of projected" in order to identfy that these projections may contain significant uncertainty, such as might be due to reactor delays, and that the fact is recognized in the forecast.

12. In paragraph A.1 the term "Purchaser" might better be "Generator".

13. Sentence A.1.b, which unduly penalizes the "Purchaser" if Appendix D is not properly submitted should be eliminated.

14. Sentence V.A.2.c, should be prefaced by, "while in his possession," and the word "maintenance" replaced by "incidental maintenance". In the second sentence, the phrase "except as otherwise provided hereunder" should be replaced by "when such cause of damage is due to Purchaser's negligence or gross negligence."

15. V.B.1 should read "DOE shall review and approve or disapprove delivery commitment in accordance with Aritcle IV.

83-1-12

COMMENTS BY

CONSUMERS POWER COMPANY ON

"CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL

AND/OR HIGH-LEVEL RADIOACTIVE WASTE"

Article I - Definitions

1. "Assigned Three-Month Period," Article I.1. It is not clear whether one three-month period will be assigned covering all of the Purchaser's reactors or one separate period assigned for each reactor. The former appears true from the wording of Paragraph B of Article VIII and the fact that Appendix "A" can cover more than one reactor. Also, defined terms should be used. For clarity the following definition is suggested:

   "The term 'Assigned Three-Month Period' means the period assigned to the Purchaser in paragraph B of Article VIII below for purposes of reporting Kilowatt Hours Generated and Sold that were generated by the Civilian Nuclear Power Reactors indentified in Appendix 'A' and for establishing fees due and payable to DOE."

2. Cask - Article I.2 should more appropriately be worded as follows:

   "The term 'Cask' means a container which meets all applicable regulatory requirements for shipping SNF and/or HLW."

3. The definitions of both "Commission" (Article I.4) and "DOE" (Article I.10) should be modified to include successor agencies.

4. The definition of "Delivery" (Article I.8) should include the concept of "transfer of custody <u>f.o.b. carrier</u>" (Article VI, B.1) and the requirement that DOE not unreasonably withhold its approval of Purchaser's designation of a domestic site other than Purchaser's reactor.