solely responsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

ARTICLE VIII - FEES AND TERMS OF PAYMENT

A. Fees

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s). The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule

are listed low:

| Nuclear Spent Fuel Burnup Range | Dollars per Kilogram (1982 Dollars) |
|---|---|
| 0 - 5,000 MWDT/MTU | $ 80.00 |
| 5,000 - 10,000 MWDT/MTU | $ 142.00 |
| 10,000 - 20,000 MWDT/MTU | $ 162.00 |
| over 20,000 MWDT/MTU | $ 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of uranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans to reinsert. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4. DOE will annually review the adequacy of the fees and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

B. Payment

1. For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983 to June 30, 1983. A one time adjustment period payment shall be due on N/A, for the period N/A to N/A. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin July 1.

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) OPTION 1 - The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee

balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) OPTION 2 - The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the

outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) OPTION 3 - The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

3. Method of Payment

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to "Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

| | | | | | |
|---|---|---|---|---|---|
| Interest = | Unpaid Balance Due To DOE For Assigned Three Month Period | X | Quarterly Treasury Rate Plus Six Percent (6%) | X | Number of Months Late Including Month Of Payment (Fractions Rounded Up to Whole Months) / 12 |

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice for interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

ARTICLE IX - DELAYS

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE -- such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather--- cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

ARTICLE X - SUSPENSION

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion

of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

ARTICLE XI - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

ARTICLE XII - NOTICES

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

U.S. Department of Energy
Procurement and Assistance Management Directorate
Office of Procurement Operations
Washington, D.C. 20585
Attention:
Thomas S. Keefe

To the Purchaser:

The Detroit Edison Company
6400 N. Dixie Highway
Newport, Michigan 48166
Attention: Supervisor, Nuclear Fuel Cycle
308 NOC

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; provided, however, that notice of such changes shall be given by registered mail.

ARTICLE XIII - REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

ARTICLE XIV - ASSIGNMENT

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

ARTICLE XV - AMENDMENTS

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; provided, however, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April 18, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

ARTICLE XVI - DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

ARTICLE XVII - OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

ARTICLE XVIII - COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

ARTICLE XIX - EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

ARTICLE XX - PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

ARTICLE XXI - RIGHTS IN TECHNICAL DATA

A. Definitions.

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B. Allocation of rights.

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.