**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **THE DETROIT EDISON COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 02-926C<br>(Judge Williams) |

# PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
The Detroit Edison Company

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

September 9, 2004

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INDEX TO THE APPENDIX .......... iv

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 4

I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PLAINTIFF, AND THAT BREACH HAS CAUSED PLAINTIFF TO SUFFER DAMAGES .......... 4

A. DOE Breached Its Standard Contract With Plaintiff .......... 4

B. DOE's Breach Of Contract Resulted In Damages To Plaintiff .......... 8

II. WHETHER PLAINTIFF SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT .......... 12

A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract .......... 13

B. Because Of DOE's Breach, Plaintiff Was Never "Obligated" To Submit A DCS .......... 13

C. Plaintiff Was Not Required To Submit A DCS Form Because Doing So Would Have Been Futile .......... 14

D. Other Aspects Of The DCS Submittal Process Were Flawed .......... 16

III. PLAINTIFF'S CLAIM FOR PARTIAL BREACH SUPPORTS A LIABILITY RULING IN ITS FAVOR .......... 18

IV. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PLAINTIFF'S GOOD FAITH AND FAIR DEALING CLAIM .......... 22

V. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO TAKE DISCOVERY BEFORE RULING ON PLAINTIFF'S MOTION TO DISMISS .......... 27

CONCLUSION .......... 29

## TABLE OF AUTHORITIES

### CASES

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953)..........................................20, 21

City of Fairfax v. Wash. Metro Area Transit Auth., 582 F.2d 1321 (4th Cir. 1978)......................22

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) ................................ *passim*

Conoco, Inc. v. United States, 35 Fed. Cl. 309 (1996) ...............................................................26

Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) .......................................................13

Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283 (Fed. Cir. 2000) .......................................25

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001)......19, 21

Indiana Mich. Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996).................5, 26

Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88 (2003) ..................................... *passim*

Indiana Mich. Power Co. v. United States, 60 Fed. Cl. 639 (2004) .......................................20, 21

Lorenz v. United States, 296 F.2d 746 (Ct. Cl. 1961) .................................................................15

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000)........... *passim*

Marathon Oil Co. v. United States, 177 F.3d 1331 (Fed. Cir. 1999)............................................26

Marathon Oil Co. v. United States, 236 F.3d 1313 (Fed. Cir. 2000)............................................26

Maxima Corp. v. United States, 847 F.2d 1549 (Fed. Cir. 1988).................................................22

Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604 (2000) ................26

Morris v. United States, 33 Fed. Cl. 733 (1995)...........................................................................15

Naekel v. U.S. Dep't of Transp., 850 F.2d 682 (Fed. Cir. 1988).................................................19

Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456 (1st Cir. 1988) ...................................14

Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997)........... *passim*

Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) .............................23

Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 913 (8th Cir. 1964) ....................14

Orange Cove Irrig. Dist. v. United States, 28 Fed. Cl. 790 (1993)...............................................22

R. A. Weaver & Assocs. v. Haas & Haynie Corp., 663 F.2d 168 (D.C. Cir. 1980).....................14

Robinson v. United States, 305 F.3d 1330 (Fed. Cir. 2002)..................................................11, 19

Rockwell Int'l Corp. v. United States, 147 F.3d 1358 (Fed. Cir. 1998).......................................27

RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747 (1999) .......................................13

San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557 (Fed. Cir. 1997) ...........20

Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991) .......................................................27

Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665 (2004).............................................. *passim*

Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306 (2002)............................................25

Yankee Atomic Elec. Co. v. United States, No. 98-126C, 2004 WL 1535688
(Fed. Cl. June 28, 2004)......................................................................................................... *passim*

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 ..................................................................................................................... *passim*

42 U.S.C. § 10222..........................................................................................................................4

59 Fed. Reg. 27,007 (May 25, 1994) .................................................................5, 19, 26, 27

60 Fed. Reg. 21,793 (May 3, 1995) ......................................................................................4, 5, 26

**MISCELLANEOUS**

Dan B. Dobbs, Handbook on the Law of Remedies § 12.6 (1993) ...........................................19

Restatement (Second) of Contracts § 205 (1981).........................................................................26

Restatement (Second) of Contracts § 245 (1981).........................................................................14

Restatement (Second) of Contracts § 253 (1981).........................................................................22

Restatement (Second) of Contracts § 350 (1981)....................................................................11, 19

24 Williston on Contracts, § 66.44 (4th ed. 1990).........................................................................19

**INDEX TO THE APPENDIX**

Description — Page

Deposition of David Zabransky, Excerpts ........ 1

1987 Annual Capacity Report (June 1987) (Appendices omitted) ........ 8

1988 Annual Capacity Report (June 1988) (Appendices omitted) ........ 30

1990 Annual Capacity Report (December 1990) (Appendices omitted) ........ 53

1991 Annual Capacity Report (December 1991) (Appendices omitted) ........ 78

1991 Instructions for Completing the Appendix C Delivery Commitment Schedule
- General Instructions ........ 96
- Specific Instructions ........ 100

Voided DCS Forms ........ 104

DOE Letters Stating DCS Forms Could Not be Approved or Disapproved ........ 114

Defendant's Response to Utility Plaintiffs' Request for Admissions (April 18, 2002) ........ 128

2004 Instructions for Completing the Appendix C Delivery Commitment Schedule ........ 132

Excerpt from GAO, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept. 1991) ........ 138

2004 Acceptance Priority Ranking & Annual Capacity Report (July 2004) (Appendices omitted) ........ 140

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE DETROIT EDISON COMPANY,** Plaintiff, | ) | |
| v. | ) | No. 02-926C (Judge Williams) |
| **THE UNITED STATES,** Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT**

Pursuant to RCFC 56, Plaintiff The Detroit Edison Company ("Plaintiff") hereby submits this Reply in support of its May 28, 2004 Motion for Summary Judgment on Liability and Response in Opposition to Defendant's July 28, 2004 Motion for Summary Judgment Upon Counts I and II of Plaintiff's Complaint ("Government's Motion").[1]

**SUMMARY OF ARGUMENT**

The Court should grant Plaintiff's Motion for Summary Judgment on Liability. Contrary to the arguments set forth in the Government's Motion, there is no question that the United States Department of Energy ("DOE") breached its Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste ("Standard Contract") with Plaintiff. In violation of Article II of the Standard Contract, DOE did not begin to accept Spent Nuclear Fuel ("SNF") from nuclear utilities as of January 1998. In fact, DOE has indicated that it will not

---

1 In support of this filing, Plaintiff is submitting an "Appendix to Plaintiff's Reply In Support Of Its Motion For Summary Judgment On Liability And Response In Opposition To Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint" dated September 9, 2004. That Appendix is cited herein as "Pl. App.".

begin to perform under the Standard Contract until 2010, at the earliest. The U.S. Courts of Appeals for the District of Columbia and Federal Circuits have found that DOE's failure to begin accepting SNF as of January 1998 resulted in a breach of the Standard Contract for all Standard Contract holders – the entire nuclear industry. Those findings apply to Plaintiff's Standard Contract.

The Government argues that Plaintiff suffered no damages as a result of DOE's breach because DOE was not obligated to begin accepting SNF from Plaintiff in January 1998. DOE's breach of the Standard Contract did injure Plaintiff, even if Plaintiff was not at the front of the SNF acceptance queue established by DOE. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept Plaintiffs' (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. Due to this delay, Plaintiff has incurred – and continues to incur – substantial damages to store SNF that DOE was contractually obligated to take.

The Government also argues that it has no liability to Plaintiff because Plaintiff failed to submit to DOE a Delivery Commitment Schedule ("DCS") for Plaintiff's SNF, which DOE alleges was a condition precedent to DOE's obligation to accept SNF under the Standard Contract. That argument should be rejected because (1) submission of a DCS form was not a condition precedent to DOE's acceptance of SNF deliveries; (2) even if submitting a DCS form was a condition precedent, once DOE breached the Standard Contract Plaintiff no longer had to satisfy that "condition;" (3) submitting a DCS would have been futile (because DOE stopped approving DCSs) and, therefore, was not required by law; and (4) the DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

In addition, the Government claims that Plaintiff was required to allege "anticipatory repudiation" in order to seek pre-breach damages. This is an incorrect interpretation of the law. Non-breaching parties are entitled, indeed required, to mitigate losses when faced with a breach, including a partial breach. And pre-breach mitigation damages are recoverable for partial breach. Such a finding is supported by prior binding decisions of the Court of Claims and by recent decisions by the Court of Federal Claims in other SNF damages cases.

The court also should reject the Government's Motion to Dismiss Plaintiff's claim that DOE breached the Standard Contract's implied covenant of good faith and fair dealing. Among other things, DOE's failure to properly implement the DCS process, its failure to annually publish its Annual Capacity Reports and Acceptance Priority Rankings, and other actions concerning DOE's failure to begin taking SNF as of January 1998, justify a finding that DOE breached the Standard Contract's good faith and fair dealing covenant.

Finally, the court should reject the Government's request that it be permitted to take discovery from Plaintiff in the event the court is inclined to otherwise grant Plaintiff's Motion for Summary Judgment. There is no factual question that DOE breached the Standard Contract when it failed to begin accepting SNF deliveries as of January 1998. Accordingly, discovery is not necessary or proper at this juncture of the proceeding.

For these reasons, Plaintiff respectfully requests that the court (1) grant Plaintiff's Motion for Summary Judgment on Liability; (2) deny the Government's Motion for Summary Judgment upon Counts I and II of Plaintiff's Complaint; and (3) deny the Government's request for limited discovery.

## ARGUMENT

### I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PLAINTIFF, AND THAT BREACH HAS CAUSED PLAINTIFF TO SUFFER DAMAGES

According to the Government, "DOE's failure to begin SNF acceptance from the commercial nuclear industry by January 31, 1998" did not create an injury "to each and every member of the commercial nuclear industry." Government's Motion at 5. Specifically, the Government argues that its delay has not injured Plaintiff, because DOE was not obligated to begin accepting SNF from Plaintiff by January 31, 1998. Id. at 5-7. The Government also contends that, before Plaintiff can seek a liability ruling, Plaintiff must establish that DOE had a specific obligation to accept Plaintiff's own SNF by the date of Plaintiff's complaint and that DOE breached that obligation. Id. at 7. For the reasons discussed below, the Government is wrong.

#### A. DOE Breached Its Standard Contract With Plaintiff

There simply is no question that the Government breached Plaintiff's Standard Contract.

Under the Nuclear Waste Policy Act of 1982 ("NWPA"), DOE was required to begin disposing of the nation's commercially-generated SNF "not later than January 31, 1998," in return for the payment of fees by utilities and others that generated or held title to SNF. See 42 U.S.C. § 10222(a)(5)(B). As also required under the NWPA, in 1983 DOE drafted the Standard Contract. See 42 U.S.C. § 10222(a); 10 C.F.R. § 961.11. Each of the nation's nuclear utilities, including Plaintiff, executed a Standard Contract with DOE. See Department of Energy's Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995). Plaintiff's Standard Contract – indeed all of the Standard Contracts – embodies the reciprocal obligations mandated by the NWPA, pursuant to which Plaintiff agreed to pay fees in return for DOE's obligation to begin disposing of SNF no later than January 31, 1998. Specifically, Article

II of the Standard Contract states: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF … has been disposed of." Standard Contract, Art. II; 10 C.F.R. § 961.11.

In 1994, however, "[DOE] announced that it could not begin disposing of nuclear waste by January 31, 1998, as the [Standard] [C]ontract required, because the repository it planned to build to store the waste would not be available until at least 2010." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1338 (Fed. Cir. 2000); see Notice of Inquiry, 59 Fed. Reg. 27,007, 27,007-08 (May 25, 1994). In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), expressly denying that DOE had a statutory and contractual obligation to begin disposing of SNF by January 31, 1998. See 60 Fed. Reg. 21,793. In the Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the [NWPA] will be available by 1998." Id. at 21,794. DOE projected that the "earliest possible date for acceptance of waste for disposal by DOE would be 2010." Id.

The United States Court of Appeals for the District of Columbia Circuit has found that DOE's failure to begin disposing of SNF by January 31, 1998 violated the Standard Contract. In Indiana Mich. Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996), the D.C. Circuit ruled that DOE's obligation under the NWPA to commence SNF acceptance no later than January 31, 1998, was "without qualification or condition." The D.C. Circuit rejected DOE's argument that the 1998 deadline was conditioned upon the operation of a repository under the NWPA, finding that such an interepretation of the Standard Contract "blue-pencil[ed] out" the 1998 deadline, destroying the "*quid pro quo* created by Congress." Id. According to the D.C.

Circuit, DOE's proposed "treatment of [the NWPA] is not an interpretation but a rewrite." Id. The D.C. Circuit concluded that the NWPA, and similarly the Standard Contract, required DOE to "begin disposing of [SNF] by a day certain." Id.

Despite the D.C. Circuit's ruling in Indiana Michigan, DOE nevertheless announced that it would not begin disposing of SNF by the January 31, 1998 deadline. As a result, a number of utilities, including Plaintiff, petitioned the D.C. Circuit for a writ of mandamus seeking to compel DOE's compliance with the D.C. Circuit's decision in Indiana Michigan. In that case, Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997), the D.C. Circuit reiterated its finding in Indiana Michigan that DOE had an "unconditional duty" under the Standard Contract to being disposing of utilities' SNF by January 31, 1998. In fact, the D.C. Circuit remarked: "[w]e would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so." Id. at 757.

Similarly, the Federal Circuit has held that DOE breached the Standard Contract. According to the Federal Circuit in Maine Yankee, Congress found DOE's obligation to begin disposal of Nuclear Waste by January 31, 1998 "so important" when it promulgated the NWPA that Congress "took the unusual action of specifying that all contracts must contain this explicit requirement." Maine Yankee, 225 F.3d at 1341-42. Thus, the Federal Circuit found, DOE's breach of its obligation to begin disposing of spent nuclear fuel by January 1998 "*involved all the utilities that had signed the contract – the entire nuclear electric industry*." Id. at 1342 (emphasis added). Accordingly, under Indiana Michigan, Northern States, and Maine Yankee, when the Government failed to begin accepting SNF as of January 1998 as required under Article II of Plaintiff's Standard Contract, the Government breached that Contract. In fact, in

every spent nuclear fuel case in which the Court of Federal Claims has addressed the question,[2] it has found the Government liable for breach of the Standard Contract.

The Government asserts that Plaintiff's Motion for Summary Judgment on Liability cannot rely on the Federal Circuit's decision in Maine Yankee because, unlike the plaintiffs in that case, Plaintiff did not submit a DCS to DOE. Government's Motion at 13-14. However, the Maine Yankee decision clearly stated that the Government breached "all" the Standard Contracts, for "the entire nuclear electric industry." Maine Yankee, 225 F.3d at 1342. The Federal Circuit did not limit that finding to utilities who had submitted DCSs.

Moreover, the Government's argument conveniently ignores the two D.C. Circuit decisions – Northern States and Indiana Michigan – on which Plaintiff also relies to establish the Government's breach. *Plaintiff was a petitioner* in Northern States, as were other utilities who had not submitted DCSs. As explained above, the D.C Circuit in Northern States reaffirmed its Indiana Michigan holding that DOE had "an unconditional obligation to begin disposing of high-level radioactive waste and spent nuclear fuel … by January 31, 1998." Northern States, 128 F.3d at 755. The D.C. Circuit did not limit its finding to those petitioners who had submitted DCSs. Accordingly, federal appeals court decisions make it clear that DOE breached Plaintiff's Standard Contract.

2 Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Florida Power & Light Co. v. United States, No. 98-483C (Sypolt, J.); Commonwealth Edison Co. v. United States, No. 98-621C (Hewitt, J.); Yankee Atomic Elec. Co. v. United States, No. 98-126C (Merow, S.J.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Merow, S.J.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Merow, S.J.); Indiana Mich. Power Co. v. United States, No. 98-486C (Hodges, J.); and Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.)

### B. DOE's Breach Of Contract Resulted In Damages To Plaintiff

Notwithstanding the Government's arguments to the contrary, Plaintiff has been injured as a result of the Government's breach.

The Standard Contracts state that DOE will issue Annual Capacity Reports ("ACR") and annual Acceptance Priority Rankings ("APR"). Standard Contract Arts. IV.B.5(a) and (b); 10 C.F.R. § 961.11. The ACR, to be used "for planning purposes," was to set forth the projected annual receiving capacity for DOE's spent fuel storage facility(ies) and the annual acceptance ranking for the disposal of SNF. Id., Art. IV.B.5(b). The APR, in turn, was to identify and prioritize the SNF to be stored based on the age of the SNF. Id., Art. IV.B.5(a). Specifically, the APR, with a few exceptions,[3] gives "[t]he oldest fuel or waste … the highest priority for acceptance." Id., Art. IV. B.5(a). In this way, the APR establishes a queue of utilities, the order of which was to reflect the "annual receiving capacity for DOE facility(ies)" and the age of SNF currently stored by the various contract holders. Id.

According to the Government, if DOE had started to accept SNF from Standard Contract holders in 1998 pursuant to DOE's 1995 APR/ACR (which was the last APR/ACR issued by the Government before Plaintiff filed its Complaint), DOE would not have begun accepting SNF from Plaintiff until after January 2008. Government's Motion at 12, 16. The Government claims, therefore, that "the first 'breach' that might have caused an injury to [Plaintiff] would not have occurred until sometime after January 2008, when [Plaintiff's] SNF would have been given some allocation rights based upon the age of its SNF." Id. at 17. The Government argues that,

[3] The Standard Contracts provide that, notwithstanding the age of SNF, priority may be given to SNF removed from a reactor that "has reached the end of its useful life and has been shut down permanently for whatever reason." Id., Art. VI.B.1(b).

under the "oldest fuel first" allocation methodology, DOE has not yet breached its contractual obligation to Plaintiff. Id. at 12-13.

As an initial matter, the SNF allocations used by the Government in the 1995 APR/ACR were counterfeit. That allocation was based on the assumption that DOE would accept Standard Contract holders' SNF at a maximum rate of 900 MTU annually, utilizing the capacity of a Monitored Retrievable Storage Facility ("MRS") that was no longer an option by the time DOE issued the 1995 APR/ACR, and which was never constructed. See Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 99 (2003); deposition of David Zabransky, Apr. 17, 2002 ("Zabransky Dep.") at 345, Pl. App. at 3 ("At that point in time in 1994 . . . [t]here was no active program looking for a voluntary MRS"). A 3,000 MTU annual acceptance rate, as reflected in the APR/ACR DOE recently issued in 2004 (See 2004 APR/ACR at 3, Table 1, Pl. App. at 144), and in virtually all other DOE documents relating to the nuclear waste program, would have been the appropriate rate necessary, at a minimum, to meet the program's objectives. See Indiana Mich., 57 Fed. Cl. at 99-100 (rejecting the 900 MTU rate, and adopting a 3000 MTU rate based upon "uniform support" for such a finding). Had DOE used the appropriate rate, Plaintiff, in fact, would have had its first deliveries accepted by DOE no later than 2006 (in the ninth year of the waste management system's operation). See 2004 APR/ACR at 2 (Tbl. 1) & 3, Pl. App. at 144-45.

Assuming, however, for the sake of argument that Plaintiff's deliveries would not have started until January 2008, Plaintiff nevertheless suffered damages at the time its complaint was filed. As explained above, the APR/ACR process was designed to establish a queue of utilities, based on the age of each utility's fuel. While Plaintiff did not have a place in the front of the queue, Plaintiff was nonetheless damaged by DOE's failure to begin taking SNF from utilities by

January 1998. Once DOE breached its obligation to begin disposing of SNF from the first utility in the queue by January 1998, that breach caused a domino effect on DOE's ability to timely accept delivery of SNF from all other utilities in the queue. Accordingly, any utility whose deliveries would fall sometime after January 1998 necessarily would have their deliveries delayed by the amount of time at least equal to DOE's delay in beginning its overall performance.

Due to these predictable cascading delays, many utilities situated later in the queue, such as Plaintiff, have already incurred costs resulting from DOE's breach. In Plaintiff's case, these costs include, for example, re-racking of the spent fuel pool at the Fermi 2 nuclear power plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up. Thus, Plaintiff has in fact suffered damages resulting from DOE's breach. Moreover, adopting the Government's argument would lead to absurd results. If Plaintiff cannot suffer injury until DOE actually fails to pick up Plaintiff's spent fuel, DOE could forever avoid Plaintiff's breach claims (and the breach claims of every other utility falling later in the queue) simply by never starting to take deliveries under the Standard Contract.

The Government's Motion also mischaracterizes Plaintiff's position on this issue. Contrary to the Government's claims, Plaintiff is *not* arguing that the Government was obligated to begin accepting Plaintiff's own SNF by January 31, 1998. Government's Motion at 13-14. Rather, as discussed above, Plaintiff contends that DOE's breach of its obligation to begin taking deliveries from nuclear utilities as of January 1998 postponed DOE's ability to begin taking deliveries from Plaintiff in a timely manner, resulting in a breach of Plaintiff's Standard Contract that caused Plaintiff to incur damages.

Plaintiff's position has been adopted by the Court of Federal Claims in other SNF cases. In Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665, 674 (2004), for example, Judge Lettow noted that Tennessee Valley Authority ("TVA") was not entitled to have its own SNF removed beginning in January 1998, and that the earliest scheduled pickup of TVA's SNF would not have occurred until July of 2002. Nevertheless, Judge Lettow has determined that TVA is entitled at trial to show that the Government's breach of the January 1998 deadline damaged TVA.

As Judge Lettow points out, DOE notified all utilities in 1995 that it would not begin collecting SNF on time. Id. at 674. Thus, "[w]hen it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance." Id. As Judge Lettow finds, under the Restatement (Second) of Contracts: "Once a party has reason to know that performance by the other party will not be forthcoming, … he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Id., quoting Restatement (Second) of Contracts § 350 cmt. b; see also Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir. 2002) ("Reasonable efforts in the form of affirmative steps are required to mitigate damages.").

Applying these principles, Judge Lettow found that TVA's construction of dry storage facilities for spent nuclear fuel "must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach." TVA, 60 Fed. Cl. at 674. Judge Lettow, therefore, held that TVA would be permitted to recover costs for dry storage facility construction, to the extent TVA can demonstrate at trial a causal connection between those costs and DOE's breach. Id. at 674-65. Similarly, the court here should allow Plaintiff the

opportunity at trial to show that its damages were due to DOE's breach of the Standard Contract, even though DOE was not obligated to begin accepting Plantiff's own SNF by January 1998.

## II. WHETHER PLAINTIFF SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT

The Government goes to great length to set forth its understanding regarding how the APR/ACR process and the submittal of DCS forms were to operate under the Standard Contract. See Government's Motion at 7-11. According to the Government, submission of a DCS "constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder." Id. at 7. The Government repeatedly argues that, since Plaintiff did not submit a DCS, DOE has no liability for breach of Plaintiff's Contract. Id. at 6-7, 13-14, 16-17.

The court should reject this argument because (1) submission of a DCS form was not a condition precedent to DOE's obligations under the Standard Contract; (2) even if submission of a DCS was a condition precedent, once DOE breached the Standard Contract Plaintiff no longer had an obligation to submit a DCS; (3) submitting a DCS would have been futile (because DOE suspended the DCS process) and, therefore, was not required by law; and (4) the DCS submittal process as implemented by DOE was flawed and inconsistent with the Standard Contract. Moreover, on every occasion in which it has addressed the issue, the Court of Federal Claims has rejected DOE's attempt to use the APR/ACR and DCS process as a basis for limiting its liability.[4]

---

[4] See, e.g., Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 666 (2003) (finding that the ACR and the DCS submissions were for planning purposes and "[t]he parties could not have expected that planning documents would create binding contractual obligations"); Indiana Mich., 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine the Acceptance Rate. The Department of Energy did not consider these forms to be binding.").

**A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract**

Submission of a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff under the Standard Contract. Conditions precedent generally are disfavored by courts and "will not be read into a contract unless required by the plain, unambiguous language." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 n.7 (9th Cir. 1990); accord RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 756 (1999). Nothing in the Standard Contract suggests that submission of a DCS by Plaintiff is a condition precedent to DOE's obligation to take SNF.

Article V of the Standard Contract addressed "Delivery of SNF and/or HLW." That article states that a utility shall "deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW." Standard Contract, Art. V.; 10 C.F.R. § 961.11. The article does *not* state that DOE's obligation is contingent upon a utility first submitting a DCS. DOE's obligation to take SNF from utilities also is referenced in several other Standard Contract articles, none of which conditions the obligations expressed therein upon the submission of a DCS. See Standard Contract, Arts. II, IV.B. & VI.; 10 C.F.R. § 961.11.

**B. Because Of DOE's Breach, Plaintiff Was Never "Obligated" To Submit A DCS**

Even if submission of a DCS constituted a condition precedent to DOE's performance – which it clearly did not – Plaintiff's "obligation" to submit a DCS never arose.

According to the Government, Standard Contract holders were to submit DCS forms after DOE issued an APR/ACR. Government's Motion at 9. The DCS form was to identify the SNF that the contract holder wished to deliver to DOE "beginning sixty-three months thereafter." Id.; Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11. However, DOE's 1995 APR/ACR (which was the last APR/ACR DOE issued before Plaintiff filed this lawsuit) contained no allocation to

Plaintiff through "Year 10." See Government's App. at 296. Given that, under DOE's calculations, Plaintiff had no delivery allocation until after January 2008, Plaintiff did not need to submit a DCS form until mid to late 2002 (i.e., 63 months before delivery) at the earliest. As discussed above, by the mid-1990s at the latest it was clear that DOE would not meet the mandated start date, and by January 1998 DOE in fact had not begun to perform. Because DOE breached the January 1998 deadline, any "obligation" of Plaintiff to submit a DCS form was extinguished long before the date on which such DCS would have been due. See Restatement (Second) of Contracts § 245 (1981) ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."); Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988).

As the court noted in Northern Heel, a breaching party relinquishes "any right to disclaim the contract because of the victim's failure to satisfy conditions precedent." 851 F.2d at 461-62; see also R.A. Weaver & Assocs. v. Haas & Haynie Corp., 663 F.2d 168, 176 (D.C. Cir. 1980); Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 913, 916 (8th Cir. 1964). According to the court in Omaha Public Power, the "theory underlying this rule appears to be based on the equitable maxim that one cannot profit from or escape liability for his own wrongdoing." 327 F.2d at 916. Thus, given DOE's breach, Plaintiff was never obligated to submit DCS forms (even if the submission of such forms was a condition precedent to DOE's performance).

**C. Plaintiff Was Not Required To Submit A DCS Form Because Doing So Would Have Been Futile**

Moreover, any effort by Plaintiff to submit a DCS form and seek DOE's approval after 1995 would have been futile. And the law does not require the performance of a futile act. Northern Heel, 851 F.2d at 461 ("[t]he law should not be construed idly to require parties to

perform futile acts or to engage in empty rituals"); see also Lorenz v. United States, 296 F.2d 746, 748 (Ct. Cl. 1961) ("It is not to be presumed that the law requires the doing of a futile act."); Morris v. United States, 33 Fed. Cl. 733, 751 n.16 (1995).[5]

The Standard Contract required DOE to approve or disapprove DCS forms within three months of their submission. Standard Contract, Art.V.B.1.; 10 C.F.R. § 961.11. Notwithstanding this express contract obligation, DOE, in fact, refused to approve or disapprove DCS forms submitted by utilities in 1996 and thereafter. See Zabransky Dep. at 32 (Apr. 17, 2002) (admitting that DOE had delivery commitment schedules submitted to it that it has neither approved nor disapproved), Pl. App. at 1. Beginning in March 1997, DOE issued letters to nearly all utilities in which DOE stated that it could not approve or disapprove their DCS forms. See DOE Letters, Pl. App. at 114-27. Furthermore, around the same time that DOE began to "hold" DCS forms submitted by utilities, DOE also unilaterally voided a number of DCS forms that had been submitted by utilities in 1996 and had been previously approved. See Voided DCS Forms, Pl. App. at 104-13; Zabransky Dep. at 596, 603-04 (Apr. 19, 2002), Pl. App. at 5-7.

DCS forms submitted after 1995 would not have been approved by DOE.[6] It would have been futile for Plaintiff to submit such forms, even if required to do so under DOE's process

---

[5] In Morris, for example, the plaintiff contracted to buy a parcel of land from the Small Business Administration ("SBA"), with closing set for September 6, 1991. Prior to the closing date the SBA advised Plaintiff that it would be unable to close until November 1991. In rejecting the Government's argument that the plaintiff's failure to tender payment in accordance with the contract relieved the government of liability, the court stated:

> While technically Mr. Morris' tender of payment was a condition precedent to the Government's obligation to convey, both parties knew and agreed that the government was unable to convey the property at the appointed time. Therefore, tender was not required to put the government in breach as the law will not require the doing of a futile act.

See Morris, 33 Fed. Cl. at 751 n. 16 (citations omitted).

(which Plaintiff was not). For that reason, whether or not Plaintiff submitted DCS forms is irrelevant to the question of the Government's liability for breach.

### D. Other Aspects Of The DCS Submittal Process Were Flawed

Although the Government's Response to Plaintiff's Motion For Summary Judgment on Liability places considerable emphasis on the role of DCSs, in reality the entire DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

For example, contrary to Standard Contract requirements, DOE did not allow utilities to submit DCSs identifying "all SNF and or HLW [they wished] to deliver to DOE." Standard Contract Art. V.B.1.; 10 C.F.R. § 961.11. Rather, in the 1991 ACR and in separate instructions to utilities DOE required that utilities submit DCS forms identifying for delivery *only* those SNF allocations reflected in DOE's most recent ACR. DOE Annual Capacity Report December 1991 ("1991 ACR") at 7, Pl. App. at 90; 1991 DOE Instructions for Completing the Appendix C Delivery Commitment Schedule ("1991 DCS Instructions") at ¶ 7(a), Specific Instructions at ¶ 2.7, Pl. App. at 97, 101. Those directions, however, were completely at odds with the procedures set forth in the Standard Contract. As Judge Hodges held in another spent fuel damages case, "the Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'" Indiana Mich., 57 Fed. Cl. at 98. In a different spent fuel damages case, Judge Hewitt commented that DOE's efforts to limit the amount of SNF requested by utilities in

---

[6] Indeed, Mr. David Zabransky – DOE's current Contracting Officer and former Contracting Officer's Technical Representative – admitted that it would be impossible for a utility to obtain an approved DCS at this time:

Q. Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct ?

A. That's correct.

Zabransky Dep. at 353 (Apr. 18, 2002), Pl. App. at 4; see also Zabransky Dep. at 42 (Apr. 17, 2002), Pl. App. at 2 (admitting that, given the Department of Energy's "current guidance" at that time, it was not possible for a utility to get a DCS approved).

their DCSs "may be a breach of DOE's duty of good faith and fair dealing." Commonwealth Edison, 56 Fed. Cl. 652 at 665.

The Government's argument that Plaintiff is not entitled to damages because it did not submit a DCS form also ignores the fact that DOE itself did not consider DCSs to be binding. The ACRs upon which utilities were asked to rely when completing their DCSs expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers." DOE Annual Capacity Report June 1987 at 2, Pl. App. at 16; 1991 ACR at 1-2, Pl. App. at 84-85. Similarly, in the 1991 instructions issued by DOE to utilities regarding the completion of the DCS forms, DOE again explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." 1991 DCS Instructions at ¶ 7(c), Pl. App. at 97. DOE, in fact, *did* reevaluate previously-approved DCS forms.[7] As set forth above, in the first quarter of 1997 DOE unilaterally voided a number of previously-approved DCS submissions. Moreover, the Court of Federal Claims previously has recognized that DOE did not consider the ACR and DCSs binding, stating:

> The Contract contemplated that DOE would use these reports for planning purposes only. The Capacity Reports disclaimed any other purpose, stating that they were not binding on either party.

Indiana Mich., 57 Fed. Cl. at 98 (citation omitted); Commonwealth Edison, 56 Fed. Cl. at 663 (concluding that the ACR and DCS "mechanism does not create a contractually binding obligation for either party").

---

[7] In 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-37. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

DOE's faulty implementation of the DCS process, and the explicitly non-binding nature of the DCS submittals, doom the Government's argument now – made in the heat of litigation – that the submission of DCS forms determines whether DOE is liable for breach of Plaintiff's Standard Contract.

## III. PLAINTIFF'S CLAIM FOR PARTIAL BREACH SUPPORTS A LIABILITY RULING IN ITS FAVOR

The Government also asks the court to deny Plaintiff's Motion for Summary Judgment on Liability because (1) Plaintiff cannot recover damages that are incurred before a partial breach; and (2) no partial breach has in fact occurred. Government's Motion at 17-19. Specifically, according to the Government, in order to recover pre-breach damages the non-breaching party must establish that the breaching party anticipatorily repudiated the contract. Id. The Government's arguments have no basis in fact or law and, therefore, should be rejected.

First, as discussed at length above, the Government *has* committed a partial breach of Plaintiff's Standard Contract. When DOE breached its obligation to begin accepting deliveries from Standard Contract holders no later than January 1998, DOE breached every Standard Contract. That breach included Standard Contracts entered into between DOE and utilities whose deliveries were likely to begin after January 1998. For that reason alone, the court should grant Plaintiff's Motion for Summary Judgment on Liability.

Second, the Government is wrong when it claims that the law does not recognize pre-breach mitigation damages for partial breach of contract. Under well-established legal principles, when one party is faced with a breach, the non-breaching party is required to mitigate further losses. According to the Restatement (Second) of Contracts, "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute

arrangements or otherwise." Restatement (Second) of Contracts § 350 cmt. b (citation omitted). The Federal Circuit has recognized this principle, finding that "[r]easonable efforts in the form of affirmative steps are required to mitigate damages." Robinson, 305 F.3d at 1334. In addition, it is clear that mitigation costs are a proper component of a non-breaching party's damages. See Naekel v. U.S. Dep't of Transp., 850 F.2d 682, 685 (Fed. Cir. 1988) (holding that plaintiff is entitled to recover costs incurred to mitigate damages) (citing Dan B. Dobbs, Handbook on the Law of Remedies § 12.6 (1993)). And mitigation costs are recoverable for partial breach. 24 Williston on Contracts § 66.44, at 610-13 (4th ed. 1990) (noting that "a buyer can obtain cover damages even if it has not cancelled the contract and has accepted a partial delivery …")[8]; see also Yankee Atomic Elec. Co. v. United States, No. 98-126C, 2004 WL 1535688 at *7 (Fed. Cl. Jun. 28, 2004). ("Damages for partial breach include the costs incurred by the seller in mitigation.").

As described in Section I.A. of this Response, at least as early as 1994 DOE announced that it could not begin disposing of any utility's SNF by January 31, 1998, as required under the Standard Contact. See 59 Fed. Reg. at 27,007-08. By 1995, DOE stated that it did not have a statutory or contractual obligation to accept waste from utilities absent a repository or interim facility. Maine Yankee, 225 F.3d at 1338. Thus, "the utilities had at minimum a good idea that the [January 31, 1998] deadline would not be met in 1994, 1996 at the latest." Yankee Atomic, 2004 WL 1535688 at *6 (footnote omitted). Accordingly, by at least the mid 1990s utilities were justified in incurring "pre-breach" mitigation costs.

---

[8] The Federal Circuit has recognized that contract principles governing the sale of goods provide "useful guidance" when evaluating service contracts. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

In another spent nuclear fuel case, the Court of Federal Claims rejected the Government's argument that utilities must allege anticipatory repudiation in order to recover pre-breach mitigation damages. Id. In Yankee Atomic, Judge Merow denied the Government's request to limit plaintiffs' damages to those expenditures that occurred after DOE's breach. According to Judge Merow, the Yankee Atomic plaintiffs could not be required to have waited until DOE failed to begin performing before deciding what to do with their nuclear waste. Id. Rather, "the utility 'was justified, indeed obligated, to take steps to minimize losses in light of DOE's imminent non-performance.'" Id. (quoting TVA, 60 Fed. Cl. at 674). Given that "[c]ontract damages are 'to place the injured party in as good a position as he or she would have been had the breaching party fully performed,'" Judge Merow allowed the plaintiffs at trial to present evidence of their pre-breach mitigation damages. Yankee Atomic, 2004 WL 1535688 at *7 (quoting Hughes, 271 F.3d at 1066); see also San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1977).[9]

Despite the Government's claims to the contrary, there is no basis in the law for finding that a party must establish a total breach through anticipatory repudiation before it can recover pre-breach damages. In fact, the Court of Claims has held just the opposite – finding that pre-breach damages were available for a breach of contract claim where the breach was not total or due to repudiation. See Chain Belt Co. v. United States, 115 F. Supp. 701, 713-14 (Ct. Cl. 1953).

In Chain Belt, the defendant sold property to the plaintiff and the defendant agreed to remove its machinery from the property by December 10, 1946. "By November 1946, it was

[9] To support its argument that pre-breach damages are not available to parties alleging partial breach, the Government cites Judge Hodges's decision in Indiana Michigan, 60 Fed. Cl. 639 (2004) (appeal pending). Plaintiff respectfully submits that Judge Hodges incorrectly interpreted the law, as discussed in this section of Plaintiff's Response.

apparent that under no circumstances could defendant move out all its machinery by December 10, as provided in the contract." Id. at 713. In response to this impending partial breach, plaintiff incurred expenses before December 10, 1946 to move some of defendant's machinery. After December 10, 1946, defendant removed its remaining machinery. In June 1947, plaintiff filed a breach of contract suit which included a claim for its pre-breach moving costs, and other damages caused by defendant's breach. The defendant argued that the pre-breach mitigation damages were not recoverable. The Court of Claims disagreed and awarded pre-breach mitigation expenses. Id. at 714. According to the Court of Claims:

> Plaintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . It makes no difference whether the breach has already occurred, or where (as was the case of the work done prior to December 10) it is merely impending under the circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

Id. at 714. Chain Belt, therefore, makes it clear that pre-breach mitigation damages are available for a partial breach of contract claim.[10]

Furthermore, the "support" cited by the Government for its tortured theory regarding pre-breach damages is unavailing. The Restatement comment quoted by the Government merely states that a repudiation can only give rise to a claim for total breach, and that an anticipatory repudiation cannot be predicated on a partial breach. Government's Motion at 18. That

---

10 In Indiana Michigan, Judge Hodges recently distinguished Chain Belt from the spent fuel damages case before him, based on his conclusion that Chain Belt "was a total breach claim in a lost profits case that may have involved repudiation." 60 Fed. Cl. at 649. This is an incorrect characterization of Chain Belt. The primary purpose of the contract at issue in Chain Belt was for the sale of real property. The building *was sold* to the plaintiff for a $1.4 million purchase price (i.e., the contract *was* performed). Chain Belt, 115 F. Supp. at 705. In addition, the defendant eventually fulfilled its obligation to remove the equipment. Id. at 707. Chain Belt, therefore, did not involve total breach or repudiation.

comment has no bearing on the relevant question of whether mitigation damages are available when partial breach (not repudiation) is alleged. In fact, the very next phrase of the comment cited by the Government states that "a breach by non-performance" – which is what Plaintiff has alleged – "can generally give rise to *either a claim for partial breach or to one for total breach*." Restatement (Second) Contracts § 253 cmt. b (emphasis added). In addition, the language quoted by the Government from City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321 (4th Cir. 1978), states that an anticipatory repudiation cannot give rise to a partial breach claim. Government's Motion at 18. Again, that point (whether or not it is true) is irrelevant here. Plaintiff has not alleged that the Government repudiated the Standard Contract; Plaintiff is seeking pre-breach mitigation damages for partial non-performance. And, as established above, such damages are recoverable.

## IV. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PLAINTIFF'S GOOD FAITH AND FAIR DEALING CLAIM

According to the Government, Plaintiff's claim that the Government breached the Standard Contract's covenant of good faith and fair dealing should be dismissed because that claim "is nothing more than an allegation that the Government breached the Standard Contract." Government's Motion at 20; see also Government's Motion at 21. However, Plaintiff can show by clear and convincing evidence that DOE breached the Standard Contract's implied covenant of good faith and fair dealing.[11] For example, DOE's failure to properly implement the DCS

---

[11] "Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing." Orange Cove Irrig. Dist. v. United States, 28 Fed. Cl. 790, 800 (1993) (citation omitted); Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed. Cir. 1988) ("The need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.") (internal quotation marks omitted).

process, its eventual cancellation of the DCS process, its failure to publish annual APR/ACRs as required by Article IV.B. of the Contract, and other actions regarding its failure to begin taking SNF as of January 1998 show clear and convincing intent to injure Plaintiff that each justify a finding of a breach of the Standard Contract's covenant of good faith and fair dealing.[12] In fact, at least two Judges of this court have found that DOE's actions provided evidence of such a breach. Commonwealth Edison, 56 Fed. Cl. at 665; TVA, 60 Fed. Cl. at 674.

In the instant case (and in all of the SNF cases), the Government acted contrary to the implied covenant of good faith and fair dealing by failing to meet the justified expectations of the parties to the Standard Contract. First, as Judge Hewitt recognized in Commonwealth Edison, DOE may have breached the implied covenant of good faith and fair dealing of the Standard Contract through its implementation of the DCS process. Commonwealth Edison, 56 Fed. Cl. at 665.

As noted supra Section II.D., DOE did not allow utilities to identify "all SNF and HLW [they wished] to deliver to DOE," as permitted by the Standard Contract. Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11; see id., Art. V.B.2. ("Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%) . . . until the submission of the final delivery schedule."). Instead, DOE issued instructions to Plaintiff (and other utilities) informing utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the [1991] ACR; exceeding the allocation will result in disapproval of the DCS(s)." Commonwealth Edison, 56 Fed. Cl. at 665 (quoting the DCS Instructions); 1991

---

12 To the extent the Government is asserting that Plaintiff may not maintain claims for both breach of contract and breach of the implied covenant of good faith and fair dealing, the Federal Circuit has already rejected such reasoning. See Maine Yankee, 225 F.3d at 1342-43 (allowing utility to maintain good faith and fair dealing claim despite Government's assertion that the claim was a "renamed" contract claim to avoid the disputes clause); Northern States Power Co. v. United States, 224 F.3d 1361, 1367 (Fed. Cir. 2000).

DCS Specific Instructions at ¶ 2.7, Pl. App. at 101. Judge Hewitt stated that "DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS Submissions may be a breach of defendant's duty of good faith and fair dealing." Commonwealth Edison, 56 Fed. Cl. at 665. Judge Hewitt also found that "Defendant's use of the 1991 ACR to limit the utilities' DCS submissions does not appear to be consistent with the 'justified expectations' of plaintiff . . . ." Id. Moreover, further demonstrating bad faith, the Government's allocation rates in its 1995 APR/ACR were based on construction of an MRS (which was no longer an option at that time), in order to minimize the Government's liability to utilities.[13]

Second, the Government's actions in voiding DCSs and suspending the DCS process further violated the Standard Contract's implied covenant of good faith and fair dealing. As discussed supra Section II.C., DOE improperly failed to follow the requirement of the Standard Contract that it approve or disapprove a DCS. Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11. Judge Lettow concluded that DOE's failure to approve or disapprove DCSs commensurate with the Standard Contract consisted of a breach of the implied covenant of good faith and fair dealing. TVA, 60 Fed. Cl. at 671 n.7 ("Because there is no dispute as to the facts surrounding DOE's inaction on TVA's DCS submissions, and because the TVA Contract specifically requires DOE's performance, the Court grants TVA's request for summary judgment

---

[13] See Zabransky Dep. at 364-65 (Apr. 18, 2002); Pl. App. at 4A:

Q. Why did the Department publish a document to be used as the basis for delivery commitment schedules [the 1995 ACR] using rates which it was not using itself for the purpose of planning the system?
A. The Department carried over the rates it had in the previous ACR and did not change them.
Q. Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using [the 1995 ACR]?
A. I believe that was a consideration.
Q. Were there any other considerations that you can think of for using those rates?
A. There was no other basis to develop any other rates at that point in time.

insofar as DOE breached its obligation to act on TVA's DCSs in good faith and ultimately to accept, transport, and dispose of TVA's SNF.").[14]

Furthermore, as noted supra Section II.C., DOE's suspension of the DCS approval process made it impossible and futile for Plaintiff to submit and have a DCS approved. The implied covenant of good faith and fair dealing prohibits one party from interfering with the other party's performance. See Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks omitted). DOE breached the implied covenant of good faith and fair dealing by preventing and hindering Plaintiff's ability to submit DCSs and, thereby, Plaintiff is excused from any such condition that may have been required by the Standard Contract. See TVA, 60 Fed. Cl. at 672.

Third, as alleged in Plaintiff's Complaint ¶ 27, DOE further breached its implied covenant of good faith and fair dealing by denying throughout the 1990s that it had any obligation to perform the Standard Contract beginning in 1998, pressing this theory in the Federal Register and the D.C. Circuit. See Yankee Atomic, 2004 WL 1535688, at *6 ("[T]he utilities had at minimum a good idea that the deadline would not be met in 1994, 1996 at the latest."); see also Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 316 (2002) (recognizing that it was "fairly foreseeable" as early as 1991 that DOE would face litigation regarding its inability to begin timely acceptance of SNF).

---

14 Also, the Standard Contract requires DOE to issue an ACR annually. Standard Contract, Art. IV.B.5(b); 10 C.F.R. § 961.11. DOE abruptly stopped issuing ACRs in 1996 and failed to issue another ACR until 2004. This inaction similarly left Plaintiff without a key document for planning purposes in attempting to forecast its needs in mitigating DOE's breach. Thus, this breach also may implicate the covenant of good faith and fair dealing.

In 1994, DOE issued a "Notice of Inquiry" stating DOE's preliminary view that it was not unconditionally obligated to begin accepting spent nuclear fuel beginning in 1998 and that DOE would not begin to do so until 2010 at the earliest. Notice of Inquiry, 59 Fed. Reg. at 27,008. In the Notice, DOE recognized that utilities had "implemented long term waste management plans" based on the utilities' understanding that DOE was required to begin accepting SNF in 1998. Id. Nonetheless, in 1995, DOE finalized its interpretation denying it had any obligation to begin accepting SNF in 1998 as required by the NWPA and Standard Contract. Final Interpretation, 60 Fed. Reg. at 21,794. DOE's theory was challenged in the D.C. Circuit and rejected. Indiana Mich., 88 F.3d at 1277. DOE ignored the D.C. Circuit ruling, the utilities again challenged DOE in the D.C. Circuit, and DOE's interpretation was again rejected. Northern States Power Co., 128 F.3d at 757 ("After issuing our decision in Indiana Michigan, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite to the contrary, the Department informed the utilities and the states that it would be unable to comply with the statutory deadline that this court had just reaffirmed.").

DOE's actions throughout the 1990s evaded the spirit of the bargain of the Standard Contract and further frustrated Plaintiff's reasonable expectations under the Standard Contract. See Restatement (Second) of Contracts § 205 cmt. d (noting that "evasion of the spirit of the bargain" can constitute bad faith); Conoco, Inc. v. United States, 35 Fed. Cl. 309, 324 n.9 (1996) (citing Restatement (Second) of Contracts § 205 cmt. d), rev'd sub nom, Marathon Oil Co. v. United States, 177 F.3d 1331 (Fed. Cir. 1999), rev'd sub nom, Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604 (2000), on remand aff'd sub nom, Marathon Oil Co. v. United States, 236 F.3d 1313 (Fed. Cir. 2000). DOE acted in bad faith by allowing

Plaintiff (and all nuclear utilities) to twist in the wind even though DOE realized that the utilities were relying on DOE to begin performance. See 59 Fed. Reg. at 27,008. While DOE asserted it had no obligation to take any contract-holder's SNF prior to 2010, Plaintiff had to create and implement a plan to store the SNF that DOE would not begin picking up as required by the Standard Contract. See Yankee Atomic, 2004 WL 1535688, at *6. DOE's actions evaded the spirit of the bargain and constituted bad faith.

The court should deny the Government's motion for summary judgment on Plaintiff's good faith and fair dealing claim. As set forth above, not only is there sufficient evidence to allow that claim to proceed to trial, see, e.g., Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142, 156 (1991) (precluding summary judgment based on some evidence that Government breached covenant of good faith and fair dealing), there is a reasonable likelihood Plaintiff will establish at trial that the Government violated the Standard Contract's implied covenant of good faith and fair dealing.

## V. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO TAKE DISCOVERY BEFORE RULING ON PLAINTIFF'S MOTION TO DISMISS

The Government asks that it be permitted to take limited discovery under RCFC 56(f), in the event the court would otherwise grant Plaintiff's Motion for Summary Judgment on Liability. Government's Motion at 22-23. The Government indicates that it would like the opportunity to seek evidence supporting the Plaintiff's supposed argument that it was "entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the 'oldest fuel first' requirement of the Standard Contract." Id. at 22. The Government's request should be denied.

Generally, summary judgment is appropriate when there is no genuine issue of material fact. RCFC 56(c); Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1361 (Fed. Cir. 1998). There is no genuine issue of material fact here regarding the Government's liability for breach.

Even the Government itself does not, nor could it, dispute the fact that it failed to begin taking deliveries of SNF on January 31, 1998 as required in the Standard Contract. The only outstanding factual issue is the measure of damages, which must be resolved at trial. Accordingly, it is neither necessary nor proper for the court to allow the Government to conduct additional discovery before ruling on Plaintiff's Motion for Summary Judgment on Liability.

In addition, as also discussed above, Plaintiff is *not* claiming that DOE was obligated to accept Plaintiff's own SNF in 1998 or otherwise outside of the Standard Contract's "oldest fuel first" structure. Whether Plaintiff was first or later in the queue for SNF deliveries is irrelevant; the Government breached each utility's Standard Contract. Therefore, there is no reason for the court to order discovery on the only matter identified by the Government in support of its request.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the court (1) grant Plaintiff's May 28, 2004 Motion for Summary Judgment on Liability; (2) deny the Government's Motion for Summary Judgment Upon Counts I and II of Plaintiff's Complaint; and (3) deny the Government's request for limited discovery.

Dated: September 9, 2004

Respectfully Submitted,

s/Alex D. Tomaszczuk by s/Daniel S. Herzfeld
Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
The Detroit Edison Company

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)