# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT

Defendant, the United States, respectfully submits this reply to "Plaintiff's Reply in Support of its Motion for Summary Judgment and Response In Opposition To The Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint."

## DISCUSSION

### I. IN RESPONSE TO THE GOVERNMENT'S CROSS-MOTION, DEC DID NOT PRESENT ANY EVIDENCE OF DAMAGE TO PRECLUDE SUMMARY JUDGMENT IN THE GOVERNMENT'S FAVOR UPON LIABILITY FOR BREACH OF CONTRACT

#### A. Incorrectly Assuming That "Breach" And "Liability" Are Synonymous Terms, DEC Has Failed To Present Any Evidence Of Damage Resulting From DOE's Delay In Beginning Spent Nuclear Fuel Acceptance From Other Contract Holders

In its response to our cross-motion for summary judgment, plaintiff, Detroit Edison Company ("DEC"), begrudgingly acknowledges that, under the Standard Contract at issue in this case, the Department of Energy ("DOE") was not obligated to begin accepting DEC's spent nuclear fuel ("SNF") by January 31, 1998. Pl. Reply 10 (stating that, "[h]ad DOE used the appropriate [acceptance] rate, Plaintiff, in fact, would have had its first deliveries accepted by DOE no later than 2005 (in the eighth year of the waste management system's operation)").[1] As we established in our cross-motion, the "oldest fuel first" allocation method for SNF acceptance from the various contract holders precluded DEC from obtaining any SNF acceptance rights at the beginning of the SNF acceptance queue, both because of the number of contract holders that

[1] "Pl. Reply __" refers to plaintiff's reply in support of its motion for summary judgment upon liability and response to defendant's cross-motion for summary judgment upon Counts I and II of plaintiff's complaint, dated September 9, 2004. "Pl. Reply App. __" refers to the appendix to that brief. "Def. Br. __" refers to defendant's response to plaintiff's motion for summary judgment upon liability and cross-motion for summary judgment upon Counts I and II. "Def. App. __" refers to the appendix to that brief. "Def. Reply App. __" refers to the appendix to this brief.

had allocations ahead of DEC and because of DEC's failure to submit any delivery commitment schedules ("DCSs") seeking a commitment to accept DEC's SNF on a particular date. Def. Br. 8-13. Nevertheless, DEC devotes the majority of its response to our summary judgment motion upon Count I of its complaint discussing the existence of a breach of contract on January 31, 1998. Pl. Reply 5-8, 12-18.

DEC has missed the point of our cross-motion. DEC seeks a dispositive decision here not only upon breach, but upon liability. Yet, as we established in our cross-motion, the existence of a breach is but one component of liability. Def. Br. 5-6. The Court of Claims has recognized that, before a contractor is entitled to judgment regarding entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions. Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). When considering a summary judgment motion regarding liability, "evidence on damages or quantum is not totally excluded because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469-70, 451 F.2d 602, 605-06 (1971).

In our cross-motion, we established the absence of any evidence that DEC could have been injured by DOE's failure to begin accepting SNF from other contract holders on January 31, 1998, given that, under any scenario, DEC could not have had any rights to the acceptance of its SNF for many years after 1998. Even under DEC's best argument – that DOE should have been obligated to begin accepting its SNF sometime in 2006, Pl. Reply 9 – DOE had no obligation to begin accepting DEC's SNF before DEC filed its complaint in this case. In all of its briefing, DEC has presented absolutely no evidence, other than unsupported attorney statements and

argument contained in its brief, to support its proposition that it has incurred any damages from DOE's delay in beginning SNF acceptance from other contract holders on January 31, 1998.[2] Although it complains about the effect of "predictable cascading delays" and the "domino effect" of DOE's delay in beginning acceptance by January 31, 1998, Pl. Reply 10, DEC cites nothing to evidence that it, as opposed to other contract holders, has incurred damage.

To refute the Government's summary judgment motion, DEC was required to provide, at a minimum, evidence through declaration detailing facts establishing that it suffered some damage from DOE's failure to beginning SNF acceptance from other contract holders by January 31, 1998. See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). Further, "it is well settled that 'a conclusory statement on the ultimate issue does not create a genuine issue of fact.'" Applied Cos. v. United States, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (emphasis in original) (quoting Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990)). "Argument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984).[3] The absence of any evidence, other than counsel for DEC's self-serving statements of alleged injury, is insufficient to create a genuine

---

[2] DEC maintains that its incurred costs include "amounts for the design, licensing, and construction of a dry spent fuel storage facility (including the purchase of dry storage casks), at the River Bend nuclear power plant, to allow the plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up." Pl. Reply 10. Other than counsel's representations in DEC's brief, DEC has provided absolutely no evidence to support these assertions or to establish that they are anything but vague predictions of some future activity in which DEC may engage.

[3] See Avenal v. United States, 33 Fed. Cl. 778, 784 (1995) ("assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact"), aff'd, 100 F.3d 933 (Fed. Cir. 1996); Hoch v. United States, 31 Fed. Cl. 111, 114 (1994) (counsel's assertions regarding fact at issue are insufficient to preclude summary judgment).

issue as to whether DEC has suffered any injury here or to preclude summary judgment in the Government's favor upon liability.

B. DEC Cannot Recover Damages That It Currently Anticipates Incurring In The Future

Given the lack of evidence of present damages, it appears that the only manner in which DEC could recover damages now is by reference to damages that it anticipates it will incur in the future if DOE does not timely accept its SNF. Yet, it is far from clear that DOE will not be able to begin SNF acceptance from DEC when it otherwise would have been obligated to do so. Although DOE currently anticipates that it will not be able to begin SNF acceptance until 2010, it is always possible that, in response to world events, congressional action or other intervening factors could alter that limitation. Def. Reply App. 9-13. Similarly, DOE's increased acceptance of SNF could speed DOE's ability to meet its ability to accept DEC's SNF. Accordingly, it is premature to assume that DOE will partially breach future obligations to accept DEC's SNF.

In this case, DEC is claiming a partial, not a total, breach of contract. "While in the case of a total breach the injured party can at once get judgment for his entire injury," 9 A. Corbin, Corbin on Contracts § 946, at 720 (interim ed. 1979), the non-breaching party may be entitled to "elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id., quoted in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004); see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract"). "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said

instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981).

When a plaintiff elects to treat a breach of contract only as a partial breach, "[i]t has been thought that where there has been no repudiation, the plaintiff can recover damages for his injury only to the date of the writ – that he must treat the breach as only 'partial.'" 9 A. Corbin, supra, § 956, at 747 (emphasis added). Specifically, if the non-breaching party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (under Texas state law, plaintiffs seeking damages for partial breach may recover damages incurred through date of filing the pleading).[4] To the extent that DEC's claim is based upon damages that it may incur in the future from future failures of DOE to accept its SNF, those damages and those future partial breaches are not at issue in this case.

---

[4] In Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), this Court held that damages in a partial breach case could be recovered up to the date of trial, rather than the date of the filing of the complaint. Id. at 648 (citing cases). Given that this Court's jurisdiction is determined by the circumstances existing upon the date that the complaint is filed, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n.4 (1992) (post-filing conduct cannot create jurisdiction that did not exist at outset of litigation); Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"), and given the problems that will always arise in identifying and verifying claimed damages incurred between the conclusion of fact discovery and the commencement of trial, the rules identified in the Restatement (Second) of Contracts and Restatement (Second) of Judgments, establishing an end date for damages for a partial breach at the filing of a complaint, appear correct.

C. Even If DEC Had Established Some Damage Under Its Theory Of DOE's Obligations, Its Theory Of DOE's Obligations Is Incorrect

In addition to DEC's failure to identify any evidence of damage, DEC's arguments regarding its rights to SNF acceptance are wrong. As we established in our cross-motion, any injury that DEC could incur from delays in SNF acceptance would result from DOE's failure to accept DEC's SNF as identified in DEC's approved delivery commitment schedules ("DCSs"). Def. Br. 8-13. The contract provision defining the contract's "Scope" expressly states that any SNF to be accepted "shall be specified in a [DCS] as provided in Article V . . . ." 10 C.F.R. § 961.11, Art. II. Yet, as previously established, DEC did not submit any DCSs that required DOE to begin SNF acceptance under DEC's Standard Contract. Although DEC seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, DEC has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed. Under DEC's theory, DOE will magically know when each contract holder wants SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when they want acceptance regardless of space, capacity, staffing, or transportation limitations; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, DEC has eliminated the only mechanism that would allow the parties to

plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot work.[5]

Similarly, DEC complains that the Court should ignore the 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACR"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance and which did not identify any allocations for DEC in the first 10 years of SNF acceptance, because the allocations there are "counterfeit." Pl. Reply 9; see 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). First, DEC's assertion that these allocations are "counterfeit" is unfounded. The 1995 APR/ACR contains the same acceptance rates as the 1991 ACR and the 1992 ACR, compare Def. App. 411 & 473 with Def. App. 294, and, in fact, contains a higher rate than the "lower bounding case" proposed in the 1990 ACR for use with a Monitored Retrievable Storage ("MRS") facility. Pl. Rep. App. 63, 65.

The plaintiff's argument regarding the 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Reply 9. Yet, it has identified no contract language containing any such requirement, and this Court has recently stated, in response to four SNF plaintiffs' requests that "the contract

---

[5] DEC suggests that the submission of "a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff under the Standard Contract." Pl. Reply 13. Yet, absent DEC's submission of a DCS and DOE's approval of it, DEC has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed.

be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objection basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 9 n.12 (Fed. Cl. Oct. 14, 2004) (Sypolt, J.) (unpublished order).

Further, the acceptance rates contained in various planning documents to which DEC cites at page 9 of its reply brief, including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. See also Def. Reply App. 41-42 ("Receipt rates in this table are only applicable if a CISF is approved"). However, as the United States Court of Appeals for the District of Columbia has recognized, DOE was not obligated to have an operating repository available in 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs

that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

Pl. Reply App. 16 (1987 ACR); see Pl. Reply App. 38 (1988 ACR), 60 (1990 ACR); Def. App. 204 (1985 Mission Plan), 408 (1991 ACR), 38-40; see also Def. App. 209 (1987 ACR: "projections in this initial report are based on current plans and best available information; they are not contractually binding"). Given that DOE was entitled under the Standard Contract to accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Accordingly, DEC cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.[6]

---

[6] DEC suggests that the Court should use the 2004 ACR that DOE recently published as establishing the mandatory minimum annual acceptance rate to impose into the Standard

In any event, DEC never contested or complained about those allocations until it filed this lawsuit in 2002. Its suggestion that it can wait 11 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were "counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier. Established precedent of this Court and its predecessor, the Court of Claims, which requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990). Further, DEC asks this Court to create a legal fiction excusing its failure to take action in response to the 1991, 1992, or 1995 ACRs. To obtain any basis for SNF acceptance in 1998, 1999, or any other year, DEC would have had to have submitted a DCS at least 63 months in advance of the desired SNF acceptance date. 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, for a 1998 acceptance, DEC had to submit a DCS in 1992. DEC, in essence, asks this Court to ignore its failure to protest and its failure to submit any DCSs. DEC fails to explain how it ever could have obtained acceptance rights for specific amounts of SNF on specific dates without having complied with the contractual requirements. It has identified no basis for forgiving its failure to protest.

---

Contract. Pl. Reply 9. However, the 2004 ACR assumes the existence of a repository in 2010, and the acceptance rates that it contains are based upon that assumption. Pl. Reply App. 144 ("projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository"); Def. Reply App. 29. It certainly is irrelevant to a "mandatory" rate applicable to SNF acceptance at an MRS in 1998.

D. DEC's Explanations About The Reasons It Never Submitted A Delivery Commitment Schedule Are Unsupported

DEC further argues that the Court should not tie any liability ruling to the DCS provisions of the Standard Contract because, it says, any attempt to submit a DCS after 1996 would have been futile because, beginning in 1997, DOE refused to approve or disapprove submitted DCSs. Pl. Reply 16. Yet, DEC could have submitted DCSs in every year beginning in 1992 through early 1997, if it had thought that DOE should dispose of its SNF within the first ten years of SNF acceptance. In fact, many other utilities did just that, beginning in 1992, to establish the amount of SNF that DOE would accept within 63 months of submission of the DCS, beginning January 31, 1998. DEC has submitted no evidence that it declined to submit DCSs because it would be "futile" or because the DCS process was somehow flawed, as it now argues. Instead, DEC had no allocations in the first 10 years of SNF acceptance, Def. App. 415, 477, and did not utilize the Standard Contract's disputes resolution process to challenge the lack of allocations. 10 C.F.R. § 961.11, Arts. V.B.1, V.B.2, & XVI.A. DEC's failure to submit a DCS and challenge any denial of that DCS under the contract's "Disputes" provision is fatal to its argument here that the Court should allow it to recover damages on some basis other than DCSs.[7]

E. DEC Cannot Recover Damages Prior To DOE's Failure To Accept Its SNF Under A "Pre-Breach Mitigation" Theory

DEC also asserts that, when a non-breaching party is faced with a partial breach, it must mitigate its losses and that it is entitled to recover any mitigation costs incurred prior to the actual

[7] To the extent that this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), conflicts with this position, we respectfully disagree with the Court's conclusions in that case. Further, in that case, the plaintiff had actually submitted DCSs to DOE in the 1990s. Here, DEC simply took no action until it filed this lawsuit in 2002.

partial breach. Pl. Reply 18-22. Aside from DEC's complete failure to provide any evidence of any damages, its attempts to cast any current damages as efforts to mitigate its possible future losses arising from the Government's partial breach are misguided. As we explained in our cross-motion, DEC is claiming a partial breach of contract, not a total breach, and there is no legal doctrine of "anticipatory partial repudiation." Def. Br. 17-19. Apparently recognizing this fact, DEC claims that it is entitled to recover pre-breach mitigation costs. Although, "[a]s a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*," Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original), costs incurred prior to an actual breach are not incurred solely as a consequence of the breach. At best, such "mitigation" costs might be incurred in anticipation of the possibility that the other party might breach the contract. Given that DEC cannot rely upon an anticipatory repudiation as a basis for supporting any pre-breach damages for a partial breach, it cannot circumvent that rule by arguing that it is entitled to rely on pre-breach "repudiations" to incur pre-breach costs.

In Middleton v. United States, 175 Ct. Cl. 786 (1966), the Court of Claims rejected the argument that a non-breaching party can recover the costs of "mitigation" efforts that occurred prior to the breach:

> [N]either of the parties here may insist upon an expansion of this concept so as to encompass items which relate to a period *antedating* defendant's breach. Both the defendant's right to a setoff and the plaintiff's duty to mitigate are defined in terms of the same fixed time period; like opposites of the same coin, they are inextricably bound together. Thus, plaintiff could no more seek to reduce defendant's setoff by alleging expenses incurred prior to his discharge, than defendant could enlarge his setoff by seeking the inclusion of income which plaintiff earned prior to his erroneous dismissal. . . . It follows, therefore, that all expenses which arose

> prior to plaintiff's discharge that he seeks to include, may not be considered within the framework of the setoff question.

Id. at 792 (italics in original; underlining added). To the extent that DEC claims that costs incurred prior to DOE's partial breach are recoverable under principles of mitigation, DEC's arguments are meritless and cannot resurrect its claims for pre-breach damages. See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649-51 (2004) (explaining reasons that pre-breach mitigation costs are not recoverable and discussing Chain Belt decision cited by DEC).[8] In any event, DEC has not identified through any evidence that it actually has incurred any "pre-breach mitigation" costs. This absence of evidence precludes summary judgment upon liability in DEC's favor and warrants judgment upon Count I in our favor.

## II. DEC HAS FAILED TO PROFFER THE SUBSTANTIAL EVIDENCE NECESSARY TO SUPPORT ITS GOOD FAITH AND FAIR DEALING CLAIM, MANDATING DISMISSAL OF THAT CLAIM

In response to the Government's motion for summary judgment upon DEC's claim for a breach of good faith and fair dealing, DEC asserts that "it can show by clear and convincing evidence that DOE breached the Standard Contract's implied covenant of good faith and fair dealing." Pl. Reply 23. DEC cites to a litany of allegations that allegedly meets the clear and convincing standard and demonstrates that the Government breached the Standard Contract's covenant of good faith and fair dealing borders on the indefensible. Pl. Reply 23-24. DEC

[8] In its reply, DEC cites to Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), as supporting its right to recover pre-breach mitigation costs. Pl. Reply 11-12, 20. However, in response to our motion for reconsideration of that decision, in which we argued that the Court should not prejudge whether pre-breach mitigation was available without briefing upon that subject, the Court in TVA issued an order, dated August 12, 2004, stating that our motion was based upon "erroneous premises" and that the Court had not found that the plaintiff could recover damages preceding a partial breach of a specific obligation to the plaintiff there.

points to broad generalizations, such as "DOE's failure to properly implement the DCS process," the "eventual cancellation of the DCS process," the "failure to publish annual APR/ACRs," and "failing to meet the justified expectations of the parties to the Standard Contract" as clear and convincing, or "well-nigh irrefragable proof," that the Government acted in bad faith. Id.

These assertions provide no substantive evidence of any specific malicious intent by DOE to injure this plaintiff or even the nuclear industry as a whole. As we explained in our cross-motion, the presumption that the Government acts in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002); see Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 743 (2003) ("presumption can be surmounted only with a proffer of 'well nigh irrefragable proof' of the government's bad faith which requires a showing of the government's specific intent to injure or actual malice on the part of the government toward the plaintiff"), aff'd, 97 Fed. Appx. 331 (Fed. Cir. 2004); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994) ("to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure"). To establish that the Government's delay in performance was in bad faith, DEC must present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," was "designedly oppressive," or was "actuated by animus toward the plaintiff." Am-Pro, 281 F.3d at 1240.

In response to the Government's motion for summary judgment upon this claim, DEC did not present any evidence, let alone "clear and convincing evidence," to indicate that the

Government's delay in accepting DEC's or any other contract holder's SNF was created with an intent to injure DEC. Instead, DEC merely asserted in its brief, through statements of counsel, that the Government's delays should be viewed as constituting malicious intent. As previously discussed, to refute the Government's summary judgment motion, DEC was required to provide, at a minimum, evidence through declaration detailing facts establishing the intent of the Government to injure DEC. See Barmag Barmer, 731 F.2d at 836. Further, "a conclusory statement on the ultimate issue does not create a genuine issue of fact," Applied Cos., 144 F.3d at 1475 (emphasis in original) (quoting Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990)), and "[a]rgument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984).[9]

DEC asserts that DOE's bad faith is self-evident through its implementation of the DCS process. Pl. Reply 24. Although DEC complains that DOE "did not allow utilities to identify 'all SNF and HLW [they wished] to deliver to DOE,' as permitted by the Standard Contract" in DCSs that contract holder utilities submitted, Pl. Reply 24, DEC never responded to DOE's DCS instructions, complained about those instructions, or submitted a DCS. In fact, and importantly, DEC did not have any acceptance allocations in at least the first ten years of the SNF acceptance queue, Def. App. 415, and, given that the acceptance allocations were developed in accordance with the contractual provision that generally requires DOE to accept SNF on an "oldest fuel first"

[9] See Avenal v. United States, 33 Fed. Cl. 778, 784 (1995) ("assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact"), aff'd, 100 F.3d 933 (Fed. Cir. 1996); Hoch v. United States, 31 Fed. Cl. 111, 114 (1994) (counsel's assertions regarding fact at issue are insufficient to preclude summary judgment).

basis, 10 C.F.R. § 961.11, Art. IV.B.5(a), DEC has no basis for asserting that it should have had allocations in 1998. Although DEC asserts without foundation that DOE "void[ed]" other utilities' DCSs, Pl. Reply 25, DOE certainly could never have "voided" any DEC DCSs since DEC never submitted any for approval and, further, under the "oldest fuel first" allocation system, had no basis upon which to submit them.[10] Further, DEC has presented absolutely no evidence that DOE's decision to suspend approvals of DCSs was made for the purpose of "injuring" DEC. Given that DEC had no acceptance allocations in at least the first 10 years of the SNF acceptance program, see Def. App. 415, and that DEC never submitted a DCS for approval, DEC cannot support an allegation that the suspension of the process was directed with any malicious intent at DEC.

---

[10] Further, no approved DCSs were ever "voided." As Mr. Zabransky, now the DOE contracting officer for the Standard Contract, has testified, when DOE determined that it would not be able to begin SNF acceptance in 1998, it stopped making commitments to accept SNF. Def. Reply App. 32-33. A few DCSs were in the process of being approved when that determination was made had not yet completed the approval process, either not yet having been approved by the contracting officer or not yet having been communicated to the contract holder. See Pl. App. 104-13; Def. Reply App. 33-34. "[I]t has never been doubted that any public officer in the Departments may correct his own errors, and open, reconsider, and reverse in whole or in part any case decided by himself." Rollins v. United States, 23 Ct. Cl. 106, 123 (1888); see Cotton v. United States, 29 Ct. Cl. 207, 225 (1894) ("[w]e have always understood that a public officer could open and reconsider any decision made by himself, like a court"). Even when a final decision is deemed "irrevocable" pursuant to statute or regulation, it becomes irrevocable only when the action described in the final decision has become an "accomplished fact," having been communicated to the interested party and implemented. See, e.g., Comptroller General Warren to the Secretary of War, B-28964, 22 Comp. Gen. 291, 292-93 (1942) ("[s]uch an action may be rescinded at any time before it is consummated by the giving of official notice thereof to the employee, but not thereafter"); Decision by Comptroller General, 3 Comp. Gen. 942, 944, 1924 WESTLAW 1178, at 3 (1924) ("before a deduction has been certified to this office for the purpose of raising a charge against the contractor, the Postmaster General may correct his own errors and open, reconsider, and reverse in whole or in part any case decided by himself"). DEC's insinuation that DOE's actions were improper is wholly unsupported. In any event, DEC has made no allegation that DOE voided its DCSs.

Although DEC asserts that this Court in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), found that DOE breached its duty of good faith under the Standard Contract, see Pl. Reply 25, DEC has misread that decision. Unlike DEC, TVA had allocations in the first ten years of the repository under the "oldest fuel first" allocation system that the Standard Contract mandates. TVA submitted DCSs to DOE for approval based upon those allocations, but DOE was unable either to approve or to disapprove them. The Court found that, pursuant to Article V.B of the contract, DOE was required either to approve or to disapprove a submitted DCS within three months of receipt and that DOE's failure to do so constituted a partial breach of the Standard Contract. Id. at 674. The Court did not find an intent to injure the plaintiff there or a breach of the duty of good faith and fair dealing.

DEC also cites to Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), as including a finding of "clear and convincing intent to injure" the plaintiff in that case supporting a breach of good faith and fair dealing claim. Pl. Reply 23-24. Although the parties in Commonwealth Edison had not filed any briefing upon the plaintiff's good faith and fair dealing claim,[11] the Court there speculated that DOE's use of the 1991 Annual Capacity Report ("ACR") "to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing," stating that the acceptance rates in that ACR appeared inconsistent "with the 'justified expectations' of plaintiff." Id. at 665 (emphasis added). Nevertheless, the Court then denied the Government's motion for partial summary judgment regarding the rate of SNF acceptance on other grounds. Id. at 666. With all due respect to the

---

[11] The briefing that the Court in Commonwealth Edison considered did not include any arguments about good faith and fair dealing claims. See Commonwealth Edison, 56 Fed. Cl. at 653 n.2 & 4.

Court's discussion in Commonwealth of the duty of good faith, the Court did not identify in that discussion the well-established requirement of clear and convincing evidence of an intent to injure the plaintiff, eliminating one of the essential components of a lack of good faith claim against the Government, and not intent to injure was identified in the decision.

Further, the plaintiff here has conceded that it would not have had any allocations in the first ten years of the SNF acceptance under the allocations and acceptance rates in the 1991, 1992, or 1995 ACRs. See Response to Defendant's Proposed Findings of Fact ¶ 38, at 29. Further, even under the revised acceptance rates that DEC proposes, it would not have any SNF acceptance rights until 2006, at the earliest. See Pl. Reply App. 145 (in document containing rates that plaintiff believes appropriate, plaintiff's first SNF acceptance begins eight years after first program SNF acceptance). Accordingly, DEC has no basis for complaining that DOE has already acted in bad faith towards DEC.[12]

Nothing in any of the evidence that DEC proffers demonstrates any specific intent by DOE to injure DEC, that DOE's actions were "motivated alone by malice," or that DOE's actions were part of a course of conduct that was "designedly oppressive" or "activated by animus" toward DEC. See Am-Pro, 281 F.3d at 1241. The only "evidence" is counsel's efforts to twist factual scenarios into something sinister – without any actual evidence of malicious intent. Counsel's speculation cannot form the basis of "clear and convincing evidence" of DOE's intent.

---

[12] DEC's citation to Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991), at page 27 of its reply brief only serves to highlight the fact that, unlike the plaintiff in Solar Turbines, DEC has provided no evidence whatsoever of any specific malice or bad faith toward it by DOE. Similarly, its reference to section 305, comment d, of the Restatement (Second) of Contracts to support the view that "'evasion of the spirit of the bargain' can constitute bad faith," Pl. Reply 27, again eliminates the presumption of good faith upon the part of Government employees and the requirement for clear and convincing evidence of an intent to injure the plaintiff.

Because there is no evidence that supports DEC's claim for a breach of the duty of good faith and fair dealing, that claim should be dismissed.

III. DEFENDANT'S REQUEST FOR LIMITED DISCOVERY ON LIABILITY ISSUES IS APPROPRIATE UNDER THESE CIRCUMSTANCES

The Government requested limited discovery in the event that the Court is considering granting plaintiff's motion for summary judgment regarding liability. DEC opposes that request, asserting that the Court need not look beyond its pleadings to decide its motion for summary judgment on liability. Pl. Reply 39. However, the DEC motion raises issues that have not been addressed by this Court previously -- specifically, whether a contract holder that did not have any allocations of SNF in the first ten years of the operation of the repository has a breach of contract claim, including whether an injury has been suffered sufficient to assert the claim at this time.

A party cannot be deprived of the discovery needed to place at issue material factual questions in opposition to a motion for summary judgment. When discovery is reasonably directed to facts essential to justify the party's opposition, such discovery must be permitted or summary judgment refused. The normal summary judgment requirement – that a nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" – is "qualified by [RCFC 56(f)'s] provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." Opryland USA, Inc. v. The Great Am. Music Show, Inc., 970 F.2d 847, 852 (Fed. Cir. 1992) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 250 n.5 (1986)).

As we explained in our motion, virtually no discovery has been taken from DEC. Our discovery here will include inquiries into (1) DEC's historical understanding of the purpose of the

delivery commitment schedules and its understanding of the meaning of the Standard Contract's acceptance schedule provisions, both at the time of contract formation and subsequently; (2) the bases upon which DEC's understanding of the contract provisions rests; and (3) the actual reasons that DEC declined to submit delivery commitment schedules to DOE. Def. Reply App. 43-44. Limited discovery may be appropriate here, where material facts are needed by the Government to fully oppose DEC's motion for summary judgment regarding liability.

## CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment upon Counts I and II of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

October 29, 2004

CERTIFICATE OF FILING

I hereby certify that on October 29, 2004, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.