A Yes, I do.

Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.

A Yes.

Q Do you recall that reassessment?

A Yes, I do.

Q Do you recall what the result of that reassessment was?

A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.

Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?

A 1998.

Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?

A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.

Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?

A Yes, it does.

Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?

A Yes, I do.

Q Would you identify it for the Court, please?

A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.

Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?

A Yes, at that time.

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from -- letter from the department's contracting officer.
Q Thank you.
Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| CONNECTICUT YANKEE ATOMIC POWER | ) | Case Nos.: |
| COMPANY, and MAINE YANKEE ATOMIC | ) | 98-126C |
| POWER COMPANY, | ) | 98-154C |
| Plaintiffs, | ) | 98-474C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 3888 through 4106

Place: Washington, D.C

Date: August 4, 2004

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

Q. What was the purpose of the 1991 ACR?

A. It was to provide the contract holders what would be the waste acceptance capacity of the Federal Waste Management System and to provide them also with the allocations that they will need for filling out their delivery commitment schedules.

Q. Were you involved in the preparation of the 1991 ACR?

A. Yes, I was.

Q. And I believe you've already said this, but which office within DOE prepared this document?

A. It was the Office of Civilian Radioactive Waste Management.

Q. Thank you. Did the contracting office have any role in the preparation of the 1991 ACR?

A. Yes, they had a minor role in the preparation of the document.

Q. And what was their minor role?

A. After we had developed a draft version of it, we sent it around to several organizations for comment, and I believe they submitted some minor comments to us on the document prior to its being finalized.

Q. Was the 1991 ACR sent out by the contracting officer?

A. Yes, it was. It was sent out to all contract holders under the signature of the contracting officer.

Q. Mr. Pollog, could I direct your attention to page five of this document, please? Mr. Pollog, what is the information set forth in table 2.1 on page five of this document?

A. These are the projected waste acceptance rates starting in 1998 and going through 2007.

Q. How were these rates developed?

A. They were based primarily on the Nuclear Waste Policy Amendments Act of 1987 and restrictions placed on a monitored retrievable storage system in that Act.

Q. Could we go to Defendant's Exhibit 23? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 23. Do you recognize this document?

A. Yes, I do.

Q. Could you explain to the Court what it is?

A. Yeah, it's an action memo from Ronald Milner, who is the associate director for the storage and transportation division at that time, to John Bartlett, seeking his approval for the publication of the 1991 annual capacity report.

1991 ACR became the document that purchasers would use for submittal of delivery purchase schedules. The prior ones were more for information and planning, but this one was the document that the purchasers would use to submit their delivery commitment schedules.

Q. Could we pull up Plaintiffs' Exhibit 52, please? Mr. Pollog, do you recognize what's been marked as Plaintiffs' Exhibit 52?

A. Yes, I do.

Q. Could you tell the Court what it is, please?

A. It is the 1987 annual capacity report.

Q. Could I direct your attention to page two of the report, that second, the first full paragraph highlighted or brought up. Would you please read the portion that's been excerpted from the document?

A. Yes. "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE Waste Management System (WMS).

Once approved, these schedules will become the basis for final delivery schedules to be submitted by the purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility."

Q. Mr. Pollog, does the paragraph you've just read comport with your understanding as to the role of the 1991 ACR?

A. Yes, it does.

Q. Was the document that's been marked as Plaintiffs' Exhibit 52 provided to standard contract holders?

A. I believe so.

Q. Can we have Defendant's Exhibit 18, please? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 18?

A. Yes, I do.

Q. So could you tell the Court what this document is?

A. This document is the 1990 annual capacity report that was produced by the Office of Civilian Radioactive Waste Management.

Q. Direct your attention to page two of this document. Could you read the portion of the document

that's been highlighted on the computer screen?

A. Yes, I can. "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers. The standard contract states that, beginning in April 1991, the ACR is scheduled to be replaced by the annual acceptance priority ranking report for receipt of SNF/HLW.

The contract further states that, beginning in January 1992 and based on the acceptance priority ranking, the purchasers shall submit delivery commitment schedules to DOE identifying the range of discharge dates of the SNF/HLW that the purchasers propose to deliver to the Waste Management System."

Q. Thank you. And just so the record's clear, the second sentence that you read actually reads, "the standard disposal contract." Mr. Pollog, the portion of the document that you just read, does that comport with your understanding as to what the role of the 1991 ACR was?

A. Yes, it is.

Q. Was this document provided to standard contract holders?

A. Yes , I believe this document, along with all other ACRs, were provided to standard contract

disposal holders.

Q. Can I direct your attention to page seven of Defendant's Exhibit 18?

MR. STOUCK: Your Honor, could I just interpose an objection for the record? I'm sorry to interrupt. We'll take this up on cross-examination. Mr. Pollog was asked at deposition, "Do you recall having any work or having any involvement in the preparation of the 1990 ACR that preceded that?

"Answer: I don't believe so."

So our objection is the testimony should be limited to reading from the documents, but we'll take it up on cross-examination.

THE COURT: Okay. You may continue, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you see page seven of the 1990 ACR?

A. Yes, I do.

Q. I believe you testified as to a difference in rates between the 1990 ACR and the 1991 ACR. Were these the rates that you were discussing earlier?

A. Yes, they are.

Q. And I believe you talked about the lower

it says 400, 600 and 900, to that rate and then just sum up what every purchaser's allocation would be in any given year and put them into this table.

Q. Could we highlight the line for Yankee Atomic on the table, please? Mr. Pollog, if we could look at the line for Yankee Atomic Electric Company. Is 9.8 the MTU allocation for Yankee Atomic in year one?

A. Yes, it is.

Q. And similarly, is 10.1 the MTU allocation for Yankee Atomic in year 2?

A. Yes, it is.

Q. Mr. Pollog, how are utilities supposed to use the information in table 3.1?

A. They would use that information for filling out and submitting their delivery commitment schedules.

Q. Let me back up a second to the highlighted for Yankee Atomic. If there's no entry, if there's no numerical entry in a given year for, say, Yankee Atomic, at the fifth entry over, there's two dashed lines, what is meant by that?

A. That means they would have no allocation in that given year.

Q. Thank you. And specifically, how were

utilities told to use the allocations in this chart to submit their DCSes?

A. They were told to use allocations as the basis for submitting their delivery commitment schedules in any given year. The total sum of the MTUs you would ask for in your DCS should equal what you were given that year in this table of the ACR.

Q. Can we have's Exhibit 30.001? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 30.001?

A. Yes, I do.

Q. Could you tell the Court what this is?

A. This is a letter from Michael Detmer transmitting the DCS instructions to Mr. Buchheit, who was manager of fuel procurement for New Hampshire Yankee division of the public service of New Hampshire.

Q. And what was the purpose of these instructions?

A. This was to provide the contract holders instructions on how to complete their delivery commitment schedules.

Q. Could we go back to Defendant's Exhibit 24. Table 3.1, page nine? Mr. Pollog, how come this chart presents information for 10 years?

don't know why that clause was placed in the DCS instructions, you think one possible reason is that DOE, if DOE, it was to provide for a situation where if DOE had more capacity to allocate, it could have increased the number of MTUs that particular purchasers would be allocated?

A. That's certainly, could be used in consideration with this clause, yes.

Q. Well, that's one possible explanation you gave at your deposition, do you recall that?

A. Not specifically at this point in time.

Q. You do think that's one possible explanation?

A. Yes, I think that could certainly be used in considering this clause, yes.

Q. That there might be additional capacity later to allocate it?

A. That's certainly consideration, yes.

Q. And that appears in fact to be what happened with this July 2004 ACR. There's additional allocation that the DOE wishes to allocate, additional capacity that the DOE wishes to allocate, and now, they're asking for new DCSes, is that right?

A. The acceptance rates in the 2000 ACR are greater than the ones that were in the '91 ACR or '95