**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on January 27, 2006)

| | |
|---|---|
| **THE DETROIT EDISON COMPANY,** Plaintiff, v. **THE UNITED STATES,** Defendant. | No. 02-926C (Judge Williams) |

**PLAINTIFF DETROIT EDISON'S SUPPLEMENTAL OPENING BRIEF IN RESPONSE TO THE COURT'S ORDER OF DECEMBER 20, 2005**

Pursuant to the Court's order of December 20, 2005, plaintiff The Detroit Edison Company ("Detroit Edison") hereby submits this supplemental opening brief addressing the impact on the parties' pending dispositive motions of the recent decision of the U.S. Court of Appeals for the Federal Circuit in *Indiana Michigan*[1] and certain prior decisions by another judge of this Court in other spent nuclear fuel ("SNF") cases,[2] all filed since the close of briefing on the pending motions here.

As described below, these new decisions fully support Detroit Edison's entitlement to judgment in its favor on its pending motions for partial summary judgment on the government's

---

[1] *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005).

[2] *Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) (denying government's liability motion); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) (granting plaintiff's liability motion); *Entergy Nuclear Indian Point 2 v. United States*, 64 Fed. Cl. 515 (2005) ("*ENIP2*") (same); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) (same); and *Consolidated Edison Co. v. United States*, 67 Fed. Cl. 285 (2005) (denying government's motion to dismiss breach claim).

liability for breach of contract and on the acceptance rate. Indeed, for present purposes, the three overarching and dispositive principles established by these decisions are:

- with respect to any SNF plaintiff that, like Detroit Edison, was a petitioner in the *Northern States* case in the U.S. Court of Appeals for the D.C. Circuit, the government is **collaterally estopped** from arguing that DOE breached any later than January 31, 1998;

- an SNF plaintiff may recover the proven **expenses of mitigating** DOE's breach(es) of contract (such as the costs of re-racking and constructing additional on-site storage facilities), even if it incurred those expenses based only on the prospective inability of the Department of Energy ("DOE") to perform and before DOE actually breached; and

- the **scheduling process based on the Delivery Commitment Schedules ("DCSs")**, which is the keystone of the government's liability and damage defenses in this and other SNF cases, is of **"dubious" and "questionable"** validity for purposes of determining either DOE's liability for breach of contract or the fact and amounts of an injured utility's damages.

## PROCEDURAL BACKGROUND

### A. From Contract Through Complaint

The procedural posture of this case is not unlike those of the above-referenced decisions of this Court. Detroit Edison signed its Standard Contract with DOE in June 1983. Pursuant to that contract, Detroit Edison had dutifully paid DOE more than $84 million by 2002, and it continues to pay DOE between $8 million and $9 million each year. In August 2002, more than four years after DOE's deadline of January 31, 1998 under the Nuclear Waste Policy Act ("NWPA") and its Standard Contract with Detroit Edison to begin removing the nuclear utility industry's SNF, Detroit Edison filed its complaint in this Court. In that complaint, Detroit Edison alleged that the government had partially breached its Standard Contract with Detroit

Edison (Count I) and the implied covenant of good faith and fair dealing (Count II), and that the failure to remove Detroit Edison's SNF constituted an uncompensated taking (Count III).[3]

**B. Earlier Round of Dispositive Motions**

After filing an answer, the government filed a motion for summary judgment (dated November 21, 2002) on the first two counts. As it had in this Court's cases cited above, the government argued in its motion that liability required a showing of not only breach but some resulting damages, and that Detroit Edison could not possibly suffer any breach and, consequently, could not possibly incur any damages before the date of the first scheduled pickup, a date determined pursuant to the DCS process. According to the government, because Detroit Edison had not submitted DCSs before DOE unilaterally suspended the DCS process in 1997 and, thus, had not obtained any approved DCSs, it had no contractually binding scheduled pickup dates. The government also argued that the submission of a DCS constituted a condition precedent to DOE's obligation to remove Detroit Edison's SNF, and that Detroit Edison had waived its pickup rights by not satisfying that condition.

Detroit Edison opposed the government's motion and filed a cross-motion for partial summary judgment (dated December 19, 2002) on the acceptance rate, arguing that the acceptance rate was an omitted but essential term of the contract and was not a term that the DCS process had ever been intended to supply.[4]

---

[3] The government had previously moved to dismiss the takings claim (Count III), a motion that the Court denied except to the extent that the takings claim related to vested contract rights. *See Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302-03 (2003).

[4] Shortly thereafter, the government filed a motion for partial summary judgment (dated January 3, 2003) on a topic known as "Greater-than-Class-C" ("GTCC") waste, further discussed below.

**C. More Recent Round of Dispositive Motions**

More recently, Detroit Edison filed a motion for partial summary judgment (dated May 28, 2004) on the government's liability for breach, and the government filed a supplemental brief (dated May 27, 2004) as well as a second, supplemental motion for summary judgment (dated July 28, 2004) on Counts I and II, in which it continued to rely on the DCS process as its principal defense.

**D. Current Status of Pending Motions**

Four of the pending motions are fully briefed and ripe for decision. We discuss below the effect of the new decisions on those motions.

The GTCC motion, though fully briefed, is at most of academic interest. None of the new decisions within the scope of this supplemental brief addresses GTCC waste. As Detroit Edison noted in its opposition (dated February 3, 2003), it has not yet made any allegations relating to GTCC waste or sought damages for such waste. Thus, the Court need not and should not decide it at this time. (If the Court nonetheless were to decide the motion on the merits, it should deny the motion for the reasons stated in Detroit Edison's opposition.)

## ARGUMENT

The above-referenced intervening decisions of the Federal Circuit and this Court fully support Detroit Edison's entitlement to rulings (i) granting its pending motions for summary judgment on (a) the government's liability for breach of contract; and (b) the acceptance rate; and (ii) denying the government's pending motions for summary judgment on liability.

**A. The Government Is Collaterally Estopped from Contesting Its Liability for Breach as to Detroit Edison**

The foregoing four motions all relate to the question of the government's liability to Detroit Edison for breach of contract (as well as breach of the covenant of good faith and fair

dealing). DOE unquestionably breached the Standard Contract between it and Detroit Edison, and it did so no later than the statutorily and contractually required start date of January 31, 1998. As in *System Fuels*, because Detroit Edison was a petitioner in *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997) ("*Northern States I*"), the government is collaterally estopped from arguing otherwise. *See Systems Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 176 (2005) ("the government is collaterally estopped from arguing that the partial breach took place after January 31, 1998"); *cf. Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 185 (2005) (Lettow, J.) ("The court rejects Boston Edison's collateral estoppel claim *unless* it shows in future proceedings that it was a party in a case where the date of breach was a critical and necessary element of the judgment." (emphasis added)).

Even apart from collateral estoppel, however, it is clear that DOE has breached Detroit Edison's contract. As Detroit Edison's motion papers describe, DOE did so not only by failing to take the steps needed to start disposing of SNF by January 1998 and by failing actually to start disposing of the nuclear utility industry's SNF by the statutory and contractual deadline (an express contractual requirement of *every* Standard Contract, including Detroit Edison's), but also by failing to *continue* disposing of the industry's SNF at a reasonable rate – that is, a rate that would have avoided the need for any utility, including Detroit Edison, to incur the costs of planning, designing, constructing and operating additional on-site storage for SNF discharged after the deadline.

**B. Detroit Edison May Recover Its Mitigation Expenses, Including Any That It May Have Incurred Before Any Breach**

As a direct and proximate result of the inevitable domino effect of these long-anticipated breaches, coupled with DOE's own prior announcement that it would be unable to start disposing of SNF before the year 2010, Detroit Edison has actually and reasonably incurred mitigation

expenses for increasing the capacity of its spent fuel pool and for preliminary engineering work on a dry storage facility. In particular, from 2001 through the present, Detroit Edison has incurred as much as $3.9 million in wet storage expansion costs attributable to DOE's failure to begin removing SNF by January 1998 and to continue removing it at a reasonable rate thereafter. In addition, Detroit Edison has incurred more than $1.1 million in connection with its planned dry storage facility, which Detroit Edison would have no need for but for DOE's failures to start and continue removing SNF. *See generally* Declaration of Wayne A. Colonnello (Exhibit A hereto). The Federal Circuit's decision in *Indiana Michigan*, as well as this Court's decision in *Boston Edison* and other cases, confirm Detroit Edison's right to recover those mitigation expenses – including any that may have been incurred before, but in anticipation of, DOE's breaches – as damages. *See:*

- *Indiana Michigan*, 422 F.3d at 1374-75 (partial-breach claimant may recover proven pre-breach mitigation expenses);

- *Boston Edison*, 64 Fed. Cl. at 184 (utility's allegation that it had incurred re-racking expenses before the contractual deadline of January 31, 1998 was sufficient to establish injury-in-fact for standing purposes because such mitigation expenses, if proven, would be recoverable as incidental damages);

- *Entergy Nuclear Generation*, 64 Fed. Cl. at 342 n.7 (proven costs of re-racking would constitute an incidental loss compensable as damages if incurred to mitigate breach); and

- *System Fuels*, 65 Fed. Cl. at 176 (although the government is estopped from arguing that the partial breach took place after January 31, 1998, "[t]he plaintiff is not . . . estopped from seeking damages incurred prior to January 31, 1998 where it was acting to mitigate its losses after DOE suspended the DCS process and it had become evident that the January 31, 1998 deadline would not be met") (citing *Entergy Nuclear Indian Point 2 v. United States*, 64 Fed. Cl. 515, 523-24 (*"ENIP2"*); *Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665, 674 (2004)).

Here, because the government is estopped from asserting that the breach occurred anytime after January 31, 1998, it is clear that Detroit Edison incurred all of the mitigation damages presently at issue *following* DOE's breach and, therefore, may unquestionably recover all of them upon presenting proper proof at trial.

**C. The DCS Process Is Irrelevant to Determining Liability or Damages**

In opposing Detroit Edison's motions and in moving for summary judgment in its favor, the government relies only on the initially flawed, ultimately corrupt, and now judicially discredited DCS process, which DOE itself never regarded or treated as contractually binding in any event (but which the Court would necessarily have to accept and rely on in full to grant the government's motions). In the government's view, this process operated principally as a mechanism for determining an allegedly binding pickup schedule (under which, *mirabile dictu*, Detroit Edison has yet to suffer a breach, let alone any legally cognizable damages) and secondarily as an alleged condition precedent that Detroit Edison did not meet. We briefly address in turn each contention and the effects of the above-cited decisions on this linchpin of the government's arguments.

According to the government, the DCS process established an acceptance rate, which in turn established a contractually binding schedule (at least until DOE unilaterally suspended the process in 1997 or earlier, and again in 2004, following a short resumption earlier that year). According to the government, Detroit Edison has not yet suffered any cognizable damages because it has no entitlement to recover for pre-breach damages and, under the DCS-determined schedule, will not suffer an actual breach until 2008. Both of these premises are faulty.

The first premise is faulty because, as noted above, *Indiana Michigan* held that SNF plaintiffs may recover proven mitigation expenses, even those incurred before the breach itself.

As to the second premise, though Judge Lettow did not find it necessary to definitively decide the issue in *Entergy Nuclear Generation*, he nonetheless characterized the government's DCS-based schedule arguments as "dubious" in light of the holdings of the D.C. and Federal Circuits that "'the NWPA imposes an unconditional obligation on [DOE] to begin disposal of the SNF by January 31, 1998.'" *Entergy Nuclear Generation*, 64 Fed. Cl. at 343 n.8 (quoting *Northern States I*, 128 F.3d at 761 (D.C. Cir. 1997); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); and *Indiana Michigan*, 88 F.3d at 1275-76 (D.C. Cir. 1996)). Judge Lettow further observed that, for this and other reasons, other judges of this Court had not accepted the government's DCS-based arguments. *See Entergy Nuclear Generation*, 64 Fed. Cl. at 343 n.8 (citing *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 503-05 (2005); and *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655-56 (2003)); *see also ENIP2*, 64 Fed. Cl. at 524 (referring to the "questionable premise that previously filed DCSs could determine the date of the breach" and again noting that other judges of the Court had not accepted the government's arguments that the DCS process governs liability and recovery of damages).

Judge Lettow also observed that the DCS process could not override the determinations of the D.C. Circuit and the Federal Circuit that "the NWPA imposes an unconditional obligation on [DOE] to begin disposal of the SNF by January 31, 1998." *See ENIP2*, 64 Fed. Cl. at 524 n.14; *see also id.* at 525 (Standard Contract would be illusory if DOE, through the DCS process, had unfettered discretion to determine its obligations under the contract).

The government also argues here that each utility had to submit a DCS as a condition precedent to DOE's obligations to pick up that utility's SNF or HLW. We have previously described at length the reasons why this argument fails – in brief, because the DCS process was

not contractual, because it was flawed in any event in its implementation, because DOE manipulated the process to suit its litigation needs, and because DOE ultimately abandoned the process. *See, e.g.*, Pltf's Opp. (Dec. 19, 2002) at 40-74; Pltf's Reply (June 10, 2004) at 14-33; Pltf's Mot. for Leave (Jan. 27, 2005) at 1-4. It is at best farfetched for the government to claim that Detroit Edison's liability could be controlled by a process that DOE could (and did) unilaterally switch on and off at its whim.

## CONCLUSION

For the reasons stated in plaintiff Detroit Edison's pending motions, as supplemented by the foregoing, Detroit Edison respectfully requests that the Court:

(1) **grant** Detroit Edison's motion for summary judgment on liability (dated May 28, 2004);

(2) **grant** Detroit Edison's cross-motion for partial summary judgment on the acceptance rate (dated December 19, 2002);

(3) **deny** the government's *first* motion for summary judgment on Counts I and II (dated November 21, 2002);

(4) **deny** the government's *second* motion for summary judgment on Counts I and II (dated July 28, 2004); and

(5) **deny** (whether as unripe for decision or on the merits) the government's motion for partial summary judgment on GTCC waste (January 3, 2003).

Dated: January 27, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*The Detroit Edison Company*

*Of Counsel:*
Jay E. Silberg
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
Tel: (202) 663-8000
Fax: (202) 663-8007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed on January 27, 2006)

| | |
|---|---|
| THE DETROIT EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-926C<br>(Judge Williams) |

## DECLARATION OF WAYNE A. COLONNELLO

The undersigned, Wayne A. Colonnello, pursuant to 28 U.S.C. § 1746, does hereby declare as follows:

**Background**

1. My name is Wayne A. Colonnello. I am the Director of Nuclear Support for The Detroit Edison Company ("Detroit Edison"), the plaintiff in this case. My business address is The Detroit Edison Company, 2000 Second Avenue, Detroit, Michigan 48226. I give this declaration in support of Detroit Edison's motion for partial summary judgment on the liability of the U.S. Department of Energy ("DOE") for breach of its Standard Contract with Detroit Edison. Unless otherwise indicated, I have first-hand personal knowledge of the facts described herein.

2. In 1982, I received a Bachelor of Science degree in Mechanical Engineering from the University of Michigan-Dearborn. I soon joined Detroit Edison and have worked there ever since. Detroit Edison owns and operates a nuclear power plant that is located in Monroe County,

Michigan, and is known as the Fermi 2 plant. During my employment with Detroit Edison, I have served in a number of management positions at the Fermi 2 plant. Among other positions, I have served as a shift technical supervisor, the director of safety engineering, the supervisor of emergency planning, project manager for nuclear maintenance regulatory compliance, and chairman of the on-site review committee (which is tasked with reviewing the operational and safety impact of design changes to the plant).

3. In 2004, I was assigned to my current position as Director of Nuclear Support. In this position, I am responsible for developing the overall strategic plan and goals with respect to the company's generation of electricity through the use of nuclear energy. These responsibilities include allocating and administering funds for capital projects and for operations and maintenance ("O&M"). This includes responsibility for financial analysis and planning with respect to the storage of the spent nuclear fuel ("SNF") generated by Detroit Edison in the past and on an ongoing basis.

4. Throughout my career at Detroit Edison, I have participated in a number of industry working groups. Most recently, I have participated in a working group concerned with the life cycle management of nuclear assets.

**Costs Incurred by Detroit Edison
As a Result of DOE's Non-Performance**

*In General*

5. In June 1983, Detroit Edison signed a Standard Contract with DOE providing that Detroit Edison would pay substantial ongoing annual fees to DOE, in return for which DOE was to begin removing and disposing of the nuclear industry's SNF by January 1998. To date, Detroit Edison has paid DOE approximately $108 million under this Standard Contract, but DOE has yet to begin removing any utility's SNF. Indeed, as is generally known throughout the

nuclear utility industry, DOE long ago announced that it did not expect to begin removing SNF from any utility's plant until the year 2010 at the earliest.

6. As a result of DOE's stated inability to begin removing and disposing of SNF before 2010 and its failure to begin doing so by the deadline in January 1998, Detroit Edison has been incurring significant additional costs of storing SNF at the Fermi 2 plant since 2001 and is almost certain to incur such costs in increasing amounts in the future.

7. The principal costs incurred to date relate to the expansion of an existing wet storage facility, or "spent fuel pool," located at the Fermi 2 plant. This facility is used to temporarily store SNF generated and discharged by the plant, pending the eventual removal and disposal of it by DOE. More recently, Detroit Edison also has begun to incur costs relating to the planned construction of a dry storage facility that will be needed by 2009.

*The Expansion of the Spent Fuel Pool*

8. As of 1995, Detroit Edison projected that it would need additional storage room in its spent fuel pool by 2001 and subsequently obtained regulatory approval to expand the storage capacity of the pool in three phases.

9. In early 2001, Detroit Edison carried out Phase 1 of the expansion by installing additional racks in the spent fuel pool, using previously unused space in the pool. The total cost to Detroit Edison of this expansion was approximately $5.1 million. Had DOE begun to remove and dispose of SNF by the contractual deadline and continued to do so at a reasonable rate thereafter, Detroit Edison would have undertaken a smaller expansion than it did. As much as $1.8 million of the cost of the actual expansion (approximately one-third of its total cost) is attributable solely to the fact that DOE had not begun removing SNF by January 1998 and its announcements that it did not expect to begin doing so until 2010 at the earliest.

10. Beginning in 2005, Detroit Edison began preparing for Phase 2 of the spent fuel pool expansion, which it will implement in early 2007 to accommodate the need for additional storage beginning in late 2007. Unlike the first phase of the expansion, this phase involves "re-racking," which entails removing existing storage racks from the pool and replacing them in a tighter formation that is capable of using the available space more efficiently (that is, storing more fuel rod bundles in a smaller space). But for DOE's continuing failure to begin removing and disposing of SNF, Detroit Edison would not require any of this additional storage capacity. From 2005 through the present, Detroit Edison has incurred expenses of approximately $1.1 million for preliminary engineering work relating to this effort, and it expects to incur additional expenses for this effort of between $6 million and $7 million over the next two years.

*Preliminary Work on Dry Storage Facility*

11. Detroit Edison projects that Phase 2 of the spent fuel pool expansion will accommodate its storage requirements through 2009. Because DOE has not begun to remove and dispose of SNF and has stated that it does not expect to begin doing so until 2010 at the earliest, Detroit Edison decided in 2001 for cost reasons that it would abandon Phase 3 of the spent fuel pool expansion and construct a dry storage facility instead. But for DOE's continuing failure to begin removing and disposing of SNF, Detroit Edison would have no need for a dry storage facility. To date, Detroit Edison has incurred expenses of approximately $1.1 million for preliminary evaluation and design work relating to the dry storage facility.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 27, 2006.

Wayne A. Colonnello