**No. 02-926C**
**(Judge Williams)**

---

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## DETROIT EDISON COMPANY,

**Plaintiff,**

**v.**

## UNITED STATES,

**Defendant.**

---

# DEFENDANT'S SUPPLEMENTAL BRIEF

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D. C. 20530**
**Tele: (202) 305-7562**
**Fax: (202) 307-2503**

**Attorneys for Defendant**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**Washington, D.C. 20585**

**January 27, 2006**

TABLE OF CONTENTS

PAGE

DISCUSSION ..... 1

I. CURRENTLY, THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT IS CONSIDERING THIS COURT'S JURISDICTION TO ENTERTAIN THESE CASES IN *PSEG NUCLEAR, LLC V. UNITED STATES* ..... 1

II. THE FEDERAL CIRCUIT HAS ISSUED ITS DECISION IN *INDIANA MICHIGAN*, CLARIFYING SOME ISSUES UNRELATED TO THE ISSUES IN THE MOTIONS PENDING BEFORE THIS COURT ..... 3

A. The Federal Circuit Barred Plaintiffs From Recovering Post-Complaint Damages In A Partial Breach Case ..... 3

B. Although The *Indiana Michigan* Decision Allows For The Possibility Of Recoverable Mitigation Damages Beginning May 25, 1994, None Of Detroit's Alleged Damages Were Caused By DOE's Delay ..... 6

III. THIS COURT HAS ISSUED VARIOUS DECISIONS REGARDING THE GOVERNMENT'S LIABILITY FOR DOE'S DELAY ..... 8

A. This Court's Finding In *System Fuels* That The Government Is Barred By Collateral Estoppel From Contesting The January 31, 1998 Deadline For Beginning To Accept SNF Does Not Preclude Judgment In The Government's Favor Here ..... 8

1. This Court In *System Fuels* Found Collateral Estoppel Based Upon The D.C. Circuit's Opinion In *Northern States* ..... 8

2. Here, Detroit Has Submitted No Evidence Of Resultant Injury From DOE's Delay ..... 9

3. The D.C. Circuit In *Northern States* Did Not Consider The Government's Arguments Regarding The Contractual Mechanism For Defining Acceptance Allocation Rights, Precluding Collateral Estoppel On That Issue ..... 11

4. To The Extent That This Court's Rationale Regarding Jurisdiction In *Boston Edison* Is Correct, The D.C. Circuit Would Have Lacked Jurisdiction To Issue Its Decision In *Northern States* ..... 12

TABLE OF CONTENTS (cont'd)

PAGE

B. This Court Has Issued Other Decisions Regarding Liability In The SNF Cases That Reflect Differing Viewpoints ................................ 14

IV. SINCE THE GOVERNMENT FILED ITS MOTION FOR SUMMARY JUDGMENT RELATING TO THE RATE OF SNF ACCEPTANCE ON MAY 27, 2004, THIS COURT HAS ISSUED SEVERAL DECISIONS RELATING TO THAT MOTION ........................................................................ 16

V. THE COURT SHOULD GRANT DEFENDANT SUMMARY JUDGMENT UPON DETROIT'S CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING ............................................................................ 23

CONCLUSION .............................................................................................................. 24

TABLE OF AUTHORITIES

CASES PAGE(S)

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......... 23

Avia Group International, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) .......... 23

Beacon Oil Co. v. O'Leary,
71 F.3d 391 (Fed. Cir. 1995) .......... 11

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) .......... 9, 13, 15, 23

Christopher Village, L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) .......... 13

Consumers Energy Co. v. United States,
65 Fed. Cl. 364 (2005) .......... 14

Cosmo Construction Co. v. United States,
196 Ct. Cl. 463, 451 F.2d 602 (1971) .......... 10

Coughlin v. Blair,
41 Cal. 3d 587, 262 P.2d 305 (1953) .......... 3

Entergy Nuclear Indian Point 2 v. United States,
64 Fed. Cl. 515 (2005) .......... 15

Entergy Nuclear Generation Co. v. United States,
64 Fed. Cl. 336 (2005) .......... 15

Florida Power & Light Co. v. United States,
64 Fed. Cl. 137 (2005), interlocutory appeal pending sub nom. PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir. filed Aug. 5, 2005) .......... 2, 19, 21

Florida Power & Light Co. v. United States,
66 Fed. Cl. 93 (2005) .......... 13

General Electric Uranium Management Corp. v. United States Department of Energy,
764 F.2d 896 (D.C. Cir. 1985) .......... 13

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) .................................... 3, 4

Indiana Michigan Power Co. v. United States,
No. 04-5139, 112 Fed. Appx. 37 (Fed. Cir. Oct. 13, 2004) ............................................. 4

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ............................................................ 3, 5, 6, 7

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) ............................... 20

Levi Strauss & Co. v. Genesco, Inc.,
742 F.2d 1401 (Fed. Cir. 1984) ....................................................................... 11

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) ............................................................................................. 11

McDonnell Douglas Corp.,
ASBCA No. 26747, 83-1 BCA ¶ 16,377 (1983) ........................................................ 18

Newman-Green, Inc. v. Alfonzo-Larrain,
490 U.S. 826 (1989) ............................................................................................. 5

Northern States Power Co. v. United States Department of Energy,
128 F.3d 754 (D.C. Cir. 1997) ...................................................................... 8, 9

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) ........................................................................................ 19

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) ........................................................................ 9

Power Authority of the State of New York v. United States,
No. 00-703C, 2004 WL 3461071 (Fed. Cl. Sept. 30, 2004) (unpublished) ............... 14, 22

Puritan Associates v. United States,
215 Ct. Cl. 976 (1977) ........................................................................................ 10

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

System Fuels, Inc. v. United States ("System Fuels I"),
65 Fed. Cl. 163 (2005) .......... 8, 12

System Fuels, Inc. v. United States ("System Fuels II")
66 Fed. Cl. 722 (2005) .......... 15, 23

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) .......... 21, 22

Winstar Corp. v. United States,
21 Cl. Ct. 112 (1990), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc),
aff'd, 518 U.S. 839 (1996) .......... 10

STATUTES AND REGULATIONS

28 U.S.C. § 1491 .......... 2

42 U.S.C. §§ 10101-10270 .......... 16

42 U.S.C. § 10139 .......... 2

10 C.F.R. § 961.11 .......... 17, 18

48 Fed. Reg. 5458 (Feb. 4, 1983) .......... 16

48 Fed. Reg. 16590 (Apr. 18, 1983) .......... 17

MISCELLANEOUS

Restatement (Second) of Contracts § 211 (1981) .......... 20

Restatement (Second) of Judgments § 26 (1982) .......... 4, 5

# INDEX TO SUPPLEMENTAL APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Statement of Loring Mills at Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 | 1 |
| Letter from Yankee Atomic Electric Company to Department of Energy, dated September 25, 1992 | 4 |
| Letter from Department of Energy to Yankee Atomic Electric Company, dated December 1, 1992 | 9 |
| Internal Yankee Atomic Memorandum, dated September 25, 1992 | 11 |
| Internal Yankee Atomic Memorandum, dated January 20, 1984 | 15 |
| Internal Yankee Atomic Memorandum, dated October 19, 1983, discussing industry task force meeting | 17 |
| Internal Yankee Atomic Memorandum, dated May 17, 1983, describing contents of Nuclear Waste Policy Act | 20 |
| Testimony of John Bartlett, former Director of Office of Civilian Radioactive Waste Management, Department of Energy, in Yankee Atomic trial on July 14, 2004 | 24 |
| Testimony of Charles Pennington, NAC International, in Yankee Atomic trial on July 16, 2004 | 27 |
| Testimony of Robert L. Morgan, former Director of Office of Civilian Radioactive Waste Management, Department of Energy, dated August 2 and 3, 2004 | 30 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DETROIT EDISON COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-926C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL BRIEF

Pursuant to the Court's order dated December 20, 2005, as amended by order dated January 20, 2006, defendant, the United States, provides this supplemental brief. Specifically, on November 21, 2002, defendant filed its motion for summary judgment upon Counts I and II of plaintiff's complaint, and, in response, plaintiff, Detroit Edison Company ("Detroit"), filed a cross-motion for summary judgment. Subsequently, on May 28, 2004, Detroit filed a motion for summary judgment on liability, and, in response, the Government filed a cross-motion for summary judgment on Counts I and II of Detroit's complaint. Those motions and cross-motions are currently pending before the Court. In its December 20, 2005 order, the Court requested that defendant provide "additional briefing . . . on any impact" that recent decisions from this Court or the United States Court of Appeals for the Federal Circuit "might have on the pending motions." Order, at 1 (Dec. 20, 2005).

DISCUSSION

I. CURRENTLY, THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT IS CONSIDERING THIS COURT'S JURISDICTION TO ENTERTAIN THESE CASES IN *PSEG NUCLEAR, LLC V. UNITED STATES*

Recently, the United States Court of Appeals of the Federal Circuit granted the plaintiff's petition for permission to seek interlocutory appeal of this Court's January 31, 2005 decision in

Florida Power & Light Co. v. United States, 64 Fed. Cl. 137 (2005). In Florida Power, which also governed three other cases filed by PSEG Nuclear LLC, Nebraska Public Power District, and Duke Power, this Court held that, pursuant to the judicial review provision at section 119 of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10139, the various United States courts of appeals possess original and exclusive jurisdiction to entertain plaintiff's claims for partial breach of the contract into which the plaintiffs and the Department of Energy ("DOE") entered in accordance with the requirements of the NWPA. Subsequently, after issuing this decision, the issuing judge, Judge Sypolt, retired, and the four cases that the Florida Power decision governed were transferred to four other judges. Upon motions for reconsideration, three of the four judges vacated Judge Sypolt's Florida Power decision, finding that the Court possessed jurisdiction to entertain these contract actions. However, in PSEG Nuclear, L.L.C. v. United States, No. 01-115C (Fed. Cl.), the Court denied the motion for reconsideration, and, on August 5, 2005, the Federal Circuit granted the plaintiff's petition for permission to appeal the interlocutory decision. Briefing in that appeal was completed on January 23, 2006, but oral argument has not yet been scheduled.

In the PSEG appeal, the Federal Circuit will have to determine the scope of the judicial review provision in the NWPA and its relationship to the statute that provides jurisdiction in this Court, the Tucker Act, 28 U.S.C. § 1491(a)(1). Both the various plaintiffs and the United States agree that this Court possesses jurisdiction to entertain these contract cases. However, it appears that the parties' understanding of the basis of that jurisdiction may differ. To the extent that the Court wishes, we can provide the Court with a copy of the Government's initial brief to the Federal Circuit that discusses in detail the various interpretations of the courts' jurisdiction to

entertain matters arising under and relating to the NWPA. Although neither party has raised a challenge to this Court's jurisdiction in this case, the Federal Circuit should soon resolve any issue relating to the scope and basis of that jurisdiction.

## II. THE FEDERAL CIRCUIT HAS ISSUED ITS DECISION IN *INDIANA MICHIGAN*, CLARIFYING SOME ISSUES UNRELATED TO THE ISSUES IN THE MOTIONS PENDING BEFORE THIS COURT

### A. The Federal Circuit Barred Plaintiffs From Recovering Post-Complaint Damages In A Partial Breach Case

On September 9, 2005, the Federal Circuit issued its opinion in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), affirming this Court's decision that the plaintiff in that case was not presently entitled to any damages as a result of DOE's delay in beginning spent nuclear fuel ("SNF") acceptance. In the original proceedings before the trial court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), the plaintiff, Indiana Michigan Power Company ("IMP"), had asserted that it was entitled to recover damages beginning in 1989 (based upon its alleged belief in 1989 that DOE would partially breach the contract in 1998) and extending approximately 40 years beyond the 1998 partial breach. Like Detroit in this case, IMP did not assert that DOE had committed a total breach of the Standard Contract, but instead claimed only that DOE had partially breached that contract. This Court, after an extensive trial upon IMP's damages claims, found that the nature of IMP's breach claim – a partial, rather than total, breach – affected its ability to recover future damages.

This Court found that, unlike a claimant in a total breach case, a partial breach claimant cannot recover damages into the future that it had not yet incurred. Id. at 648. Instead, this Court, relying in part upon a California court decision, Coughlin v. Blair, 41 Cal. 2d 587, 262

P.2d 305 (1953), found that the partial breach claimant was limited to those damages that it had incurred as a result of partial breaches up to the "date of trial." Indiana Michigan, 60 Fed. Cl. at 648. This Court also found that the partial breach claimant was entitled to return to court as it incurred damages in response to future partial breaches. Id.

On appeal to the Federal Circuit, IMP challenged the trial court's holdings regarding a partial breach claimant's ability to recover future damages in a single action, arguing that a partial breach claimant should be permitted to recover damages beyond the date of trial and that the claimant should not have to return to court to seek additional damages after they have been incurred.[1] In our response to IMP's future damages argument, we informed the appellate court that, according to section 26 of the Restatement (Second) of Judgments, a partial breach claimant, unlike a total breach claimant, cannot recover future damages for future partial breaches that it anticipates will occur, but that the partial breach claimant may return to court in the future after it has actually incurred those costs. We also identified two different applications of this rule: the rule espoused in section 26 of the Restatement (Second) of Judgments, allowing a partial breach claimant to recover damages incurred by the date that it filed its complaint, and that espoused in the California court decision upon which this Court had relied, allowing recovery of damages incurred through the time of trial.

---

[1/] The Government filed a cross-appeal in Indiana Michigan, in which we had intended to challenge the trial court's earlier decision regarding the rate of SNF acceptance, a decision that we discussed in detail in our supplemental brief dated May 27, 2004. However, in response to IMP's motion to dismiss our cross-appeal, the Federal Circuit found that the rate of SNF acceptance issue was unnecessary to the trial court's judgment, found that the United States would therefore not be bound by the decision in future proceedings, and dismissed the cross-appeal. Indiana Michigan Power Co. v. United States, No. 04-5139, 112 Fed. Appx. 37 (Fed. Cir. Oct. 13, 2004). Accordingly, the Federal Circuit has not yet had addressed the merits of the rate of SNF acceptance issues in these cases.

In its decision, dated September 9, 2005, the Federal Circuit agreed that, in a partial breach case, future damages are not recoverable. It found that, instead, a partial breach claimant may "sue from time to time for the damages incurred to the date of suit," defined as "the time of the institution of the action." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1377 (Fed. Cir. 2005) (quoting Restatement (Second) of Judgments § 26(1)(e) & cmt. g (1982)). Although the Court did not expressly discuss the distinction between the California court's "date of trial" rule for a partial breach damages award and the Restatement's "institution of the action" rule, the appellate court expressly found that the grievance at issue "falls within [the Restatement (Second) of Judgments] subsection (e)'s exception," id. at 1378, which expressly limits damages in a partial breach case to those "incurred to the date of suit," Restatement (Second) of Judgments § 26(1)(e) (1982), or "damages sustained from breaches up to the time of the institution of the action." Id. § 26 cmt. g, at 241 (quoted in Indiana Michigan, 422 F.3d at 1377). IMP sought panel rehearing of a portion of the future damages aspect of the appellate court's decision, but IMP's petition for rehearing was denied on November 25, 2005.

Under Indiana Michigan, Detroit may not recover damages that post-date the filing of their complaints in this case. See Indiana Michigan, 422 F.3d at 1376-78 (adopting the rule set forth in Restatement (Second) of Judgments § 26(1)(e)). The jurisdiction of this Court is determined by reference to the partial breaches existing upon the date that the complaints in these three cases were filed. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989). Under the breach of contract theory that Detroit elected to pursue – a partial, rather than total, breach of contract theory – the damages that it may recover in this action are limited to those that were incurred by the time that it filed its complaints. Restatement (Second ) of

Judgments § 26(1)(e). To the extent that Detroit is seeking to rely upon damages incurred after the date upon which it filed its complaint in 2002 to justify a liability ruling in this case, any post-complaint costs (in addition to Detroit's failure in any of its briefing actually to identify any costs that it allegedly has incurred as a result of DOE's delay) are not part of this action and cannot form the basis of a liability ruling here.

B. Although The *Indiana Michigan* Decision Allows For The Possibility Of Recoverable Mitigation Damages Beginning May 25, 1994, None Of Detroit's Alleged Damages Were Caused By DOE's Delay

In its decision in Indiana Michigan, the appellate court not only resolved the recoverability of future damages in these SNF partial breach cases, but also set forth standards for reviewing claims for damages that pre-date the January 31, 1998 deadline for DOE to begin accepting SNF from the nuclear utility industry. Although the Government argued in Indiana Michigan that pre-breach mitigation damages were *per se* unrecoverable in a partial breach case, the Federal Circuit disagreed. It found that its previous "breach-of contract cases have dealt only with the duty to mitigate damages incurred after a total breach." Indiana Michigan, 422 F.3d at 1375. It further held, however, that "[w]e see no reason why efforts to avoid damages in contemplation of a partial breach should not also be recoverable," id. (emphasis added), stating as follows:

> Section 350, comment b of the Restatement of Contracts advises that "[o]nce a party has reason to know that performance by the other will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Indiana Michigan is "not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss." Id..

Indiana Michigan, 422 F.3d at 1375. It determined that, "[h]ence, mitigation damages are available for pre-breach costs should the obligee elect to treat the obligor's breach as partial, while pre-breach damages for anticipatory breach are available should a party elect to treat the obligor's breach as total." Id.

The Federal Circuit then defined the date upon which the nuclear utilities were obligated to begin mitigating damages: "[i]t is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps" at that time. Id. Specifically, the appellate court found that, on May 25, 1994, "DOE announced that it would not begin SNF collection until 2010 because its planned storage repository would not be ready until then." Id. at 1372. Although IMP had argued before the trial court that DOE had made announcements in 1987 and 1989 that led it to believe that DOE would not begin accepting SNF by 1998, "six years before the 1994 Notice of Inquiry announced DOE's inability to begin timely SNF collection," see id. at 1376, the Federal Circuit identified the May 25, 1994 date as the date upon which "the utilities" were "obligated to take mitigatory steps." Id. at 1375.

Under the rationale of Indiana Michigan, and only after establishing causation, a spent nuclear fuel plaintiff may potentially recover pre-breach costs dating back to May 25, 1994, to the extent that those costs constituted reasonable mitigation of damages. Indiana Michigan, 422 F.3d at 1374-75. Nevertheless, as we explained in our prior briefing, Detroit cannot establish any damages in this particular case, at least at this point in time, because it never submitted any of the required documents necessary to establish the time frame in which DOE would begin acceptance of Detroit's SNF. As we explained in our prior briefing, Detroit did not have any

SNF acceptance allocations in at least the first 10 years of the SNF acceptance program. Although Detroit alleges that, under the rate of SNF acceptance that it would like the Court to impose into the Standard Contract, DOE was obligated to have begun accepting SNF from Detroit in 2006, see Pl. Reply Brief, at 9 (filed Sept. 9, 2004), even that deadline post-dates the filing of Detroit's complaint by four years. Although, under Indiana Michigan, a plaintiff might be able to claim damages for mitigation that pre-date the actual due date for DOE's performance towards that plaintiff, where the costs incurred were reasonably necessary to mitigate the plaintiff's incremental costs resulting from DOE's delay, Detroit here has offered absolutely no evidence that it has incurred any such costs. As we discussed in our prior briefing, and as we will further discuss below, the absence of any such evidence precludes a liability finding here.

## III. THIS COURT HAS ISSUED VARIOUS DECISIONS REGARDING THE GOVERNMENT'S LIABILITY FOR DOE'S DELAY

### A. This Court's Finding In *System Fuels* That The Government Is Barred By Collateral Estoppel From Contesting The January 31, 1998 Deadline For Beginning To Accept SNF Does Not Preclude Judgment In The Government's Favor Here

#### 1. This Court In *System Fuels* Found Collateral Estoppel Based Upon The D.C. Circuit's Opinion In *Northern States*

In System Fuels, Inc. v. United States, 65 Fed. Cl. 163 (2005) ["System Fuels I"], the Court found that, in Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), the United States Court of Appeals for the District of Columbia Circuit had issued a writ of mandamus "precluding DOE from excusing its own delay for failure to construct a permanent repository or interim storage facility," System Fuels I, 65 Fed. Cl. at 175, and that, pursuant to that writ, DOE was required to "proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin

disposal of the SNF by January 31, 1998." Id. (quoting Northern States, 128 F.3d at 760). The Court found that, with regard to the Government's argument that the plaintiff must show resultant injury as part of a liability ruling, collateral estoppel did not preclude that argument, but that System Fuels had submitted sufficient information to overcome that hurdle. Id. at 175-76. However, it found the Government barred by collateral estoppel from arguing, once that resultant injury hurdle was overcome, "that the partial breach took place after January 31, 1998." Id. at 176.[2]

2. Here, Detroit Has Submitted No Evidence Of Resultant Injury From DOE's Delay

The System Fuels I decision on collateral estoppel should not affect the result here for several reasons. First, here, unlike the Court's finding in System Fuels I, Detroit has submitted absolutely no evidence that it has suffered any injury as a result of DOE's delay through the date upon which Detroit filed its complaint. To the extent that the D.C. Circuit in Northern States made a determination regarding the date by which DOE was obligated to begin accepting SNF from the nuclear utility industry contract holders, it held that DOE was obligated to begin that acceptance by January 31, 1998. See Northern States, 128 F.3d at 760. Assuming that this delay constitutes a partial breach of the contract, and as we have discussed in prior briefing, the existence of a breach is only one part of a liability analysis. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue

---

2/ The Court found that mutuality is a requirement for collateral estoppel, System Fuels I, 65 Fed. Cl. at 175, and declined to apply collateral estoppel where the plaintiff had not been a party to the Northern States case before the D.C. Circuit. See Boston Edison Co. v. United States, 64 Fed. Cl. 167, 185 (2005). Here, however, Detroit was a party to the Northern States petition.

(whether there was a breach)" (italics in original)); see also Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Further, the Court of Claims has recognized that, before a contractor is entitled to judgment as to liability, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . .

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469 n.3, 451 F.2d 602, 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). In an action bifurcated as to liability and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the liability phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Id. at 469-70, 451 F.2d at 605-06 (emphasis in original).

As we have discussed in our prior briefing, Detroit has submitted absolutely no evidence that, as of the date that it filed its complaint, it had suffered actual damage from DOE's delay – that is, it had incurred incremental costs that it would not otherwise have incurred but for DOE's delay. Given that, even under Detroit's theory of the rate at which DOE was obligated to accept SNF from the nuclear utility industry, DOE would not have been obligated to begin Detroit's

SNF acceptance until 2006, see Pl. Reply Br., at 9 (filed Sept. 9, 2004), it makes sense that, at least as of 2002, Detroit had not yet incurred any additional actual costs as a result of DOE's delay in accepting other utilities' SNF. In its prior briefing, the only "evidence" that Detroit has submitted to establish that it suffered any actual monetary injury by the time it filed its complaint is its attorneys' statements in its September 9, 2004 brief that "Plaintiff has in fact suffered damages resulting from DOE's breach." Pl. Reply Brief, at 9-10 (filed Sept. 9, 2004). As the United States Supreme Court has explained, "the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1992). "Argument and assertion of counsel cannot substitute for factual statements under oath . . . ." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984). Without any evidence of resultant injury, Detroit has no basis for seeking summary judgment on liability, as opposed to the existence of an element of liability (a breach).

3. The D.C. Circuit In *Northern States* Did Not Consider The Government's Arguments Regarding The Contractual Mechanism For Defining Acceptance Allocation Rights, Precluding Collateral Estoppel On That Issue

Second, the D.C. Circuit did not consider, and did not purport to rule upon, the issue of whether the delivery commitment schedule process defined the manner in which, and extent to which, DOE would be obligated to accept an individual utility contract holder's SNF. "*Stare decisis* applies only to legal issues that were actually decided in a prior action." Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). The effect of the delivery commitment schedule ("DCS") process in the administration of the contract was not an issue in Northern States and

was not considered there. Accordingly, to the extent that this Court in System Fuels I implicitly held to the contrary, we respectfully disagree.

As we established in our prior briefing, Detroit could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility contract holders by January 31, 1998, under the Nuclear Waste Policy Act program. Instead, any injury that Detroit Edison incurred would result from DOE's failure to accept Detroit Edison's SNF as identified in Detroit Edison's approved DCSs. However, as discussed below, because Detroit Edison has never submitted a DCS to DOE for approval, it has no basis for asserting that DOE failed to act in accordance with the terms of the Standard Contract with regard to its DCS submissions or acceptance of its SNF. Because the January 31, 1998, deadline for beginning SNF acceptance is not a deadline that required DOE to begin accepting SNF from each and every contract holder by January 31, 1998, but, instead, is a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole, Detroit Edison must establish, before it can seek a liability ruling, that DOE had a specific obligation to accept particular SNF from Detroit Edison by the date that it filed its complaint and that DOE breached that specific obligation to Detroit Edison. Absent such a showing, Detroit Edison has not identified any injury-in-fact that could provide this Court with a basis to consider a liability ruling or any cause of any damage to Detroit Edison.

4. To The Extent That This Court's Rationale Regarding Jurisdiction In *Boston Edison* Is Correct, The D.C. Circuit Would Have Lacked Jurisdiction To Issue Its Decision In *Northern States*

Third, and importantly, the Court's decision in System Fuels I applying collateral estoppel against the Government based upon the D.C. Circuit's 1997 decision in Northern States

is wholly dependent upon the D.C. Circuit's jurisdiction to issue that decision. The Federal Circuit has held that, where a sister court has improperly asserted jurisdiction over a matter involving the Federal Government and where that assertion of jurisdiction directly implicates issues of sovereign immunity, the sister court's ruling is void. Christopher Village, L.P. v. United States, 360 F.3d 1319, 1329-30, 1333 (Fed. Cir. 2004). Thus, if the D.C. Circuit lacked jurisdiction to issue its ruling in Northern States, that decision would not form the basis for collateral estoppel here.

The D.C. Circuit's jurisdiction to entertain challenges to actions arising under Title III of the NWPA, the title within which the NWPA's provisions relating to the creation of the Standard Contract is contained, depends upon the D.C. Circuit's prior analysis in General Electric Uranium Management Corp. v. United States Department of Energy, 764 F.2d 896 (D.C. Cir. 1985). As we fully explained in our briefing to the Federal Circuit in PSEG, the D.C. Circuit in General Electric held that Section 119 of the NWPA, which contains the NWPA's judicial review provision, encompasses matters arising under Title III of the NWPA. Id. at 901-02. Recently, in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), this Court held that the judicial review provision in Section 119 of the NWPA does not encompass Title III of the NWPA. Id. at 178-79; see Florida Power & Light Co. v. United States, 66 Fed. Cl. 93, 97-98 (2005) (adopting Boston Edison jurisdictional analysis). If, as this Court held in Boston, the judicial review provision in Section 119 does not encompass Title III of the NWPA, no basis exists for the D.C. Circuit's exercise of jurisdiction in Northern States exists, and, pursuant to the Federal Circuit's decision in Christopher Village, no basis exists upon which to apply collateral estoppel to that decision's findings. As we explained to the Federal Circuit, we believe that the

D.C. Circuit overstepped its jurisdiction in issuing its writ of mandamus in Northern States, and this issue is presently in the briefing pending before the appellate court in the PSEG Nuclear appeal.

B. This Court Has Issued Other Decisions Regarding Liability In The SNF Cases That Reflect Differing Viewpoints

The decisions of other judges of this Court relating to plaintiffs' motions for summary judgment on liability have resulted in rulings based upon various rationales. In at least one case, in which the plaintiff had sold its reactor and assigned its contract to another, the Court, assessing the Government's arguments relating to the contractual process through which a particular contract holder would gain SNF acceptance rights at particular times, declined to grant the plaintiff's motion for summary judgment on liability: "[t]he question whether Plaintiff suffered actual injury – a requirement for standing – depends on whether, under the Standard Contract, the Department of Energy had, and failed to meet, any obligation to accept Plaintiff's spent nuclear fuel prior to the date of the sale of its facilities." Power Auth. of the State of N.Y. v. United States, No. 00-703C, 2004 WL 3461071, at *1 (Fed. Cl. Sept. 30, 2004) (unpublished) (Damich, C.J.). Consistent with the discussion in our prior briefing, and as this decision recognizes, in light of the contractual scheme for allocating SNF acceptance rights, DOE was not obligated to accept SNF from all contract holders by January 31, 1998, and, therefore, not all contract holders have yet necessarily suffered damage as a result of DOE's initial delay.[3]

---

3/ In another case, Consumers Energy Co. v. United States, 65 Fed. Cl. 364 (2005) (Damich, C.J.), the Court found that, where a plaintiff possessed a delivery commitment schedule for SNF acceptance in 1999 (rather than 1998) and there was an issue relating to the timing of the plaintiff's subsequent final delivery schedule under the contractual mechanism for identifying SNF acceptance rights, the short time frame between the 1998 date and the plaintiff's acceptance rights, coupled with other evidence, was sufficient to establish resultant injury for that plaintiff.

In another decision, this Court declined to rule on liability at this stage of the proceedings, finding that questions about the date of the breach, the effect of the Standard Contract's mechanism for assigning acceptance rights and allocations, and the effect of the delivery commitment schedule process precluded summary judgment on liability. Boston Edison, 64 Fed. Cl. at 188 (Lettow, J.).

Other decisions have found liability based upon DOE's delay in meeting the January 31, 1998 deadline for beginning SNF acceptance and either an allegation or evidence of resultant injury. See, e,g,, System Fuels, Inc. v. United States, 66 Fed. Cl. 722, 732-33 (2005) ["System Fuels II"] (Braden, J.); Entergy Nuclear Indian Point 2 v. United States, 64 Fed. Cl. 515, 524 (2005) (Lettow, J.); Entergy Nuclear Generation Co. v. United States, 64 Fed. Cl. 336, 344 (2005) (Lettow, J.). To the extent that any of these decisions accept an allegation of resultant injury to support a liability ruling, as opposed to evidence of resultant injury, we respectfully disagree with those decisions, for the reasons previously explained both above and in our prior briefing. To the extent that these decisions indicate that plaintiffs can establish their own injury simply because of DOE's failure to meet the January 31, 1998 date, without any further analysis or evidence tying any alleged damages to the dates by which DOE would have been contractually obligated to accept their (rather than other utilities') SNF, we again respectfully disagree with those decisions, for the reasons explained in our prior briefing.

---

Id. at 374-75.

## IV. SINCE THE GOVERNMENT FILED ITS MOTION FOR SUMMARY JUDGMENT RELATING TO THE RATE OF SNF ACCEPTANCE ON MAY 27, 2004, THIS COURT HAS ISSUED SEVERAL DECISIONS RELATING TO THAT MOTION

In its cross-motion for summary judgment regarding the rate of SNF acceptance, Detroit has identified the base assumption upon which all of its damages claims apparently will depend: that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. Detroit contends that the Department of Energy ("DOE") contractually obligated itself to accept SNF and/or high-level radioactive waste ("HLW") at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that deadline. It asserts that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 MTUs per year, after a short five-year "ramp-up" period. Detroit's basic assumptions are unsupported by either the Standard Contract or the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270.

The evidence is completely contrary to Detroit's assertions that DOE was required to create an acceptance rate that satisfied Detroit's two-part "test." As the Court is aware, DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. 48 Fed. Reg. 5458 (Feb. 4, 1983); see DPFUF ¶¶ 12-19.[4] In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that

---

[4/] "DPFUF ¶ ___" refers to defendant's proposed findings of uncontroverted fact regarding the rate of spent nuclear fuel acceptance, dated November 21, 2002. "Resp. to PPFUF ¶ ___" refers to defendant's responses to the plaintiff's subsequent proposed findings of uncontroverted fact regarding the rate of SNF acceptance. "Pl. App. ___" refers to the appendix to plaintiff's cross-motion for summary judgment regarding the rate of spent nuclear fuel acceptance. "Supp. App. ___" refers to the supplemental appendix accompanying this brief.

DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate, to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan, or to accept SNF "at a rate commensurate with the amount of [SNF] then being generated together with the accumulated backlog of [SNF]." DPFUF ¶¶ 20-25. Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983), DOE declined to agree to such requests. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual obligations to meet any pre-determined acceptance rate. See DPFUF ¶¶ 41-43; Supp. App. 32 (Tr. 3626:23-3627:13) & 36 (Tr. 3693:23-3695:6); see also Supp. App. 33-35 (Tr. 3635:12-23, 3657:4-12, 3668:1-3).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b).

Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a DCS identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. Id., Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in those terms creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, Detroit can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." 10 C.F.R. § 961.11, Art. XXII.A. Detroit's proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in this case, "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n.12 (2005), interlocutory appeal pending sub nom. PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir. filed Aug. 5, 2005).

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains any such obligation, the nuclear utilities consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their

conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy Detroit's two-part test and that the nuclear utilities were well aware of that fact. DPFUF ¶¶ 20-25 & 41-43; Supp. App. 32 (Tr. 3626:23-3627:13) & 36 (Tr. 3693:23-3696:8). Further, in other utilities' internal documents from 1983 and 1984, soon after the Standard Contract was executed, those utilities indicated that DOE had not obligated itself in the contract to satisfy a minimum performance rate, and witnesses from other utilities have previously testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. Supp. App. 3, 15 (¶ 2), 18 (¶ 2); see Supp. App. 20-23 (May 1983 utility summary of NWPA, not mentioning existence of any requirements for minimum rate at which DOE was required to continue SNF acceptance from utilities after January 31, 1998).[5] Further, before filing its complaint, Detroit did not ever complain that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. See DPFUF ¶¶ 97. Not only did Detroit not complain that DOE's rates were too low, it never even submitted a DCSs for DOE's approval. Id. Yet, utilities understood that they were entitled to dispute those allocations, if they so

---

[5/] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms in a uniform manner as applied to all contract holders, not simply Detroit, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of Detroit's individual understandings.

desired. See DPFUF ¶¶ 111; Def. App. 418-28; Supp. App. 4-12. The industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of Detroit's two-part test into the Standard Contract.

In our supplemental brief in this case dated May 27, 2004, we identified and discussed two published decisions and two unpublished decisions resolving our motions regarding the rate of SNF acceptance in the cases in which those decisions were issued. Since that time, this Court has issued several other decisions that relate to the parties' rate of acceptance motions. In Florida Power & Light Co. v. United States, 64 Fed. Cl. 37 (2005), interlocutory appeal pending sub nom. PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir. filed Aug. 5, 2005), this Court agreed with the Government that the Standard Contract does not create the two-part requirement regarding the mandatory rate of SNF acceptance that Detroit and other SNF plaintiffs have proposed. Although ultimately finding that the Court lacks jurisdiction to entertain these partial breach contract cases, the Court also recognized that "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Id. at 48 n.12. Similarly, this Court should reject Detroit's argument that the Standard Contract obligates DOE to accept SNF at a rate sufficient to eliminate additional at-reactor storage and to reduce the backlog of SNF.

In another case, this Court analyzed the acceptance schedule provisions in the Standard Contract and issued a decision applying them in the manner that the Government has established is appropriate. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), this

Court explained the manner in which the DCS and FDS provisions were intended to function. The Court in Tennessee Valley stated that the DCS mechanism determines "the earliest scheduled pickup of [plaintiff's] SNF." Tennessee Valley, 60 Fed Cl. at 674. The Court stated in the circumstances of that case that, although the Government generally breached the Standard Contract with respect to the nuclear utility industry by failing to begin acceptance of the utilities' SNF on January 31, 1998, that breach did not apply to each and every nuclear utility because the DCS mechanism in the Standard Contract determined the earliest date that DOE was obligated to accept a particular utility's SNF, explaining as follows:

> TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. *See* Standard Contract Art. V.B.1. TVA submitted its first proposed DCS . . . in April of 1997. Consequently, the earliest scheduled pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674. Although the Court limited the application of its Tennessee Valley decision, accepting "only for the purposes of [that] case that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract," id. at 671 n.7, the rationale supporting that decision should apply here.[6]

---

[6] In an unpublished order in Power Authority of the State of New York v. United States, No. 00-703C, 2004 WL 3461071 (Fed. Cl. Sept. 30, 2004), the Court found that the issue implicated by the Government's motion for partial summary judgment upon the rate of SNF acceptance, as well as the plaintiff's cross-motion for summary judgment regarding the rate, "is a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." Power Auth., 2004 WL 3461071, at *1. Accordingly, the Court in Power Authority denied both parties' motions regarding the rate.

## V. THE COURT SHOULD GRANT DEFENDANT SUMMARY JUDGMENT UPON DETROIT'S CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

In the pending motions, the Government seeks summary judgment upon Count II of Detroit's complaint, alleging a breach of the duty of good faith and fair dealing. In System Fuels, Inc. v. United States (System Fuels II), 66 Fed. Cl. 722 (2005), this Court recently granted that same motion in an SNF case, finding that the evidence that the plaintiff had submitted to support its breach of duty claim – the very same evidence that Detroit has submitted to this Court – did not establish a breach of that duty:

> SFI relies exclusively on the testimony of David Zabransky, the DOE Contracting Officer, that DOE did not change the ACR rates from year to year because it was attempting to minimize the commitments under the Standard Contract. *See* Pl. Reply at 10 n.4. The testimony, however, is not clear and convincing evidence of any intent by DOE specifically to harm SFI. At best, it indicates only an employee's opinion that DOE was attempting to limit its contractual responsibilities and any potential liability. *See Am-Pro Protective Agency*, 281 F.3d at 1240 ("[T]he requirement of 'well-nigh irrefragable' proof . . . sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith."). Therefore, SFI has failed to overcome the presumption that the Government acted in good faith.

Id. at 732 (citing Am-Pro Protective Ag. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002)).[7] For the same reasons, the Court should grant summary judgment here.

---

[7] In Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), the Court denied the Government's motion to dismiss a good faith and fair dealing claim, finding that the plaintiff "had alleged facts that, if proved, would make out a viable claim for relief under these implied covenants." Id. at 186. However, here, in response to a motion for summary judgment, it is not the plaintiff's allegations that form the basis of the Court's review, but whether the plaintiff has submitted sufficient evidence to create a genuine issue of material fact. "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988). Here, Detroit has not submitted any evidence that would

CONCLUSION

For the foregoing reasons, and those set forth in our prior briefing, we respectfully request that the Court grant the Government's motion for summary judgment regarding the rate of SNF acceptance and upon Counts I and II of Detroit's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

January 27, 2006

support a verdict in its favor on this claim, entitling the Government to summary judgment.

# SUPPLEMENTAL APPENDIX

CONF-831217

# Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting

December 12-15, 1983
Washington, D.C.

February 1984

Sponsored by:
U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

DEFENDANT'S EXHIBIT 001

SN069588 [D]

Protected Material Subject to Protective Order

SN069588 [D]

SNP0118459

FOREWORD

On January 7, 1983, President Reagan signed into the law the Nuclear Waste Policy Act of 1982. This act established a process whereby the President, the Congress, the affected individual States and Indian tribes, the U.S. Department of Energy and other Federal agencies could work together in the siting, construction, and operation of facilities for the storage and disposal of nuclear waste.

This proceedings document from the 1983 Civilian Radioactive Waste Management Information Meeting serves to highlight developments since the passage of the Act, and reviews program activities necessary to provide for the permanent disposal and storage of commercially generated high-level radioactive waste. Presentations included in this program cover topics concerning interim spent fuel, monitored retrievable storage, geologic repository deployment as well as management of the Nuclear Waste Fund.



SN069589

Protected Material Subject to Protective Order

SN069589



SNP0118460

# NUCLEAR WASTE FUND MANAGEMENT

Loring Mills, Vice President
Nuclear Activities, Edison Electric Institute

We recognize that a key that unlocked the Congressional log-jam to achieve the waste bill was the establishment of contracts, and Bob suggested that I might spend my time talking a little about the contracts. I have crossed out a lot of the words that I had prepared because others have already touched on them. It does provide that mechanism for funding a program without using general tax dollars. As indicated, we have 70 contracts in existence. The process of developing that contract language last spring was a rather interesting one in which a lot of us had some dialogue. Four-letter words were exchanged, also. The Department of Energy, (DOE) did consider the contract concerns of utilities and others, consequently substantial improvements were made over the initial draft as a result of the rule-making process, but there are still some open questions.

Basically these contracts do call for regular large payments to DOE; and as was indicated, these monies are flowing at a rate of over $300 million a year. Those of us in the investor-owned utilities support the concept of cost-work in progress. There are others that don't always do that, but we do support that, and encourage it to be used in our own area, too.

The money will continue to flow as long as electricity is generated by nuclear power plants. While Congress did set the initial rate at 1 mil per kilowatt hour, it also gave DOE the permission to change that fee to make sure they covered the full cost of the program. In addition to money, we are providing a great deal of information on the spent fuel quantity and characteristics.

In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day, at some unspecified rate, hopefully, starting in 1998. The DOE promise must be carried out, and it is our task as contract holders to do everything we can to assure that it is achieved.

Now, there are some folks who are concerned about how rapidly the money flows out. There are those in the Federal Government; I won't name any place like OMB or any other, who may try to balance the budget by minimizing the amount of outflow of the money, and we must resist that. Congress recognized that you will not always have a balanced cash flow in any one year. They provided a mechanism so that wasn't necessary. While the program must be funded sufficiently to assure full cost recovery, it does not require that balanced cash flow in any one year.

There are some who are concerned about the equity associated in the contracts, but we are pleased to have them. They provide the lubrication to get the job done. We really were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance. We were not really looking for that, however, there were many concerns expressed by the utilities that were not resolved, as we believe equitably during the contract generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances, to include some of the things we heard this morning which were not embodied in the contract.

While no petition has been initiated yet, the utility industry has identified several elements that appear to be worthy of such a position, and it can be done by anyone at any time. In all probability it will be revisited several times over the many decades that these contracts are in force. After all, these contracts are expected to be paying in as long as any utility is generating nuclear electricity, and that, we hope, is for several decades. When the contracts have been signed, one could question about deliverables compared to the time in which the payments are made. Any court review of the contract might challenge whether the equity principle is satisfied or whether the contracts really bind only one party; the utilities. That won't be resolved, but it is a question. While most persons are resigned for the time being to the contract as it exists, a few utilities and an owner of spent fuel, have initiated lawsuits against DOE on specific provisions of the





SN069619

YC03-04-01

YANKEE ATOMIC ELECTRIC COMPANY

Telephone (508) 779-6711
TWX 710-380-7619

YANKEE

580 Main Street, Bolton, Massachusetts 01740-1398

September 25, 1992
FMD 92-621

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

Dear Sir or Madam:

Enclosed are completed Delivery Commitment Schedules for Yankee Atomic Electric Company. Please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs.

Please do not hesitate to call if you have any questions.

Sincerely,

R. M. Grube, Director
Fuel Management Department

RMG/JMB/cmc

Enclosure

c: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

DEFENDANT'S EXHIBIT 030.002



YDK008922

bc: A. C. Kadak
J. M. Buchheit
A. A. H. Koch
R. A. Mellor
F. X. Quinn

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0250
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 985601442801

1.2 Contact Person:
(a) Name: J. H. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44426

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1998
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 34.8 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 135 Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] — 25 [illegible] 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube — Name (Please Type or Print)

3.3 Director, Fuel Management Department — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2 Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



YDK008924

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 995601442801

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44426

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 45.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 194 Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] ____ [handwritten date] 1992
Authorized Purchaser Signature — Date

3.2 Rudolph H. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2 ____
Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



YDK008925

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0250
Expires: 11/30/93

## U.S. DEPARTMENT OF ENERGY

### APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 005601442801

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44428

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 47.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 204 Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] 25 Sept 1992
Authorized Purchaser Signature — Date

3.2 Rudolph H. Gruba
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



YDK008926

**Department of Energy**
Washington, DC 20585

RECEIVED
DEC 10 1992
Yankee Atomic Electric Company

DEC 01 1992

Mr. J. M. Buchheit
Contract Administrator
Yankee Atomic Electric Company
580 Main Street
Bolton, MA 01740-1398

Dear Mr. Buchheit:

The Department of Energy (DOE) has reviewed the three Delivery Commitment Schedules (DCS) submitted by Yankee Atomic Electric Company (YAEC), dated September 25, 1992 (DCS numbers 98-5601-4428-01, 99-5601-4428-01, and 00-5601-4428-01). We have determined that Item 2.7 (Metric Tons Uranium) of each DCS was incorrectly completed.

In accordance with the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Waste (10 CFR Part 961), an annual Acceptance Priority Ranking (APR) report and an Annual Capacity Report (ACR) are issued. The APR establishes the order in which DOE allocates projected spent nuclear fuel (SNF) acceptance capacity. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The APR is the basis for allocating SNF acceptance capacity to each owner in the ACR. The ACR applies a ten-year projected waste acceptance rate to the APR, resulting in individual capacity allocations of projected acceptance capacity (measured in metric tons of uranium - MTU). The allocations in the ACR are the basis for DCS submittals.

As stated in the DCS Instructions for Item 2.7, "...the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." Based on the December 1991 Annual Capacity Report (ACR), YAEC exceeded its allocations for each DCS.

| DCS Number | Year | Allocation in ACR | Item 2.7 of DCS |
|---|---|---|---|
| 98-5601-4428-01 | 1998 | 9.84 MTU | 47.1 MTU |
| 99-5601-4428-01 | 1999 | 10.09 MTU | 45.1 MTU |
| 00-5601-4428-01 | 2000 | 9.65 MTU | 47.1 MTU |

Note that once Item 2.7 is revised, Item 2.8 will require revision as well.

As a result of these errors, DCS numbers 98-5601-4428-01, 99-5601-4428-01, and 00-5601-4428-01 have been disapproved. Consistent with Article V.B.1 of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, I am requesting that you submit revised DCSs to correct these errors within 30 days of receipt of this notification. To assist you in revising these DCSs, a copy of the "Instructions for Completing the Appendix C Delivery Commitment Schedule" is enclosed as are additional DCS forms.

DEFENDANT'S EXHIBIT 030.004

YDK021597

Should you have any questions concerning this action, please contact Nick Graham of my staff on (202)634-4415 or Nancy Montgomery of the Department's Office of Civilian Radioactive Waste Management on (202) 586-8320.

Linda Strand
Contracting Officer
Office of Placement and
Administration

Enclosures

cc: R. M. Grube

YDK021598

MEMORANDUM

YANKEE ATOMIC - BOLTON

| | | | |
|---|---|---|---|
| To | R. M. Grube | Date | September 25, 1992 |
| From | J. M. Buchheit | Group # | FMD 92-616 |
| | | W.O.# | |
| Subject | YANKEE DELIVERY COMMITMENT SCHEDULES (DCS) | LM.S.# | Y-L03-04-01 |
| | | File # | |

SUMMARY/RECOMMENDATION

The Standard Contract for spent fuel disposal requires Yankee to submit a Delivery Commitment Schedule (DCS) to DOE for at least the first year of operation of DOE's Waste Management System (WMS), currently considered by DOE to be 1998, by September 30 1992. DOE's instructions for DCS submittal specify that the quantity which DOE will accept must not exceed allocations specified in the December 1991 Annual Capacity Report (ACR). Along with year one, DCSs can also be submitted for any of succeeding year's allocations listed in the ACR. We recommend that Yankee deviate from DOE's instructions to comply with ACR allocations and request that DOE accept all of Yankee's spent fuel in the first three years of WMS operation.

DISCUSSION

The Standard Contract for Disposal of Spent Nuclear Fuel/High Level Radioactive Waste requires that purchasers who have allocations for spent fuel disposal in the 1991 ACR in the first year of WMS operation, currently considered by DOE to be 1998, must submit a DCS for this allocation to DOE by no later than September 30, 1992. Failure to do so will result in Yankee loosing its place in the queue; i.e. Yankee would have no allocation rights in year one. A copy of the DCS form is attached. A purchaser's allocation is based on the 1991 Acceptance Priority Ranking which is a listing of all domestic spent fuel discharged through December 1990 in chronological order, with oldest fuel first.

Although a purchaser is only required to submit a DCS if it has an allocation in the first year, DOE does not prohibit submittals for any of the purchaser's allocations during the 10 years of WMS operation shown in the ACR. In fact, DOE requests that each purchaser submit DCSs for as many allocations as possible to assist them in the planning of the WMS.

I have attached the schedule from the ACR showing Yankee's projected delivery allocation during the initial 10 years of WMS operation. It shows that DOE will accept a total of 56.1 MTU of spent fuel during the period. Deliveries are scheduled in years one through four and six and eight. This quantity is less than half the fuel in the pool. Although, instructions for completing



DEFENDANT'S EXHIBIT 035

YDK037423

YDK037423

the DCSs say DOE will reject those which do not correspond with the allocations shown in the 1991 ACR, it is recommended that we deviate from DOE's instructions and request DOE accept all of YNPS spent fuel during the first three years of WMS operation. In doing this we will not jeopardize our right to an allocation in the initial year of WMS operation. However, DOE has the right to reject our request and if rejected will require us to submit revised DCSs. Further, if DOE does not accept the revised DCSs, we are required to negotiate an acceptable schedule with DOE.

Acceptance of all YNPS spent fuel within three years of WMS startup is consistent with Yankee's desire to remove spent fuel from the site as soon as possible to permit orderly decommissioning. It should also be logistically possible to remove all of the spent fuel over a three year period with the proper compliment of multi-element truck casks. More significantly, our request to deliver all YNPS spent fuel on an accelerated schedule will highlight the importance to us for timely acceptance and removal of spent fuel from YNPS. Hopefully, our request will have positive effects especially for those reactors which are decommissioned or are currently contemplating decommissioning; i.e. that it will play a role in convincing DOE to either give priority to permanently shutdown reactors or perhaps increase acceptance rates as a means of assuring timely decommissioning.

J. M. Buchheit
Sr. Nuclear Fuels Engineer

c: A. C. Kadak
A. A. H. Koch
F. X. Quinn
R. A. Mellor



YDK037424

YDK037424

the DCSs say DOE will reject those which do not correspond with the allocations shown in the 1991 ACR, it is recommended that we deviate from DOE's instructions and request DOE accept all of YNPS spent fuel during the first three years of WMS operation. In doing this we will not jeopardize our right to an allocation in the initial year of WMS operation. However, DOE has the right to reject our request and if rejected will require us to submit revised DCSs. Further, if DOE does not accept the revised DCSs, we are required to negotiate an acceptable schedule with DOE.

Acceptance of all YNPS spent fuel within three years of WMS startup is consistent with Yankee's desire to remove spent fuel from the site as soon as possible to permit orderly decommissioning. It should also be logistically possible to remove all of the spent fuel over a three year period with the proper compliment of multi-element truck casks. More significantly, our request to deliver all YNPS spent fuel on an accelerated schedule will highlight the importance to us for timely acceptance and removal of spent fuel from YNPS. Hopefully, our request will have positive effects especially for those reactors which are decommissioned or are currently contemplating decommissioning; i.e. that it will play a role in convincing DOE to either give priority to permanently shutdown reactors or perhaps increase acceptance rates as a means of assuring timely decommissioning.

J. M. Buchheit
Sr. Nuclear Fuels Engineer

c: A. C. Kadak
A. A. H. Koch
F. X. Quinn
R. A. Mellor



YDK037424

YDK037424

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: ______________________

1.2 Contact Person:
(a) Name: ______________________
(b) Telephone (include Area Code): ______________

1.3 Contract Number: ______________________

1.4 Reactor/Facility Information:
(a) Name: ______________________
(b) Address: ______________________
(c) City, State & Zip Code: ______________________

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ______________________
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck______; Rail______; Barge______
2.4 Proposed Delivery Date: ______________________
2.5 DOE Assigned Delivery Commitment Date: ______________ (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: ______________ ______________
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial)______________ (Discharged)______ (Not Required)
2.8 Number of Assemblies: BWR ______ PWR ______ Other ______

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 ______________________________________________
Authorized Purchaser Signature — Date

3.2 ______________________ 3.3 ______________________
Name (Please Type or Print) — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

______________________________________________
Technical Representative — Title — Date

4.2 ______________________________________________
Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



YDK037425

Yankee Annual Allocation For Delivery to DOE
From the 1991 Annual Capacity Report

| Year | MTU |
|---|---|
| 1 | 9.8 |
| 2 | 10.1 |
| 3 | 9.7 |
| 4 | 8.6 |
| 5 | - |
| 6 | 9.4 |
| 7 | - |
| 8 | - |
| 9 | 8.5 |
| 10 | - |
| Total MTU | 56.1 |



YDK037426

dk023771 (2544x3263x2 tiff)

# MEMORANDUM

## YANKEE ATOMIC - FRAMINGHAM

To W. H. Grube/R. A. Rich

From J. M. Buchheit

Subject PETITION FOR RULEMAKING TO AMEND THE NUCLEAR WASTE CONTRACT

Date January 20, 1984

Group #

W.O. # NHG 84-43

L.M.S. #

We recently received a draft Petition for Rulemaking and Memorandum in Support of Petition for Rulemaking from the UNWMG. Both documents were prepared by Shaw-Pitman for UNWMG and were dated January 5, 1984. Comments are due Shaw Pitman or EEI by February 15, 1984. The following 11 items were the subject of the petition.

1. The Contract should be disassociated from the rule. This would permit the DOE and the purchaser to make changes in the Contract without petitioning for a rulemaking.

2. The Contract should provide additional performance standards to assess DOE's progress toward meeting the goals established by the Nuclear Waste Policy Act. Presently there are no performance standards. Even though DOE is required to commence accepting spent fuel no later than January 31, 1998, the Contract is so vague it could be interpreted that, if DOE accepts one fuel assembly, it will meet its obligation.

3. The 1 mil per kilowatt hour fee should be based on net electrical generation instead of gross electrical generation. It seems clear that this was the intent of the Waste Act. Several utilities are currently challenging the DOE in court on this issue, namely, Wisconsin Electric Power Company, et al. Even though the court case is undecided, UNWMG believes that DOE should modify the final rule and the Contract without waiting for the court outcome.

4. The Contract should include program review for the purchasers. Those who are paying for the waste program should have access to the information necessary to review and evaluate the progress of the program.

5. The interest rates on overdue fees should be set at 130 percent of the quarterly Treasury rate. Presently, interest rates on unpaid fees are set at the quarterly Treasury rate plus 6 percent. Additionally, UNWMG is saying that the interest rate for the first three months on unpaid fees should be at the quarterly Treasury rate without any additional penalty.

6. The Contract should provide:

   a. Nuclear liability protection which is the same as that required of a contractor should DOE choose to act as its own transporter and/or be the operator of the waste facility.

   b. Liability protection through government indemnity or insurance.

YDK023771

DEFENDANT'S EXHIBIT 092

dk023772 (2544x3255x2 tiff)

E. H. Grube/R. A. Rich
January 20, 1984
Page 2

c. Indemnification to the purchaser for any claims connected with Contract performance by DOE or its contractors.

7. The Contract should be amended to eliminate liability of the purchaser for damage to shipping casks when this damage is not caused by the purchaser's negligence. DOE omitted the word "negligence" in the present Contract. If, for example, the damage was the result of a defect in the cask, the purchaser could be liable.

8. The standard/non-standard fuel classifications presented in Appendix E should be eliminated. These classifications apparently were taken from a draft of a DOE reprocessing contract. They are not needed in the Waste Contract.

9. The Contract should not require proof of ownership of spent nuclear fuel or high level wastes. Certification that the purchaser owns such spent fuel or high level waste should be adequate.

10. The Contract should require records retention for only five years after delivery of spent fuel or after the payment under the Contract of those records relating to such delivery or payment. Section 8(E)(3) of the Contract states that the purchaser <u>shall retain</u> such records for a period of three years from the completion of delivery of all materials under the Contract.

11. The Contract should be amended to eliminate any possible disparity between the fees for discharged fuel that is reinserted and the fees for incore fuel. For example, if a fuel assembly removed without plans for reinsertion had a burnup of 5,000 MWD/MT, a fee of $142/kgU would be assessed. If the same assembly was later reinserted and used to generate electricity, and if the final burnup were 30,000 MWD/MT, an additional charge of $195/kgU would be assessed. The total fee would be $337/kgU. If that same assembly was removed with plans for reinsertion and was classified as incore fuel, the total charge for a 30,000 MWD/MT burnup would be $234/kgU.

When EEI receives the comments, the Contract Task Force will reconvene in late February or early March to make any necessary revisions to this draft. A final draft will be submitted to the UNWMG Steering Committee at its spring meeting and to the EEI Nuclear Power Executive Advisory Committee at their meeting in May.

J. M. Buchheit
J. M. Buchheit
Senior Fuel Engineer

JMB/cah

cc: A. E. Soucy

YDK023772

L-3.7.c YAEC w/o Contract MB for FrL

MEMORANDUM

YANKEE ATOMIC - FRAMINGHAM

To R. M. Grube/R. A. Rich
Date October 19, 1983

From J. M. Buchheit
Group #
W.O. # NMG 83-647

Subject SEPTEMBER 27, 1983 UNWMG DOE CONTRACT TASK FORCE MEETING
I.M.S. #

ATTACHMENTS

1. Potential Issues to be Addressed in a Rulemaking Proceeding on the DOE Disposal Contracts

2. Attendance List

The meeting convened with a brief discussion on whether or not to go forward with a rulemaking proceeding. At the September 7, 1983 Steering Committee meeting, it was my understanding that the group's opinion was unanimous to go ahead subject to EEI Executive Advisory Committee approval. UNWMG attorneys estimated that it would take one to two months to prepare the petition to DOE, and that it would take three to four months more for the various committees within EEI to pass judgment on the petition.

The procedure for rulemaking was briefly described. Under the Administrative Procedures Act, virtually anyone can file for a rulemaking. A party must merely identify itself and what the issues are. DOE in turn can deny the petition. If DOE denies the petition, the reasons for such denial must be published in the Federal Register. If DOE goes ahead with a rulemaking proceeding, the proceeding must be published for comment in the Federal Register. DOE will probably allow a comment period of 30 to 60 days. DOE will make its decision after reviewing the comments. No public hearings are required. However, DOE could choose to have hearings as a means of encouraging public participation.

Possible adverse problems were discussed. A rulemaking procedure would open the contract to intervenors, and DOE could come up with a worse contract. However, an intervenor could challenge the contract at almost any time so we are not necessarily opening up the contract for challenge.

Prior to a rulemaking proceeding, we would discuss our petition with DOE. It was noted that DOE could publish a notice in the Federal Register requesting further comments before opening the contract to a rulemaking. It was also noted that DOE can select the issues it desires to address and ignore the others.

Concerning timing, it could be argued that because we have had little experience with the present contract, we should wait until we see how things work. On the other hand, we may not get favorable treatment from the DOE if

DEFENDANT'S EXHIBIT 092A



YDK045589

YDK045589

we delay on our petition for a rulemaking if, for example, a new administration takes office in 1984. A discussion of some of the issues addressed in Attachment 1 follows.

1. Contract as a Regulation:

In UNWMG's initial comments to DOE on the waste contract, we disagreed that the contract should be a regulation. We disagreed on the basis that this allows the intervenors to come in at any point in time and attempt to amend the contract, and that there is not enough flexibility in such a system. We cited the enrichment contracts as an example, stating they are not a regulation, that they have been workable, and can be amended without difficulty. It was noted that DOE itself has already been inconsistent in that a number of the Appendices to the contract were changed without prenotification in the Federal Register.

There are no signs, however, that DOE desires to accede to this change. DOE is likely to argue that if the contract is not a regulation, the public will not be able to participate in the contract in the future.

BFD, the "public" is not a party to the contract!

2. Lack of Milestones:

DOE's only requirement in the present contract is to take fuel by January 31, 1998. There are no specific performance standards. DOE is required to publish a Mission Plan in April 1984, which is to be approved by Congress. It was generally agreed that some statement concerning the Mission Plan should be incorporated into the contract with attendant dates. Also, the contract should be changed to incorporate receiving rates into the 1998 schedule.

3. The Gross Versus Net Issue:

Although Wisconsin Electric Power Company, et al., have sued the DOE over this issue, UNWMG counsel still felt that it would be useful to make this issue part of a rulemaking proceeding. The lawsuit and the rulemaking proceeding would leverage each other. In other words, the DOE may choose to Proceed directly with the rulemaking rather than go to Court. If it appears that it will be a long time before a decision is made on a rulemaking, we could go ahead with a lawsuit. As a matter of interest, OMB may have pressured DOE to select gross instead of net over concerns for balancing the budget.

No surprise!

4. Program Review Rights:

In our previous comments on the waste contract, we requested that utilities be given the right to audit the DOE program. If we petition the DOE for a rulemaking, it was suggested that we use the word review instead of audit. It was considered that it would be very difficult to perform an adequate audit and that the DOE may be more receptive to a review of their program rather than an audit.

dk045591 (2544x3377x2 tiff)

E. H. Grube/E. A. Rich
October 19, 1983
Page 3

5. Credits:

It was generally felt that the manner of credits was a sticky issue. There was some concern that rights to credits may encourage DOE to impose additional charges if costs for handling certain types of fuel exceeded the norm. There was general agreement that credits should not be addressed as a matter for the rulemaking.

The remaining issues in Attachment 1 were briefly addressed. We agreed that in addition to the Credit issue, Priorities and Allocations (6), Delays (13), and Separate Payment Schedules (14), need not be considered as part of this rulemaking.

J. H. Buchheit
Senior Fuels Engineer
Nuclear Materials Group

JHB/bal

Attachment

cc: P. A. Clark
J. T. Pearson
A. R. Soucy

YDK045591

# MEMORANDUM

To: A. R. Soucy — Date: May 17, 1983

From: R. H. Grube — File: FCH 83-42

Subject: NUCLEAR WASTE POLICY ACT FACT SHEET

Attached is the subject information which you requested. In addition, we have provided two pages of back-up data summarizing the Waste Policy Act and its financial implications to Yankee.

R. H. Grube
Fuel Cycle Department Manager

RHG/saj

Attachment

cc: R. A. Rich
E. E. Pilat
K. W. Ludwig
[redacted]

DEFENDANT'S EXHIBIT 102

YDK013697

YDK013697

NUCLEAR WASTE POLICY ACT
YANKEE MILESTONES

1983:

Jan 7 — President signed Waste Act

June 30 — Yankee signs DOE disposal contract

July 31 — Yankee makes first quarterly payment on new spent fuel

1985:

Jan 1 — DOE recommends 3 candidate repository sites

June 30 — Yankee selects payment option for old spent fuel

1987:

March 31 — President selects first repository site

1989:

Jan 1 — NRC approves construction at first site

1998:

Jan 31 — First repository operational

NUCLEAR WASTE POLICY ACT OF 1982

- Passed by Congress on December 20, 1982; signed by the President on January 7, 1983.
- The Act sets a schedule for repository development in deep geologic formations.
  - President decides on first site by March 31, 1987.
  - Decision on second site is required by March 31, 1990.
  - Final NRC decisions on construction of the two repositories are required by January 1, 1989 and January 1, 1992, respectively.
  - DOE is required to submit a proposal for monitored retrievable storage (MRS) to Congress by July 1985.
- "Interim Away-From-Reactor (AFR) storage of up to 1900 MTU spent fuel will be allowed at existing federal facilities, but only after all other alternatives have been exploited; a separate user's fee for AFR storage will be developed; after a permanent repository is operating, AFR storage must be phased out within three years.
- A state or Indian tribe may veto the selection of a repository site, MRS, or AFR with greater than 300 MT capacity; a majority vote of both House and Senate is needed to overturn the veto.
- Both high level waste (HLW) and spent fuel will be accepted for disposal in the repository. HLW is defined as the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste.
- A 1 mill per killowatt hour (M/kwh) fee is established for future spent fuel and an equivalent one-time per kg heavy metal (HM) fee for existing spent fuel will be developed; the fee will cover the repository, MRS, and transportation.
- The Federal government will take title to spent fuel at the reactor site and will transport it to either an AFR or repository.
- Each owner or generator of spent nuclear fuel or high level waste is required to sign a contract with the U.S. Government by the later of June 30, 1983, or date on which reactor commences operation.

SUMMARY OF FINANCIAL IMPLICATIONS

- A 1 M/kwh fee will be assessed by the Secretary of Energy (Secretary) for electricity generated beginning April 7, 1983.
- For existing spent fuel and fuel in the reactor core prior to April 7, 1983, a one-time fee per Kg HM in spent fuel has been established which is equivalent to an average charge of 1 M/kwh for the electricity originally generated by the spent fuel.




YDK013699

- Procedures for the collection and payment of the fees have been set forth in the Standard Contract Published by DOE on April 18, 1983.

- All fees shall be paid to the U.S. Treasury and deposited in the Nuclear Waste Fund.

- Once spent fuel or HLW is delivered to the Government, the utility will have no financial obligation beyond payment of the fee.

- The Secretary will review the 1 M/kwh fee annually to decide whether full cost recovery will be achieved or whether excess funds are being collected. If the Secretary determines there is a need for an adjustment, he shall transmit his proposal for adjustment to Congress, which has 90 working days to reject the proposal.

- In return for payment of the above fees, the Secretary, beginning no later than January 31, 1998, will dispose of the high level radioactive waste or spent fuel.

FINANCIAL IMPACT ON YANKEE

- Quarterly payments for 1 M/kwh due by the end of month following each calendar quarter.

- Approximate annual payment for the 1 M/kwh fee based on Yankee's average annual gross electrical generation is $1,200,000.

- The approximate fee for existing spent fuel and for fuel in-core prior to April 7, 1983 is $12,600,000.

  - Spent fuel 264 assy x 235 kg/assy x $184 = 11,400,000
    1 assy x 235 kg/assy x $80 = 19,000

  - In-core at 1 M/kwh estimate = 1,200,000

- Three (3) payment options for existing spent fuel and in-core fuel prior to April 7, 1983. Yankee must select its option by June 30, 1985.

  - Lump sum with no interest if paid on or before June 30, 1985.

  - Quarterly payments for 10 years with interest at T-bill rate with final payment to be made prior to first shipment to repository.

  - Lump sum payment with interest at T-bill rate at any time prior to first shipment to repository.


YDK013700

Yankee Atomic v. U.S. No.: 98-126C July 14, 2004

Page 574 to Page 793

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*

Page 574

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY, Plaintiffs, ) Case Nos.: 98-126C, 98-154C, 98-474C

v.

THE UNITED STATES, Defendant. ) Consolidated

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, July 14, 2004

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 575

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
MICHAEL R. MINER, ESQ.
VIVEK H. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
GERALD GARFIELD, ESQ.
General Counsel
Day, Berry & Howard, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0102

Page 576

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN ECKHAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 577

PROCEEDINGS

MR. SHAPIRO: Your Honor, we're ready to proceed with Dr. Bartlett.

THE COURT: Good.

MR. SHAPIRO: The plaintiffs call John Bartlett.

THE COURT: Okay.

Whereupon,

JOHN WESLEY BARTLETT

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

MR. SHAPIRO: Your Honor, once again, we have a notebook with some documents we would like to provide the witness and to provide copies to you as well, and to government counsel.

I know we have the fan, Your Honor, which is pleasant. But, obviously, if you have any trouble hearing, let us know.

THE COURT: I'm more worried about the reporter.

DIRECT EXAMINATION

BY MR. SHAPIRO:

Q Would you state your name for the record, please.

A My name is John Wesley Bartlett.

Page 710

you wouldn't be disrupting operations?
A You would generally not operate that way for optimal purposes at the reactor. You would campaign more on an 18 month or more schedule.
Q And you would want to pick up more than 1 cask –
A Yes.
Q – worth of fuel, wouldn't you?
A Yes. Yes.
Q Okay. I want to talk to you now, sir, about what you had been discussing or you had discussed on direct examination about eliminating the need for additional at-reactor storage.
When you were director of OCRWM, you did not do any calculation of what rate of acceptance would be necessary in order to preclude the need for additional at-reactor storage, correct?
A I did not, no.
Q And now as the Yankees' expert witness, you have not done any calculation of what rate of acceptance would be necessary to preclude the need for additional at-reactor storage; is that correct?
A I have not, no.
Q Okay. You have not done any calculation of what rate of acceptance would be necessary to preclude

Page 711

the need for additional at-reactor storage and work off the backlog, right?
A I have not done any direct calculation, but I would refer you back to the mission plan which established a 3,000-ton per year rate of acceptance to avoid the buildup of must-move fuel.
Q And you're talking about the 1985 mission plan?
A Yes.
Q You've told us today – and I'm going to come back to that in a second. You've told us today that 3,000 MTU acceptance rate that you advocate is designed, and I think this dovetails with what you're saying, is designed to remove part of the backlog that exists because of continuing generation of spent fuel.
A Yes.
Q Have I summarized that correctly?
A Yes.
Q The aggregate amount of fuel that's produced by all reactors each year is actually 2,000 MTU per year.
A That's right.
Q So that's what contributes to the backlog; is that right?
A That's right. Prior years of operation.

Page 712

Q But in order to eat away at that backlog, DOE would really just need to make sure that they accept more than 2,000 MTU per year; is that correct?
A An appropriate rate to maintain receipt of constant – or current generation and eat away the backlog is 3,000 MTU per year.
Q I understand that you feel that way, sir.
A Yes.
Q But what I actually want to find out about is, if DOE were to make sure that they accepted just more than 2,000 MTU per year, they would be eating away at the backlog, wouldn't they?
A At a very minor rate.
Q But they would?
A Yes.
Q So if they accepted, say, 2,100 MTU per year, they would be eating away at the backlog?
A At a very minor rate, yes.
Q They would be eating away at the backlog if they accepted, say, 2,500 MTU per year; is that right?
A Yes.
Q I want to ask you, sir, about one of the documents that you discussed with Mr. Shapiro. So if I could have you look back at your binder of exhibits that Mr. Shapiro gave you. Do you still have that?

Page 713

A I don't have that.
MS. HERRMANN: Mr. Shapiro, do you still have that?
BY MS. HERRMANN:
Q And I'm going to ask you, sir, about tab 1. Are you with me?
A Almost.
Q Okay. Take your time. I'm sorry.
A I'm stuck. Tab 1.
Q Okay. Looking at tab 1, which is Plaintiffs' Exhibit 175, the Civilian Radioactive Waste Management System Throughput Rate Analysis?
A Yes.
Q Does this document, sir – does this – let me put it this way: Is this document a system study –
A Yes, it is.
Q – as you defined it?
A Yes, it is.
Q Yes, it is. Am I correct that your testimony about this document was that you reviewed a draft of this document prior to the end of your tenure as director?
A No.
Q You –

Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, & 98-474C July 16, 2004

TRANSCRIPT FILED ~~UNDER SEAL~~

Page 1066 to Page 1322

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1070

June 1st, 2004 letter you also identify NAC International's assumption that actions taken to comply with the subpoenas, quote, will not give rise to an organizational conflict of interest, end quote.

As you know the Department of Justice is not involved in any future procurements relating to this litigation in which NAC International may have an interest and, as a result, has no basis for evaluating conflicts of interest that may exist in such procurements.

Accordingly, although we acknowledge your representation regarding conflicts of interest, we have no basis to take any position upon that representation.

THE COURT: Thank you, Mr. Lester.

Whereupon,

CHARLES W. PENNINGTON

having been previously duly sworn, was examined and testified further as follows:

VOIR DIRE EXAMINATION

BY MR. LESTER:

Q Mr. Pennington, I just have a couple of quick questions for you. I understand from your testimony yesterday that you have dealt a lot with dry storage casks and cost estimating for those; is that

Page 1072

Page 1150

Page 1151

. . . . We understand how much fuel is discharged every year by every reactor in the United States. And it's somewhere between 1500 metric tons and 2,000 metric tons.

Page 1152

Page 1153

Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004

Heritage Reporting Corporation

Page 3378 to Page 3660

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3606

the defense appropriation, and you're going to have to come up with the other 749 million. And right now my understanding is that there are discussions at very senior levels within the Office of Management and Budget and Congress in order to try to address this. But the simple answer to your question, and I didn't mean to go on, is we do not have direct access to that fund. It has to be appropriated by Congress.

And the industry over the years has made several attempts to try to get the waste fund used for its original purposes. And that legislation up until this point has not been passed.

THE COURT: Okay. Anything further?

MS. SULLIVAN: Nothing further, Your Honor. Thank you.

THE COURT: Okay. You're excused. And thank you very much for your testimony.

MR. MILLER: Your Honor, our next witness will be Mr. Robert Morgan.

THE COURT: Okay.

Whereupon,

ROBERT L. MORGAN

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

Page 3607

DIRECT EXAMINATION

BY MR. MILLER:

Q Good afternoon, Mr. Morgan. Would you state your full name for the record, please, sir.

A Robert L. Morgan.

Q And you are a former director of what started out to be the Nuclear Waste Policy Act project office, and what during your tenure became the Office of Civilian Radioactive Waste Management; is that correct?

A Yes. That's correct.

Q As we're talking here today, Mr. Morgan, you have to try to remember to let me finish my question before you answer so the court reporter doesn't have to try to decide which one of us she wants to reflect in the record. Do you think you can do that, sir?

A Yes.

Q All right. Thank you.

THE COURT: You can ask him questions, too.

MR. MILLER: I beg your pardon, Your Honor.

THE COURT: Go ahead. Off-the-record comments here.

BY MR. MILLER:

Q Mr. Morgan, I would like before we begin your substantive testimony to ask you just a few

Page 3608

questions about your educational background and your work experience.

So I'll ask you first, sir, if you graduated from the United States Military Academy in 1952?

A Yes.

Q And what degree did you obtain when you graduated?

A It's a bachelor of science in military engineering.

Q Okay. And at that time, you were commissioned as a second lieutenant in the United States Army?

A Yes. In the United States Army Corps of Engineers.

Q Okay. And if you will, please, sir, if you could just summarize for the Court what your subsequent assignments in the Army were.

A After graduation, there was an interim assignment of about 2-1/2 months in Fort Lewis, Washington on my way to Korea. I served with the 25th infantry division in Korea. After the war ended, I transferred to Japan. From Japan, I went to Fort Bragg with the 82nd airborne division.

And after 2 years there, the Army selected me to go to MIT. I spent 2 years there and received a

Page 3609

master of science in civil engineering and a master of science in nuclear engineering.

Subsequent to that, I went to Idaho Falls, Idaho, assigned to the U.S. – to the Atomic Energy Commission. Following that, I went to an advanced course at Fort Belvoir. Then to Indonesia as a special assistant to the ambassador for civic action. After my return from there, I resigned my commission from the military and joined the Atomic Energy Commission in 1965. Initially assigned for a year in Savannah River. I transferred to Southern California for reactor development. Spent 7 years there. I was selected as the deputy manager at Savannah River. I spent 7 years as deputy manager and then 8 years as manager before I retired from DOE at that time.

Q Okay, sir. And you retired from DOE in what year?

A 1988.

Q Okay, sir. Your assignment to the – to Idaho Falls – and I believe you mentioned that you were working with the Atomic Energy Commission at that time?

A That's correct.

Q And what was – what did that assignment

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract -- I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities -- I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was -- several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being -- I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific --
A No.
Q -- rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific -- I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you -- did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3654

And I didn't have any agreement with Mr. Mills.
Q All right, sir. I believe you said that you recalled Mr. Mills discussing with you the rates that are reflected in the draft mission plan --
A Yes.
Q -- that we've been talking about --
A Yes.
Q -- is that correct?
Do you recall that he said that the rates, the schedule there didn't comport with the utilities' understanding that he thought he had with you and other DOE officials about the acceptance rate that they expected under the contract?
A I did not have any agreements with Mr. Mills or any of the utilities as to rates of acceptance.
Q Under the contract?
A Under the contract or relative to this schedule, this table.
Q All right, sir. Just a few more questions and I believe I'll be finished with my direct testimony, Mr. Morgan.
Do you recall if before the Nuclear Waste Policy Act, was there a specific statutory direction to DOE to develop a repository?
A Not that I know of.

Page 3655

Q Okay. By the way, after you took over the program, did Mr. Brewer, Mr. Coffman, did they have anything to do with decision making on the program?
A No.
Q All right. So you and your new staff in the -- in the office were the -- were you the sole individuals responsible for implementing the act?
A I was responsible --
Q You were?
A -- for implementing the act.
Q The buck stopped with you; is that correct, sir?
A Yes, sir.
Q I'm sorry?
A Yes, sir.
Q And you reported to Secretary Hodel; is that correct?
A That's correct.
Q Okay. Between the time the draft contract was published and the final contract was published, had you begun to develop the design for the repository?
A That was in the process. So, yes, we would have started development of a design.
Q Okay. What about specific design --

Page 3656

repository design receipt rates? Had you begun to do that at the time the contract was formed?
A No.
Q Do you recall Mr. Mills representing to you or arguing to you that the acceptance rate under the contract should be the repository design receipt rate?
A There wasn't a receipt rate under -- in the contract.
Q Yes, sir.
A So the question again?
Q Yes. Do you recall that Mr. Mills asserted to you that that's the rate that should be in the contract, the repository design receipt rate?
A I don't -- I'm sure that he could have. I don't know.
Q Okay, sir. Had he done so at the time, would you have made a representation to him that the contract receipt rate would be the repository design receipt rate?
A Absolutely not.
Q And why was that? Why would you not have done so?
A Because we dealt with that in the rule-making process. And there was no way that I would go through a rule-making process without, you

Page 3657

know, in the contract, and denying a receipt rate and turn around and make a -- an agreement otherwise. That's ludicrous.
Q All right, sir. Do you recall if the contract did address the manner in which DOE would accept spent nuclear fuel from the utilities?
A Yes. In the appendices.
Q All right. And do you recall what the contract said about it in general?
A That there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time.
Q All right, sir. At the time the contract was finalized, did you know what that rate would be?
A No.
MR. MILLER: All right, sir. Just one moment, Your Honor, to make sure --
THE COURT: Take all the time you need.
MR. MILLER: All right. Your Honor, due to the lateness of the hour, is it all right that we break for tonight? It may be I have a few additional questions. I would sort of like to, especially considering the hour, to consider that.
THE COURT: Sure. We can do that.
MR. MILLER: All right. Thanks, Your Honor.

Page 3665

Q. Sir. if you can. just reading from the one-sentence paragraph that begins. "This is our basic strategy." do you see that?
A. Yes.
Q. If you could just read that to the end of the page. the rest of the page. please. sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court. Mr. Morgan. what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that. although the schedules we felt were very tight. it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry. sir. you said January 19 --
A. 1998.
Q. All right. sir.
A. And that even though it was tight. we had the alternative to kick in. which was the monitored retrievable storage program. and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

Page 3693

proceeding, there might have been a little bit of confusion on that point.

But ultimately, we're talking about the same relevancy. Thank you for your time.

THE WITNESS: You're welcome.

THE COURT: Any redirect?

MR. MILLER: Short redirect, Your Honor.

THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. You thought you were going to get away, didn't you, Mr. Morgan?

THE COURT: I don't blame you, you want to go back to Oregon, I think.

THE WITNESS: I now live in Colorado.

THE COURT: Oh, Colorado.

BY MR. MILLER:

Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?

A. Yes.

Q. Was that a deliberate choice on your part?

A. Yes.

Q. Did DOE feel -- well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.

Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?

A. Not in total because of the fact that NRC had not identified the requirements for licensing.

Q. Okay.

A. And quite honestly --

Q. I'm sorry.

A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.

Q. So that was a concern of yours?

A. Yes, that was a concern of mine.

Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.

Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?

A. No.

Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?

A. No, that was not part of the Act.

Q. Was that a program goal that you had at the time you were director --

A. That was a program goal that we identified in the mission plan.

Q. And is that a goal that DOE specifically declined to put in the contract?

A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?

A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.

MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.

THE COURT: Anything further?

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: All right. You're excused, and thank you very much for your testimony.

THE WITNESS: Thank you, sir.

MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.

Whereupon--

BENARD C. RUSCHE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Are you all set, Mr. Rusche?

CERTIFICATE OF FILING

I hereby certify that on this 27th day of January 2006, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.