Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, & 98-474C July 16, 2004

TRANSCRIPT FILED ~~UNDER SEAL~~

Page 1066 to Page 1322

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

June 1st, 2004 letter you also identify NAC International's assumption that actions taken to comply with the subpoenas, quote, will not give rise to an organizational conflict of interest, end quote. As you know the Department of Justice is not involved in any future procurements relating to this litigation in which NAC International may have an interest and, as a result, has no basis for evaluating conflicts of interest that may exist in such procurements.

Accordingly, although we acknowledge your representation regarding conflicts of interest, we have no basis to take any position upon that representation.

THE COURT: Thank you, Mr. Lester.

Whereupon,

CHARLES W. PENNINGTON

having been previously duly sworn, was examined and testified further as follows:

VOIR DIRE EXAMINATION

BY MR. LESTER:

Q Mr. Pennington, I just have a couple of quick questions for you. I understand from your testimony yesterday that you have dealt a lot with dry storage casks and cost estimating for those; is that

Page 1150

Page 1152

Page 1151

. —. We understand how much fuel is discharged every year by every reactor in the United States. And it's somewhere between 1500 metric tons and 2,000 metric tons.

Page 1153

29

Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004

Heritage Reporting Corporation

Page 3378 to Page 3660

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3606

the defense appropriation, and you're going to have to come up with the other 749 million. And right now my understanding is that there are discussions at very senior levels within the Office of Management and Budget and Congress in order to try to address this. But the simple answer to your question, and I didn't mean to go on, is we do not have direct access to that fund. It has to be appropriated by Congress.

And the industry over the years has made several attempts to try to get the waste fund used for its original purposes. And that legislation up until this point has not been passed.

THE COURT: Okay. Anything further?

MS. SULLIVAN: Nothing further, Your Honor. Thank you.

THE COURT: Okay. You're excused. And thank you very much for your testimony.

MR. MILLER: Your Honor, our next witness will be Mr. Robert Morgan.

THE COURT: Okay.

Whereupon,

ROBERT L. MORGAN

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

Page 3607

DIRECT EXAMINATION

BY MR. MILLER:

Q Good afternoon, Mr. Morgan. Would you state your full name for the record, please, sir.

A Robert L. Morgan.

Q And you are a former director of what started out to be the Nuclear Waste Policy Act project office, and what during your tenure became the Office of Civilian Radioactive Waste Management; is that correct?

A Yes. That's correct.

Q As we're talking here today, Mr. Morgan, you have to try to remember to let me finish my question before you answer so the court reporter doesn't have to try to decide which one of us she wants to reflect in the record. Do you think you can do that, sir?

A Yes.

Q All right. Thank you.

THE COURT: You can ask him questions, too.

MR. MILLER: I beg your pardon, Your Honor.

THE COURT: Go ahead. Off-the-record comments here.

BY MR. MILLER:

Q Mr. Morgan, I would like before we begin your substantive testimony to ask you just a few

Page 3608

questions about your educational background and your work experience.

So I'll ask you first, sir, if you graduated from the United States Military Academy in 1952?

A Yes.

Q And what degree did you obtain when you graduated?

A It's a bachelor of science in military engineering.

Q Okay. And at that time, you were commissioned as a second lieutenant in the United States Army?

A Yes. In the United States Army Corps of Engineers.

Q Okay. And if you will, please, sir, if you could just summarize for the Court what your subsequent assignments in the Army were.

A After graduation, there was an interim assignment of about 2-1/2 months in Fort Lewis, Washington on my way to Korea. I served with the 25th infantry division in Korea. After the war ended, I transferred to Japan. From Japan, I went to Fort Bragg with the 82nd airborne division.

And after 2 years there, the Army selected me to go to MIT. I spent 2 years there and received a

Page 3609

master of science in civil engineering and a master of science in nuclear engineering.

Subsequent to that, I went to Idaho Falls, Idaho, assigned to the U.S. – to the Atomic Energy Commission. Following that, I went to an advanced course at Fort Belvoir. Then to Indonesia as a special assistant to the ambassador for civic action.

After my return from there, I resigned my commission from the military and joined the Atomic Energy Commission in 1965. Initially assigned for a year in Savannah River. I transferred to Southern California for reactor development. Spent 7 years there. I was selected as the deputy manager at Savannah River. I spent 7 years as deputy manager and then 8 years as manager before I retired from DOE at that time.

Q Okay, sir. And you retired from DOE in what year?

A 1988.

Q Okay, sir. Your assignment to the – to Idaho Falls – and I believe you mentioned that you were working with the Atomic Energy Commission at that time?

A That's correct.

Q And what was – what did that assignment

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract -- I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities -- I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was -- several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being -- I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific --
A No.
Q -- rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific -- I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you -- did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3654

And I didn't have any agreement with Mr. Mills.

Q All right, sir. I believe you said that you recalled Mr. Mills discussing with you the rates that are reflected in the draft mission plan –

A Yes.

Q – that we've been talking about –

A Yes.

Q – is that correct?

Do you recall that he said that the rates, the schedule there didn't comport with the utilities' understanding that he thought he had with you and other DOE officials about the acceptance rate that they expected under the contract?

A I did not have any agreements with Mr. Mills or any of the utilities as to rates of acceptance.

Q Under the contract?

A Under the contract or relative to this schedule, this table.

Q All right, sir. Just a few more questions and I believe I'll be finished with my direct testimony, Mr. Morgan.

Do you recall if before the Nuclear Waste Policy Act, was there a specific statutory direction to DOE to develop a repository?

A Not that I know of.

Page 3655

Q Okay. By the way, after you took over the program, did Mr. Brewer, Mr. Coffman, did they have anything to do with decision making on the program?

A No.

Q All right. So you and your new staff in the – in the office were the – were you the sole individuals responsible for implementing the act?

A I was responsible –

Q You were?

A – for implementing the act.

Q The buck stopped with you; is that correct, sir?

A Yes, sir.

Q I'm sorry?

A Yes, sir.

Q And you reported to Secretary Hodel; is that correct?

A That's correct.

Q Okay. Between the time the draft contract was published and the final contract was published, had you begun to develop the design for the repository?

A That was in the process. So, yes, we would have started development of a design.

Q Okay. What about specific design –

Page 3656

repository design receipt rates? Had you begun to do that at the time the contract was formed?

A No.

Q Do you recall Mr. Mills representing to you or arguing to you that the acceptance rate under the contract should be the repository design receipt rate?

A There wasn't a receipt rate under – in the contract.

Q Yes, sir.

A So the question again?

Q Yes. Do you recall that Mr. Mills asserted to you that that's the rate that should be in the contract, the repository design receipt rate?

A I don't – I'm sure that he could have. I don't know.

Q Okay, sir. Had he done so at the time, would you have made a representation to him that the contract receipt rate would be the repository design receipt rate?

A Absolutely not.

Q And why was that? Why would you not have done so?

A Because we dealt with that in the rule-making process. And there was no way that I would go through a rule-making process without, you

Page 3657

know, in the contract, and denying a receipt rate and turn around and make a – an agreement otherwise. That's ludicrous.

Q All right, sir. Do you recall if the contract did address the manner in which DOE would accept spent nuclear fuel from the utilities?

A Yes. In the appendices.

Q All right. And do you recall what the contract said about it in general?

A That there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time.

Q All right, sir. At the time the contract was finalized, did you know what that rate would be?

A No.

MR. MILLER: All right, sir. Just one moment, Your Honor, to make sure –

THE COURT: Take all the time you need.

MR. MILLER: All right. Your Honor, due to the lateness of the hour, is it all right that we break for tonight? It may be I have a few additional questions. I would sort of like to, especially considering the hour, to consider that.

THE COURT: Sure. We can do that.

MR. MILLER: All right. Thanks, Your Honor.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?

A. Yes.

Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.

A. I'm done.

Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?

A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.

Q. I'm sorry, sir, you said January 19 --

A. 1998.

Q. All right, sir.

A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?

A. Yes.

Q. All right, sir.

MR. MILLER: No further questions at this time, Your Honor.

THE COURT: Okay. Cross-examination.

MR. MILLER: Mr. Morgan, do you need some water up there?

THE WITNESS: I would appreciate it.

MR. MILLER: All right.

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q. Good morning, Mr. Morgan.

A. Good morning.

Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?

A. That's correct.

Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.

Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?

A. No, I was busy with other activities.

Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?

A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.

Q. But other than your informal interactions with Mr. Rusche?

A. That's correct.

Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?

A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?

A. Well, that was defined in the contract.

Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?

A. Did I deal with the acceptance of fuel?

Q. Right.

A. We accepted no fuel during the time that I was there.

Q. So you didn't have occasion to deal with those issues?

A. That's correct.

Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?

A. No, that had started before I arrived.

Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?

A. I didn't, I don't understand the question.

Q. The Nuclear Waste Policy Act directs that

Page 3693

proceeding, there might have been a little bit of confusion on that point.

But ultimately, we're talking about the same relevancy. Thank you for your time.

THE WITNESS: You're welcome.

THE COURT: Any redirect?

MR. MILLER: Short redirect, Your Honor.

THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. You thought you were going to get away, didn't you, Mr. Morgan?

THE COURT: I don't blame you, you want to go back to Oregon, I think.

THE WITNESS: I now live in Colorado.

THE COURT: Oh, Colorado.

BY MR. MILLER:

Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?

A. Yes.

Q. Was that a deliberate choice on your part?

A. Yes.

Q. Did DOE feel -- well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.

Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?

A. Not in total because of the fact that NRC had not identified the requirements for licensing.

Q. Okay.

A. And quite honestly --

Q. I'm sorry.

A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.

Q. So that was a concern of yours?

A. Yes, that was a concern of mine.

Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.

Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?

A. No.

Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?

A. No, that was not part of the Act.

Q. Was that a program goal that you had at the time you were director --

A. That was a program goal that we identified in the mission plan.

Q. And is that a goal that DOE specifically declined to put in the contract?

A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?

A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.

MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.

THE COURT: Anything further?

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: All right. You're excused, and thank you very much for your testimony.

THE WITNESS: Thank you, sir.

MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.

Whereupon--

BENARD C. RUSCHE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Are you all set, Mr. Rusche?

## CERTIFICATE OF FILING

I hereby certify that on this 27th day of January 2006, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.