IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed on July 22, 2008)

| | | |
|---|---|---|
| **THE DETROIT EDISON COMPANY**, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-926C |
| | ) | (Judge Williams) |
| **THE UNITED STATES**, | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT**

Plaintiff, The Detroit Edison Company ("Detroit Edison"), for its first amended complaint and supplemental in this action,[1] alleges as follows:

**NATURE OF THE CASE**

1. Detroit Edison brings this lawsuit to recover significant damages caused by the Department of Energy's ("DOE") material partial breach of its unconditional obligation to begin disposing of spent nuclear fuel and high level nuclear waste (collectively, "SNF") generated by the commercial nuclear power plant owned and operated by Detroit Edison. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), DOE and Detroit Edison entered into a contract in 1983 under which Detroit Edison has paid and continues to pay substantial fees in return for DOE's obligation to remove and dispose of SNF beginning no later than January 31, 1998. Detroit Edison has fully complied with its fee payment obligations under the contract. DOE, however, has failed to perform its reciprocal obligation to dispose of SNF, and has stated that it will not do so until 2020 at the earliest.

[1] Because Defendant (the "Government") filed an Answer in this case on October 31, 2002, Detroit Edison seeks leave from the Court to file this pleading through a motion filed contemporaneously herewith. See RCFC 15(a).

Detroit Edison has incurred and will continue to incur significant costs associated with procuring additional SNF storage capacity and other damages as a result of DOE's total disregard of its contractual obligations.

## PARTIES

2. Detroit Edison is the owner and operator of the Fermi 2 Nuclear Power Plant ("Fermi"), located in Monroe County, Michigan, for which an operating license was issued by the Nuclear Regulatory Commission ("NRC") in July 1985. The Fermi 2 nuclear plant has generated and continues to generate SNF, which is stored at the plant site. Detroit Edison has entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") with DOE pursuant to which DOE is to accept and dispose of the SNF generated by Detroit Edison's nuclear plant in return for payment of specified fees by Detroit Edison.

3. Defendant is the United States of America, acting through DOE.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1).

5. DOE's complete failure to comply with its essential contractual obligation to begin disposing of SNF by January 31, 1998 constitutes a material partial breach of its Standard Contract with Detroit Edison, for which Detroit Edison may seek recovery of its damages without exhausting any administrative remedies. In companion decisions handed down on August 31, 2000, the Federal Circuit has conclusively rejected the Government's exhaustion of remedies jurisdictional defense. See Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) ("Northern States"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee").

6. Furthermore, Article XI of the Standard Contract states, "Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, Detroit Edison is entitled to pursue its legal claims without exhausting any administrative remedies.

## FACTUAL BACKGROUND

### The Standard Contract

7. In 1982, Congress enacted the NWPA, codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of commercial SNF. Pursuant to Section 302(a)(5)(B) of the NWPA, 42 U.S.C. § 10222(a)(5)(B), DOE was required to commence disposing of commercially-generated SNF no later than January 31, 1998, in return for the payment of fees by utilities and others that generated or held title to the SNF. The fees are paid into the Nuclear Waste Fund, which is the source of funds to cover DOE's costs for disposing of SNF.

8. Pursuant to Section 302 of the NWPA, in 1983 DOE developed the Standard Contract. The Standard Contract embodies the reciprocal obligations mandated by the NWPA, pursuant to which contract holders agree to pay fees into the Nuclear Waste Fund in return for the provision of SNF disposal services by DOE, beginning no later than January 31, 1998. See 10 C.F.R. Part 961.11. Specifically, the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." 10 C.F.R. § 961.11, Art. II.

9. Detroit Edison executed its Standard Contract with DOE on June 27, 1983. As of September 2002, Detroit Edison had paid more than $84 million into the Nuclear Waste Fund pursuant to this contract and continued to pay fees of between $8 and $9 million per year.

**DOE's Anticipatory Breach of the Contractual Deadline**

10. Notwithstanding the obligation imposed upon DOE by the Standard Contract, DOE failed to meet most of the early milestones established by the NWPA. These early failures eventually led to problems further along the program schedule, particularly in establishing the geologic repository called for by the NWPA. At the same time, however, DOE continued to make commitments and representations that it would begin to dispose of SNF by the 1998 deadline.

11. For example, in a September 7, 1984 letter by Donald P. Hodel, then Secretary of Energy, to United States Senator J. Bennett Johnston, Secretary Hodel stated, "Pursuant to my authority, it is my intention that this commitment together with the overall thrust of the [NWPA], will create an obligation for [DOE] to accept spent fuel in 1998 whether or not a repository is in operation."

12. Similarly, in its 1987 Mission Plan Amendment, DOE announced that the geologic repository called for by the NWPA would not be available until 2003. DOE indicated, however, that it would be able to begin accepting SNF by 1998 at a Monitored Retrievable Storage ("MRS") facility designed to store SNF until commencement of repository operation.

13. Congress substantially amended the NWPA in 1987. As amended, the NWPA required DOE to focus its entire repository development effort on characterizing Yucca Mountain, Nevada, one of the earlier-identified candidate sites, to determine its suitability as the nation's first geologic repository. 42 U.S.C. § 10133. Congress also authorized DOE to construct a MRS but did not name a specific site. Rather, the NWPA provided two different options for siting a MRS. Under the first option, an MRS could be sited through the efforts of the Nuclear Waste Negotiator, an Executive Branch position created by the 1987 Amendments. 42 U.S.C. §§ 10242-10249. Under the second option for MRS siting, DOE was authorized to

site and develop an MRS on its own, but on a schedule that was linked by the NWPA to the development of the repository. 42 U.S.C. §§ 10165(b), 10168(d).

14. By 1987, the repository program was more than ten years behind schedule. Despite the fact that, in less than five years, the repository program had fallen ten years behind schedule, DOE relied solely on the efforts of the Nuclear Waste Negotiator for development of the MRS. DOE did not develop any contingency plans for meeting the January 31, 1998 deadline in the event that the Negotiator was unsuccessful, a state of events that continued even after the Negotiator's authority expired with the unsuccessful completion of his mission. Not surprisingly, DOE's waste disposal program fell further behind schedule.

15. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation") wherein DOE retreated from its earlier acknowledgments that it had an unconditional obligation to begin disposing of SNF by January 31, 1998. 60 Fed. Reg. 21973, 21974 (May 3, 1995). In its Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998," and that it would commence disposing of SNF at a repository by 2010 at the earliest. 60 Fed. Reg. at 21794. The Final Interpretation also stated DOE's conclusion that the NWPA does not impose an obligation on DOE to commence disposing of contract holders' SNF in 1998 in the absence of a disposal or interim storage facility. Id. at 21794-95.

**DOE's Breach of its Contractual Obligation**

16. Various utilities filed petitions for review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit ruled in favor of the petitioners and held that the NWPA imposed on DOE an unconditional obligation to begin disposing of SNF by January 31, 1998. Indiana Michigan Power Co, v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The Court further held that this obligation was reciprocal to the

utilities' obligation to pay fees into the Nuclear Waste Fund. The Court remanded the matter to DOE for proceedings consistent with the opinion.

17. Notwithstanding the D.C. Circuit's unequivocal ruling, DOE advised Detroit Edison and other Standard Contract holders that it would not begin to dispose of SNF by the January 31, 1998 deadline. Specifically, DOE announced in a December 17, 1996 letter to contract holders "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." DOE further took the position that its failure to meet the deadline was excused because its delay was unavoidable.

18. In response to DOE's recalcitrance, Detroit Edison and other utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel DOE to comply with the mandate in Indiana Michigan. In Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997) ("Northern States I"), the D.C. Circuit reiterated that DOE had an unconditional obligation under both the NWPA and the Standard Contract to begin disposing of utilities' SNF by January 31, 1998. The Court also held that DOE had a clear duty to act in accordance with this unconditional obligation and issued a writ of mandamus precluding DOE from arguing that its failure to meet the January 31, 1998 deadline was unavoidable. On November 30, 1998, the United States Supreme Court denied DOE's petition for a writ of certiorari in the Northern States I case, 525 U.S. 1016 (1998).

19. Despite the ruling in Northern States I, DOE made no effort to meet the contractual deadline. DOE did not begin to dispose of SNF by January 31, 1998, as required by the NWPA and Standard Contract, and has maintained the position announced prior to the D.C. Circuit's rulings that it will not begin to dispose of SNF until 2010 at the earliest. In recent years, DOE initially stated that the "best-achievable" date to begin receipt of SNF was March 31, 2017. This date was one that DOE characterized as "aggressive" and assumed among other highly optimistic assumptions "the absence of litigation related delays." Statement of Edward F.

Sproat III, Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, before the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (July 19, 2006). More recently, DOE stated that repository operations could begin as early as 2020 assuming an "unconstrained cash flow" from appropriations once the NRC has issued its construction authorization.

20. In Maine Yankee, decided by the Federal Circuit on August 31, 2000, the Federal Circuit concluded that DOE's admitted failure to begin accepting spent nuclear fuel by the January 31, 1998 contractual deadline constituted a breach of the Standard Contract. In the companion Northern States case, the Federal Circuit held that the unavoidable delays provision of the contract "does not bar a suit seeking damages for the Government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." Northern States, 224 F.3d at 1367. In summary, the Federal Circuit has determined as a matter of law that DOE breached the contract and that Detroit Edison and other similarly situated utilities that are parties to the Standard Contract can bring an action for breach of contract damages in this Court.

**Nature of Damages Sustained by Detroit Edison as a Result of DOE's Breach**

21. As a direct consequence of DOE's disregard of its contractual obligations and defiance of the D.C. Circuit's rulings, Detroit Edison has been and will be forced to incur substantial additional costs to provide for extended on-site storage of its SNF. Moreover, Detroit Edison has incurred and will continue to incur other substantial damages, including but not limited to regulatory costs associated with efforts to ensure sufficient on-site storage capacity or alternative off-site storage capacity to permit continued operation of its nuclear plant.

## CLAIMS FOR RELIEF

## COUNT I

**(Partial Breach of Contract)**

22. Paragraphs 1 through 21 are incorporated herein by reference as if set forth in full.

23. Detroit Edison has complied and continues to comply with all of its obligations under the Standard Contract, including the payment of all required fees into the Nuclear Waste Fund.

24. DOE has failed to perform its obligation under the Standard Contract to dispose of SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contract.

25. As a direct and proximate result of DOE's partial breach of the Standard Contract, Detroit Edison has incurred and will incur damages in an amount to be determined at trial. The rate at which Detroit Edison's damages will continue to accrue is dependent upon various factors including but not limited to when DOE commences performance of its contractual obligations, and Detroit Edison reserves all rights to recover presently unascertainable damages that may be caused by DOE's continuing partial breach of the Standard Contract.

## COUNT II

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

26. Paragraphs 1 through 25 are incorporated herein by reference as if fully set forth in full.

27. The Standard Contract between Detroit Edison and DOE contains an implied covenant of good faith and fair dealing, pursuant to which DOE has a duty to perform its

obligations under the contract in good faith and not to take actions detrimental to Detroit Edison's contractual rights. DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting to avoid its obligations under the contract as defined by the D.C. Circuit; by failing to make any effort to dispose of Detroit Edison's SNF or even to provide Detroit Edison with a firm date on which DOE will begin to do so; and by insisting on Detroit Edison's continued performance of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

28. DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

29. In contrast to DOE's failure to take any action to meet its contractual commitments, DOE has taken action to receive, transport and store SNF from other entities. For example, DOE continues to accept and store SNF from foreign research reactors.

30. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Detroit Edison has suffered and will continue to suffer damages as alleged above.

**COUNT III**

**(Taking Without Just Compensation)**

31. Paragraphs 1 through 30 are incorporated herein by reference as if set forth in full.

32. Based on its longstanding commitment to dispose of SNF, which was codified with a date certain in the NWPA, the Government was and is unequivocally obligated under the Standard Contract and NWPA to commence acceptance and disposal of SNF generated at Fermi no later than January 31, 1998.

33. The Government's failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of SNF generated at Fermi constitutes a taking of Detroit Edison's vested real property rights. For example, the Government's failure to honor its commitments under the Standard Contract will prevent Detroit Edison from being able to decommission its nuclear plant site and devote that site to other uses as soon as it otherwise would have been able to do so. The Government's conduct has deprived, and will continue to deprive, Detroit Edison of the full valuable economic use of that site, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed.

34. Detroit Edison is entitled to just compensation for this taking of Detroit Edison's vested contract rights and real property in an amount to be determined at trial.

## SUPPLEMENTAL PLEADING

35. Since the filing of the original complaint in this case, Detroit Edison has continued to pay fees into the Nuclear Waste Fund of between $8 and $9 million per year. To date, Detroit Edison has paid approximately $140 million into the Nuclear Waste Fund.

36. Since the filing of the original complaint in this case, Detroit Edison has incurred and continues to incur additional damages at Fermi, which damages arise from the same continuing partial breach of Detroit Edison's Standard Contract and continuing taking of Detroit Edison's property without just compensation by the Government.

37. Since the filing of the original complaint in this case, a number of transactions, occurrences, and events, *inter alia*, have taken place at Fermi as a direct and proximate result of the Government's continuing partial breach of Detroit Edison's Standard Contract and continuing taking of Detroit Edison's property without just compensation. For example, Detroit Edison incurred costs to re-rack the spent nuclear fuel pool at Fermi, and to design and construct a facility at Fermi to store SNF in concrete dry casks (i.e., an Independent Spent Fuel Storage Installation or "ISFSI"). In particular, costs have been expended to design, procure, and install new storage racks; design, license, and commence construction of the ISFSI and related facilities; purchase and construct dry fuel storage casks; purchase ancillary equipment; and upgrade certain cranes and other equipment and facilities at the plant.

38. As a direct and proximate result of DOE's continuing partial breach of Detroit Edison's Standard Contract, continuing taking of Detroit Edison's property without just compensation, and the actions taken in paragraph 37 above, Detroit Edison has incurred substantial damages in addition to those sought in the original Complaint in this case. The amount of these damages is to be determined at trial if the Government is found liable for breach of contract. Detroit Edison reserves all rights to recover damages incurred after this trial that result from the continuing partial breach of Detroit Edison's Standard Contract and continuing taking of Detroit Edison's property without just compensation by the Government.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Detroit Edison respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(a) On Count I, for damages in an amount to be established at trial;

(b) On Count II, for damages in an amount to be established at trial;

(c) On Count III, for damages in an amount to be established at trial;

(d) Pre-judgment and post-judgment interest as permitted by law;

(e) Costs of suit, including reasonable attorneys' fees as permitted by law; and

(f) Such other and further relief as this Court may deem proper.

Dated: July 22, 2008

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
The Detroit Edison Company

Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Thomas A. Hughes
Vice President and General Counsel

Bruce R. Maters
Assistant General Counsel

David G. Pettinari
Senior Attorney

**THE DETROIT EDISON COMPANY**
2000 Second Avenue
Detroit, MI 48226
(313) 235-8000